**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1019 (consolidated with No. 22-1020)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

EAGLE COUNTY, COLORADO,

Petitioner,

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,

Petitioners,

v.

SURFACE TRANSPORATION BOARD, ET AL,

Respondents,

SEVEN COUNTY INFRASTRUCTURE COALITION, ET AL.

Intervenors.

---

ON PETITION FOR REVIEW OF FINAL ACTION OF THE
SURFACE TRANSPORTATION BOARD

---

**PETITIONERS CENTER FOR BIOLOGICAL DIVERSITY, ET AL.'S
PROOF OPENING BRIEF IN SUPPORT OF PETITION FOR REVIEW**

---

Wendy Park
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7138
wpark@biologicaldiversity.org

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity, Living Rivers,
Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

### Parties

Petitioners are Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians.

Respondents are the Surface Transportation Board, United States of America, and U.S. Fish and Wildlife Service.

Respondent-Intervenors are the Seven County Infrastructure Coalition and Uinta Basin Railway, LLC.

The State of Utah has filed a notice stating it will file an amicus brief.

### Rulings under Review

Two agency actions are under review:

(1) The Surface Transportation Board's December 15, 2021 order authorizing the construction and operation of the Uinta Basin Railway in Utah and exempting the project from the certificate requirements of 49 U.S.C. § 10901. The ruling is located at Appendix __. The official agency citation is *Seven County Infrastructure Coalition—Rail Construction & Operation Exemption—In Utah, Carbon, Duchesne, & Uintah Counties, Utah*, FD 36284, slip op. (STB served Dec. 15, 2021), ID-51032; *see also* Seven County Infrastructure Coalition-Rail Construction & Operation Exemption-In Utah, Carbon, Duchesne, and Uintah Counties, Utah, 86 Fed. Reg. 72366 (Dec. 21, 2021).

i

(2) The U.S. Fish and Wildlife Service's September 20, 2021 Biological Opinion for the Uinta Basin Railway ("BiOp"). The BiOp is located at Appendix __.  No official agency citation exists for the BiOp.

## Related Cases

This case was not previously before any other court. This case has been consolidated with *Eagle County v. Surface Transportation Board*, No. 22-1019. Petitioners are unaware of any other related cases.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Petitioners Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians are non-profit organizations.

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASE ...................... i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS....................................................... iv

TABLE OF AUTHORITIES ................................................... vi

GLOSSARY................................................................ xi

JURISDICTIONAL STATEMENT ........................................... 1

STANDING ............................................................... 3

STATEMENT OF ISSUES ................................................... 4

STATUTES AND REGULATIONS............................................. 5

STATEMENT OF THE CASE................................................. 5

    I.     THE LEGAL FRAMEWORK ........................................... 5

          A. NEPA's EIS Requirement..................................... 5

          B.  The ESA's Consultation Requirement ......................... 6

          C.  Regulation of Railroad Construction and Operations .......... 7

    II.    FACTUAL BACKGROUND .................................... 8

          A. The Uinta Basin and the Uinta Basin Railway................. 8

          B.  The Board's Exemption Decision ............................ 10

SUMMARY OF ARGUMENT ................................................ 11

ARGUMENT .............................................................. 13

    I.     STANDARD OF REVIEW....................................... 13

II.    THE BOARD VIOLATED NEPA BY FAILING TO TAKE A 'HARD LOOK' AT THE RAILWAY'S IMPACTS.............................................13

    A. The EIS Failed to Consider the Railway's Intended Effect of Increasing Oil Production and its Environment Consequences..........14

        1. Increased Oil Production and Its Effects Were Reasonably Foreseeable Consequences of Authorizing the Railway................14

        2. The EIS Substantially Downplayed the Project's Harms by Mischaracterizing Certain Upstream Drilling Effects and Downstream Oil Burning Effects as Cumulative Effects..............19

        3. Even if Cumulative and Indirect Effects Analyses Were Interchangeable, Neither Analysis Here Disclosed Significant Upstream and Downstream Impacts .............................................23

        4. *Public Citizen* Does Not Excuse the Board's Failure to Properly Disclose the Project's Upstream and Downstream Impacts..........28

        5. The EIS's Consideration of the Project's Economic Benefits Without Full Consideration of Its Environmental Costs Violated NEPA .......................................................................................31

    B. The EIS Failed to Take a Hard Look at the Railway's Geological Risks ...................................................................................................33

III.    THE BIOP FAILED TO CONSIDER IMPORTANT EFFECTS ON THE ENDANGERED FISH, AND THE BOARD UNLAWFULLY RELIED ON THE DEFICIENT BIOP ................................................... 39

IV.    THE BOARD'S FAILURE TO CONSIDER RELEVANT FACTORS VIOLATED ICCTA AND THE APA ......................................................43

V.    THE BOARD'S DECISION SHOULD BE VACATED .......................48

CONCLUSION.................................................................................................49

CERTIFICATE OF COMPLIANCE......................................................................51

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. NRC*,
   988 F.2d 146 (D.C. Cir. 1993) ...............................................................48

*Am. Rivers & Ala. Rivers All. v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018) ................................................. 13, 41, 43

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................2

*Birckhead v. FERC*,
   925 F. 3d, 510 (D.C. Cir. 2019) ...........................................................19

*Black Oak Energy, LLC v. FERC*,
   725 F.3d 230 (D.C. Cir. 2013) ...............................................................48

*Chelsea Neighborhood Ass'n. v. U.S. Postal Serv.*,
    516 F.2d 378 (2nd Cir. 1975)................................................................32

*City of Tacoma v. Federal Energy Regulatory Comm'n ("FERC")*,
   460 F.3d 53 (D.C. Cir. 2006) ................................................. 2, 13, 42

*City of Tacoma v. Taxpayers of Tacoma*,
   357 U.S. 320 (1958) ................................................................................2

*Ctr. for Biological Diversity v. Haaland*,
   No. 19-cv-05206-JST, 2022 WL 2444455 (N.D. Cal. July 5, 2022) .................41

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) ................................................. 23, 47

*Davis v. Coleman*,
   521 F.2d 661 (9th Cir. 1975)..................................................................15

*Defenders of Wildlife v. U.S. EPA*,
   420 F.3d 946 (9th Cir. 2005)...................................................................3

*Delaware Riverkeeper Network v. FERC*,
   --- F.4th ---, 2022 WL 3036392 (D.C. Cir. Aug. 2, 2022)...................15

*DOT v. Public Citizen*,
    541 U.S. 752 (2004) ............................................................ 28, 29, 30

*Friends of the Earth v. Laidlaw*,
    528 U.S. 167 (2000) ........................................................................3

*High Country Conservation Advocates v. U.S. Forest Serv.*,
    52 F. Supp. 3d 1174 (D. Colo. 2014) ...........................................32

*Ill. Commerce Comm'n v. ICC*,
    787 F.2d 616 (D.C. Cir. 1986) ......................................................44

*In re Pub. Emples.*,
    957 F.3d 267 (D.C. Cir. 2020) ........................................................3

*Lemon v. Geren*,
    514 F.3d 1312 (D.C. Cir. 2008) ......................................................4

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) ................................................ 8, 16, 26

*N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*,
    374 F.3d 1177 (D.C. Cir. 2004) ....................................................48

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007) ........................................................................3

*Nat'l Parks Conservation Ass'n v. Jewell*,
    62 F. Supp. 3d 7 (D.D.C. 2014) ....................................................49

*Northern Plains Resource Council v. Surface Transportation Board*,
    668 F.3d 1067 (9th Cir. 2011) ......................................................37

*Oglala Sioux Tribe v. U.S. NRC*,
    896 F.3d 520 (D.C. Cir. 2018) ..................................................6, 39

*Public Emples. For Envtl. Responsibility v. Hopper*,
    827 F.3d 1077 (D.C. Cir. 2016) ........................................... 14, 36, 37

*Resources Ltd. v. Robertson*,
    35 F.3d 1300 (9th Cir. 1994) .........................................................43

*Riffin v. Surface Transp. Bd.*,
  592 F.3d 195 (D.C. Cir. 2010) ...............................................................13

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ......................................................................5, 37

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ...................................... 5, 16, 19, 26, 29, 30, 33

*Sierra Club v. Marsh*,
  769 F.2d 868 (1st Cir. 1985) ...............................................................15

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983).............................................................. 32, 33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  503, 519, 985 F.3d 1032 (D.C. 2021) .................................................. 33, 48, 49

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  139 S. Ct. 361 (2018) ........................................................................48

**Statutes**

16 U.S.C. § 1531(b) ..............................................................................6

16 U.S.C. § 1532(5)(A)(i) .......................................................................40

16 U.S.C. § 1532(6) ..............................................................................6

16 U.S.C. § 1536(a)(1)-(2).......................................................................42

16 U.S.C. § 1536(a)(2).........................................................................7, 43

16 U.S.C. § 1536(b)(3)(A).........................................................................7

28 U.S.C. § 2321(a) ..............................................................................1

28 U.S.C. § 2342(5) ..............................................................................1

42 U.S.C. § 4332(2)(C)............................................................................5

42 U.S.C. § 4332(2)(C)(i)-(iii)...................................................................6

49 U.S.C. § 10101(8) ........................................................... 7, 12, 36, 44, 49

49 U.S.C. § 10502 ............................................................................... 7

49 U.S.C. § 10502(a)(1) ............................................................. 31, 44

49 U.S.C. § 10901 ............................................................................. 7

49 U.S.C. § 10901(c) ..................................................................... 31

5 U.S.C. § 706(2)(A) ................................................................ 13, 48

5 U.S.C. § 706(2)(D) ...................................................................... 13

## Regulations

40 C.F.R. § 1500.1(b) ..................................................................... 34

40 C.F.R. § 1502.16 .......................................................................... 6

40 C.F.R. § 1506.13 (2020) ............................................................. 6

40 C.F.R. § 1508.7 ........................................................................ 6, 21

40 C.F.R. § 1508.8 ...................................................................... 14, 33

40 C.F.R. § 1508.8(b) ................................................................. 15, 20

50 C.F.R. § 402.01(b) ....................................................................... 6

50 C.F.R. § 402.02 .......................................................................... 41

50 C.F.R. § 402.14 .......................................................................... 40

50 C.F.R. § 402.14(a) ........................................................................ 7

50 C.F.R. § 402.14(b) ........................................................................ 7

50 C.F.R. § 402.14(d) ................................................................. 41, 43

50 C.F.R. § 402.14(g)(4) ...........................................................................41

**Administrative Decisions**

*Butler, Warren and Hamilton Counties*,
   9 ICC 2d 783, 791 (1993) ...................................................................45

*Cal. High-Speed Rail Auth.—Constr. Exemption—in Merced, Madera, and Fresno
Cntys., Cal.*,
   FD 35724, 2013 WL 3053064 (June 13, 2013) ....................................................8

*Texas Cent. R.R. and Infrastructure, Inc.—Pet. for Exemption—Passenger Rail
Line between Dallas & Houston, Tex.*,
   FD 36025, 2020 WL 4036897 (July 16, 2020) ...................................................46

**Other Authorities**

84 Fed. Reg. 44,976, 45,016 (Aug. 27, 2019) .........................................................41

84 Fed. Reg. 44,238, 44,245 (Aug. 23, 2019) .........................................................25

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Basin | Uinta Basin |
| BiOp | Biological Opinion |
| Board | Surface Transportation Board |
| bopd | barrels of oil per day |
| CG_FEIS_ | Reference submitted with Conservation Groups' final EIS comments, available at ID-303172 |
| Coalition | Seven County Infrastructure Coalition |
| Decision | the Board's final decision authorizing the project |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| ESA | Endangered Species Act |
| GHG | greenhouse gas emissions |
| ICC | Interstate Commerce Commission |
| ICCTA | Interstate Commerce Commission Termination Act |
| NEPA | National Environmental Policy Act |
| Railway | Uinta Basin Railway |
| Service | U.S. Fish and Wildlife Service |

| | |
|---|---|
| STB_ | Reference cited in the EIS, available from the Board |
| Tribe | Ute Indian Tribe |
| UP Line | Union Pacific Line |

## JURISDICTIONAL STATEMENT

Petitioners Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians ("Conservation Groups") seek review of two interdependent decisions: (1) the Surface Transportation Board's ("Board's") December 21, 2021 decision approving a construction and operation exemption for the Uinta Basin Railway; and (2) the U.S. Fish & Wildlife Service's ("Service's") September 20, 2021 Biological Opinion ("BiOp"), the terms of which are expressly incorporated into the Board's decision, and which the Board relies on for compliance with the Endangered Species Act ("ESA"). *See Seven County Infrastructure Coalition—Rail Construction & Operation Exemption—In Utah, Carbon, Duchesne, and Uintah Counties, Utah*, FD 36284, (STB served Dec. 15, 2021) (hereafter, "Decision"), slip op. at 50.

Congress granted this Court exclusive jurisdiction over challenges to final orders of the Board. 28 U.S.C. §§ 2342(5), 2321(a). Conservation Groups submitted comments on the Board's environmental impact statement (EIS), and thus were parties to the Board's decision. EI-26670, EI-30487, ID-303098. Conservation Groups timely filed a petition for review in this Court.

This Court also has jurisdiction over Conservation Groups' challenge to the Board's reliance on the Service's biological opinion to discharge the Board's

obligations under the ESA, and to the BiOp itself. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997) (holding that a BiOp is a final agency action due to its "powerful coercive effect" on an action agency). The Supreme Court and this Court have found in similar circumstances that the Court's jurisdiction encompasses "all issues inhering in the controversy" over which it has exclusive jurisdiction. *See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958) (where Congress granted appeals court "exclusive jurisdiction" over agency action, it "necessarily preclude[s] *de novo* litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review.").

In *City of Tacoma v. Federal Energy Regulatory Comm'n* ("*FERC*")*,* 460 F.3d 53, 76 ("*Tacoma II*") (D.C. Cir. 2006), this Court held that where Congress had provided the Court with exclusive judicial review of FERC licensing procedures, the court had jurisdiction to review a challenge to FERC's reliance on a challenged biological opinion prepared by the Service in the course of a licensing proceeding. "Although in other contexts a BiOp is subject to independent review in a proceeding in which the agency issuing the BiOp is a party, when a BiOp is prepared in the course of a FERC licensing proceeding, the only means of challenging the substantive validity of the BiOp is on review of FERC's decision in the court of appeals." *Id.* (citation omitted). The same is true here, where this Court has exclusive jurisdiction over challenges to the Board's decision, and where

2

the Board relied on the Service's BiOp. *See also In re Pub. Emples*., 957 F.3d 267, 271-72 (D.C. Cir. 2020) (federal appellate court's exclusive jurisdiction over FAA actions encompassed "any predicate environmental determinations by the [National Park Service]"); *Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 956 (9th Cir. 2005), *rev'd on other grounds by Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) (appellate court's exclusive jurisdiction over challenge to EPA permitting action led court to "conclude that we have jurisdiction to consider the adequacy of both the section 7 consultation and the Biological Opinion that resulted from it while reviewing the EPA's final decision").

## STANDING

To establish standing, Conservation Groups must show: (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that a favorable decision is likely to redress the injury. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180-81 (2000). Further, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*.

Conservation Groups' members are injured by the challenged approvals,

3

because they use and enjoy (1) areas where rail construction and operation will occur; (2) Uinta Basin areas at risk of increased oil and gas activities due to the Railway's operation; and (3) areas in the Gulf Coast likely to be impacted by the refining (and resulting air pollution) of additional oil induced by Railway construction. The challenged decisions, including the Board's "uninformed decisionmaking" under NEPA and the ESA, and the Service's flawed BiOp, threaten the Conservation Groups members' interests with "increased risk of environmental harm," *Lemon v. Geren*, 514 F.3d 1312, 1314-15 (D.C. Cir. 2008). *See* Addendum, Hamblin Decl.; Elder Decl.; Henley Decl.; Nichols Decl; Weisheit Decl.; Mannchen Decl.; Sakashita Decl. A favorable decision would redress these injuries by vacating the approvals.

## STATEMENT OF ISSUES

(1)     Whether the Board's review of the Uinta Basin Railway ("Railway") failed to take a hard look at (a) the Railway's intended effect of inducing greater oil production in the Uinta Basin and its environmental consequences and (b) its geological hazards, in violation of NEPA;

(2)     Whether the Service's BiOp arbitrarily failed to consider the consequences of Railway operations on Colorado River endangered fish and their critical habitat;

4

(3)     Whether the Board violated its ESA Section 7 duty to avoid jeopardy to the endangered fish, by relying on the BiOp to authorize the Railway; and

(4)     Whether the Board arbitrarily failed to consider relevant factors bearing on its decision to exempt the project from the Interstate Commerce Commission Termination Act's application requirement.

## STATUTES AND REGULATIONS

Pertinent statutory provisions and regulations appear in the Addendum.

## STATEMENT OF THE CASE

## I.    THE LEGAL FRAMEWORK

### A. NEPA's EIS Requirement

NEPA's environmental protection goals are achieved "through a set of action-forcing procedures that require agencies take a 'hard look' at environmental consequences …." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) *Id*. at 349 (citation omitted). "One of the most important procedures NEPA mandates is the preparation, as part of every 'major Federal action[] significantly affecting the quality of the human environment,' of a 'detailed statement' discussing and disclosing the environmental impact of the action." *Sierra Club v. FERC* ("*Sabal Trail*"), 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citing 42 U.S.C. § 4332(2)(C)). The EIS must analyze the proposed action's environmental consequences and alternatives to the proposal. 42 U.S.C. §

5

4332(2)(C)(i)-(iii); 40 C.F.R. § 1502.16.[1] Importantly, agencies must "take a '*hard look*' at environmental consequences *in advance* of deciding whether and how to proceed." *Oglala Sioux Tribe v. U.S. NRC*, 896 F.3d 520, 532 n.9 (D.C. Cir. 2018) (emphases added, citation omitted).

### B. The ESA's Consultation Requirement

Congress enacted the ESA to provide both a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] a program for the conservation of such" species. 16 U.S.C. § 1531(b). The ESA imposes duties on the Secretary of the Interior, which have been delegated to the Service. 50 C.F.R. § 402.01(b).

The ESA affords substantial protections to "endangered species" – a species "in danger of extinction." 16 U.S.C. § 1532(6). ESA Section 7 mandates that each federal agency "shall, in consultation with and with the assistance of the [Service], insure that any action authorized ... by such agency ... is not likely to jeopardize the continued existence of any endangered … species or result in the destruction or

---

[1] This action is governed by the Council on Environmental Quality's (CEQ) 1978 regulations. In July 2020, CEQ promulgated new regulations, which apply only "to any NEPA process begun after September 14, 2020," or where the agency has chosen to "apply the regulations in this subchapter to ongoing activities." 40 C.F.R. § 1506.13 (2020). The Railway NEPA process began before September 2020, and the record indicates the Board applied CEQ's 1978 regulations. *See* FEIS T-43 (referring to 1978 "cumulative impacts" definition under 40 C.F.R. § 1508.7).

adverse modification of [critical habitat]." 16 U.S.C. § 1536(a)(2). Each federal agency must review its actions to determine if they "may affect" a listed species. 50 C.F.R. § 402.14(a). If so, the agency must engage in "formal consultation" unless the "action is not likely to adversely affect any listed species." *Id*. at § 402.14(b). Formal consultation concludes with the Service's issuance of a "biological opinion" "detail[ing] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A).

## C. Regulation of Railroad Construction and Operations

Conservation Groups refer the Court to Eagle County's discussion of the Interstate Commerce Commission Termination Act ("ICCTA") but highlight two key aspects of the Board's decisionmaking under ICCTA. First, a precondition to an exemption, which the Board issued to authorize the Railway, is a finding by the Board that a full certification proceeding under 49 U.S.C. § 10901 "is not necessary to carry out the transportation policy of section 10101 of this title." 49 U.S.C. § 10502. In turn, the transportation policy of section 10101 lists 15 policies, including "to operate transportation facilities and equipment without detriment to the public health and safety." 49 U.S.C. § 10101(8).

Second, if the Board finds a proposed project is consistent with the pertinent rail policy goals and the other exemption requirements under section 10502 are met, it considers whether the project's environmental impacts are sufficiently

offset by the project's transportation benefits. *Cal. High-Speed Rail Auth.—Constr. Exemption—in Merced, Madera, and Fresno Cntys*., *Cal.*, FD 35724, 2013 WL 3053064, *16-18, *19 (June 13, 2013); *see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 533 (8th Cir. 2003) (explaining that, in full licensing proceedings, the Board determines whether its preliminary conclusion that the project is consistent with the public convenience and necessity "is still warranted after taking into account the potential environmental effects of the project and the cost of any necessary environmental mitigation")).

## II.    FACTUAL BACKGROUND

### A. The Uinta Basin and the Uinta Basin Railway

On December 15, 2021, the Board approved the construction of the Uinta Basin Railway ("Railway") in northeast Utah, which would be used to ship up to 350,000 barrels of oil daily from Uinta Basin ("Basin") oil fields to the national rail network. The Railway would extend 88 miles between two termini at Myton and Leland Bench, on its eastern end—near the Basin's principal oil fields (EI-26490, 2-3)—to Kyune, Utah. FEIS 2-25. It would traverse 12 miles of roadless areas of the Ashley National Forest through Indian Canyon; destroy and degrade thousands of acres of habitat for several ESA-protected plants and sensitive wildlife (FEIS 3.4-49-51, 3.4-55-59); and induce oil production up to five times

current levels, compounding the Basin's unhealthy air problem due to existing oil development. (FEIS 3.15-38-41, CG_FEIS_Utah DEQ 2021, 15).

From the terminal in Kyune, Utah, oil trains would connect to the national rail network, and 90 percent would travel east to Denver, Colorado (*see* FEIS T-37), including along nearly 100 miles of critical habitat for the four Colorado River endangered fish (CG_FEIS_CBD Fish Map)—Colorado pikeminnow, humpback chub, razorback sucker, and bonytail ("endangered fish"). From Denver, trains could take several routes, but 85% of all oil trains would head to Gulf Coast refineries, in communities already heavily burdened by pollution. FEIS C-3-C-4. The eventual end-use combustion of oil transported by the Railway would emit over 53 million tons of greenhouse gas emissions annually, nearly one percent of U.S. emissions. FEIS 3.15-36.

Remote and rugged terrain within the Railway's path presents numerous challenges for rail safety. The Railway would traverse mountain slopes and valleys located in canyons with steep ridge lines, including Indian Canyon, EI-26882, 1 (PDF 3). Large cut and fills and retaining walls will be required. FEIS 3.5-24, 3.12-28. Development will entail constructing 30 rail bridges and one road bridge; blasting and mining for five tunnels totaling 5.7 miles through mountainous terrain; and tunneling 423 streams and rechanneling and filling 3.8 miles of streams. FWS_01801; FEIS 2-32.

The Railway would be at a high elevation that usually receives several feet of snow each winter. EI-30563, 2; EI-26560, 1. Summer rainstorms may create washouts, flooding, and rockfall. *Id*.; EI-26672, 2. Indian Canyon's loose, silty, and sparsely vegetated ridgeline soils make it susceptible to erosion and landslides. EI-26515, 2.

## B. The Board's Exemption Decision

Conservation Groups refer the Court to Eagle County's brief for its detailed procedural background on the Board's December 15, 2021 decision, but highlight several additional facts.

First, the Board authorized the Railway's Whitmore Park Alternative over Conservation Groups' objections that the underlying EIS was deficient. ID-303098, 2-5. Among other things, Conservation Groups objected that the EIS failed to consider the project's intended effect of increasing oil production in the Basin, and the upstream and downstream environmental consequences of that expanded production; and improperly deferred analysis of the project's geological hazards throughout the project area. *Id*.

Second, the Board's decision rested on the Service's BiOp. In March 2021, the Board requested formal consultation over the Railway's impacts on several listed species. The Board prepared a Biological Assessment which determined the Project "may affect, and is likely to adversely affect" the Colorado endangered

10

fish, among other species, and requested formal consultation with the Service. FWS_00531. The Biological Assessment only identified the project's effects on the endangered fish in connection with the project's construction-related water depletions. FWS_00597. It did not consider whether the fish would be affected by train operations along its critical habitat near the Green and Colorado rivers. *See id*. In September 2021, the Service issued the BiOp for the Project without addressing these effects on the endangered fish. *See* FWS_01795, FWS_01838. Conservation Groups objected to these omissions and the Board's reliance on the flawed BiOp, ID-303098, 89-92, but the Board dismissed these objections. Decision 10.

## SUMMARY OF ARGUMENT

The EIS predicted that oil trains along the Railway would haul up to 350,000 barrels of oil daily, which would require nearly quintupling Basin oil production, but failed to connect the dots—that the Railway would not only transport these massive volumes but enable their production, the project's entire purpose. It thereby failed to consider the project's reasonably foreseeable indirect effects of boosting oil production, including (1) damage from 3,330 new wells drilled throughout the Basin, (2) pollution from downstream refining on pollution-burdened Gulf Coast communities, and (3) climate impacts of end-use combustion. This failure also put a thumb on the scale for the project, because the EIS disclosed the economic benefits of increased oil production, but not the corresponding

11

harms, or minimized them as cumulative impacts *not* attributable to the project. The Board also unlawfully deferred analysis of the project's likelihood of increasing landslides, until after the project's approval, and failed to fully analyze landslide threats to oil trains. Each of these NEPA violations also undermined the Board's ability to determine whether the project was consistent with ICCTA's rail transportation policy "to operate transportation facilities and equipment without detriment to the public health and safety," 49 U.S.C. § 10101(8).

The Service's BiOp likewise conducts a curtailed effects analysis. Its determination that the project would not jeopardize the continued existence of the endangered fish or adversely modify their critical habitat—which the Board relied on—arbitrarily failed to consider the potential impact of oil train spills and leaks on critical habitat along the Union Pacific Line, which 90% of all oil trains leaving the Basin via the Railway will use, and which follows the fish's critical habitat for nearly 100 miles.

The flawed EIS and BiOp led the Board to arbitrarily conclude that the project would not undermine ICCTA's public health and safety policy, in violation of ICCTA. The Board's determination that the Railway's transportation benefits outweighed its environmental harms was also based on the EIS's blinkered analysis that ignored the increased oil drilling, transport, refining, and combustion impacts that the Railway would induce and violated the APA.

# ARGUMENT

## I.    STANDARD OF REVIEW

In determining whether an agency has taken the hard look required by NEPA, the Court applies the APA standard of review, i.e., the Court "shall ... set aside" an agency's decision if it is arbitrary, capricious, or "otherwise not in accordance with law" or if it was adopted "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D) (emphasis added). The Court applies the same standard in reviewing the BiOp's adequacy, *Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32, 44-45 (D.C. Cir. 2018); in reviewing whether the Board lawfully relied on the BiOp to fulfill its substantive duty to insure against jeopardy under ESA Section 7, *Tacoma II*, 460 F.3d at 75; and in evaluating whether the Board lawfully issued the exemption under ICCTA. *Riffin v. Surface Transp. Bd.*, 592 F.3d 195, 197 (D.C. Cir. 2010).

## II.    THE BOARD VIOLATED NEPA BY FAILING TO TAKE A 'HARD LOOK' AT THE RAILWAY'S IMPACTS.

In violation of NEPA, the EIS failed to fully disclose the project's environmental consequences. Specifically, it (1) failed to disclose the project's indirect effects of nearly quintupling oil production, including damage from upstream drilling and downstream refining and combustion; and (2) unlawfully deferred analysis of the project's geological hazards until after the project's approval.

13

## A. The EIS Failed to Consider the Railway's Intended Effect of Increasing Oil Production and its Environmental Consequences.

The Railway's purpose and predicted effect is to dramatically expand oil production in the Basin—up to nearly five times current production rates—by providing a transportation link between Basin oil producers and refinery markets outside Utah. However, rather than analyzing the full consequences of linking producers to refineries on the Gulf Coast—including the upstream effects of spurring drillers to produce more oil and its environmental consequences, and the downstream impacts of sending 35 two-mile-long oil trains to the Gulf Coast weekly—the EIS arbitrarily limited its analysis to only the impacts of Railway construction and operations, in violation of NEPA's mandate for agencies to consider "every significant aspect of the environmental impact of the proposed action." *Public Emples. For Envtl. Responsibility v. Hopper* ("*PEER*"), 827 F.3d 1077, 1081 (D.C. Cir. 2016) (citation omitted).

### 1. Increased Oil Production and Its Effects Were Reasonably Foreseeable Consequences of Authorizing the Railway.

NEPA requires that an EIS analyze a project's direct and indirect effects. *PEER*, 827 F.3d at 1082 (citation omitted). "Direct effects" are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8. "Indirect effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. "Indirect effects may include

14

*growth inducing effects* and other effects related to induced changes in the pattern of land use, population density *or growth rate*, and *related effects on air and water and other natural systems, including ecosystems*." *Id*. § 1508.8(b) (emphases added).

Two types of "indirect effects" are at issue here—the "upstream" effects of increased oil drilling that the Railway is projected and designed to induce, and the "downstream" effects of refining and burning that oil that would otherwise remain in the ground. First, this Court has stated that when analyzing the impacts of authorizing a new gas pipeline, FERC is required to disclose upstream impacts, including the drilling of new gas wells, if those impacts are "reasonably foreseeable." *Delaware Riverkeeper Network v. FERC*, --- F.4th ---, 2022 WL 3036392, *3 (D.C. Cir. Aug. 2, 2022) (quoting 2020 NEPA regulations' definition of "indirect impacts"); *see also* 40 C.F.R. § 1508.8(b) (1978) (same definition). Similarly, courts have required agencies to analyze and consider growth-inducing effects in the area to be served by a transportation project. *See Davis v. Coleman*, 521 F.2d 661, 675 (9th Cir. 1975) (where proposed highway's "raison d'etre" was to expand industrial development, NEPA required consideration of these induced growth effects); *Sierra Club v. Marsh*, 769 F.2d 868, 878-79 (1st Cir. 1985) (agencies should have considered industrial development impacts to be induced by proposed causeway).

Second, agencies are required to consider downstream effects of the processing and/or consumption of fossil fuels that would be facilitated by a fuel delivery project. In *Mid States,* the Eighth Circuit required that the Board analyze and consider a new coal-export rail line's indirect effects on air quality, including the effects of burning the transported coal, considering that the project's "stated goal" was to increase the market availability of coal from Wyoming's Powder Basin. 345 F.3d at 549-50. And in *Sabal Trail*, this Court likewise held that FERC violated NEPA by failing to take a hard look at the greenhouse gas ("GHG") emissions of burning gas that would be transported by the Sabal Trail pipelines, where the burning of that gas was "not just reasonably foreseeable" but "the project's entire purpose." 867 F.3d at 1372.

Here, the Railway's sole purpose is to expand Basin oil production. The Seven County Infrastructure Coalition's ("Coalition") Petition for Exemption reveals Basin oil production is currently "capped," because Basin oil producers' only viable transportation option is trucking oil to Salt Lake City refineries, and those refineries cannot accept more than 90,000 barrels of oil per day. ID-300676, 13-14.

The Petition further explains that the Railway would address this impediment by "giv[ing] oil producers the opportunity to access new markets"— namely Gulf Coast refineries—"and expand production." ID-300676, 17; *see also*

16

ID-300875, PDF 516 (application requesting state grant for the project for the same reasons); CG_FEIS_SCIC 2018, 2 (oil producers urging same: "Although several large operators have intentions to increase production significantly …, based on the current transportation constraints, these plans are not likely to be realized. The [Railway] would ... provide access to alternative refining markets ….").

Moreover, the financial foundation for the Railway wholly depends on trains moving oil from increased production to refineries outside Utah. The EIS revealed there are "no reasonably foreseeable plans" to ship bulk goods aside from oil on the line, except to import frac sand for oil production, which would require, on average, less than one train per day at peak operations. *See* FEIS 1-4, 3.13-13. Accordingly, the Railway can only run if it ships high volumes of oil at rates far higher than current production. A Coalition-commissioned study states the Railway's viability "is extremely dependent upon ... the [production] ramp up rate and total production." ID-300875, PDF 418. High volumes of oil traffic are "even more critical" due to the Railway's "extremely high capital costs." *Id*., PDF 416. The study concludes, for the Railway to pencil out, Basin oil producers *must* produce and ship on the Railway 225,000 to 350,000 bopd. *See id*., PDF 419, 468.

Accordingly, for purposes of estimating Railway traffic, the EIS assumed the Railway would almost entirely transport oil—10 out of 11 trains traveling the line would be crude oil trains at peak operations—and at levels far exceeding

17

current production levels. FEIS 2.1. Currently, the Basin produces about 90,000 bopd. FEIS 3.8-7, n.3. In contrast, the EIS predicts the Railway could transport up to 350,000 bopd, while 80,000 bopd would continue to be trucked to Salt Lake City refineries. *Id*.; FEIS 2.1, 3.15-3-4. Thus, total oil production in the Basin could soar to 430,000 bopd (350,000 + 80,000), *4.8 times* current levels.

Although the EIS found oil production in the Basin would nearly quintuple current levels due to railway operations, it failed to acknowledge that increased production was a reasonably foreseeable, indirect impact of the Railway. Instead, the EIS arbitrarily disclaimed these impacts, stating "[a]ny potential future increase in crude oil production in the Basin *would not be a direct or indirect impact of the proposed rail line*." FEIS 3.8-13 (emphasis added).

Consequently, the EIS failed to consider both indirect upstream drilling effects of increased oil production—including degradation of local air quality, water pollution, and wildlife and vegetation habitat fragmentation and loss due to increased drilling—and downstream oil refining and burning effects, including increased air pollution harming Gulf Coast refinery communities and climate change. As discussed below, the EIS entirely disregarded some of these foreseeable impacts, while minimizing others as cumulative effects that would occur irrespective of project approval.

In sum, ramped-up Basin oil production—the Railway's "entire purpose"—and its consequences are reasonably foreseeable and were required to be considered and disclosed as project impacts in the EIS. *Sabal Trail*, 867 F. 3d at 1372; *cf. Birckhead v. FERC*, 925 F. 3d, 510, 520 (D.C. Cir. 2019) (noting FERC's "less-than-dogged efforts" to determine whether pipeline's "downstream greenhouse-gas emissions qualify as a reasonably foreseeable indirect effect").

### 2. The EIS Substantially Downplayed the Project's Harms by Mischaracterizing Certain Upstream Drilling Effects and Downstream Oil Burning Effects as Cumulative Effects.

The EIS acknowledged that increased oil production in the Basin—albeit not the project itself—could have profound consequences for the Basin's environment (upstream) and climate change (downstream), including:

- the drilling of up to 3,330 wells over 15 years, under the "high oil production scenario" of 350,000 bopd (FEIS 3.15-5);

- 6,429 Basin truck trips daily for drilling operations, and trucking oil to rail terminals, generating more than 46.05 million local vehicle miles traveled annually (FEIS 3.15-12, 3.15-14);

- 5,558 tons of annual volatile organic compound emissions from oil and gas activities—a precursor for the formation of ozone or smog (FEIS 3.15-38)—which would perpetuate ongoing federal ozone standard violations and unhealthy air in the Basin (FEIS 3.15-39);

19

- destruction and fragmentation of wildlife and plant habitat throughout the Basin, including extensive loss and disturbance of habitat for ESA-protected Uinta Basin hookless cactus and Pariette cactus across 94,000 acres of the species' "Core Conservation Areas"—where they are most densely concentrated—in oil fields (FEIS 3.15-56, 3.14-13); and

- annual GHG emissions of over 53,000,000 tons from combusting oil that would be transported via the Railway, which would comprise nearly one percent of total U.S. emissions. FEIS 3.15-36.

While acknowledging these impacts, the EIS, and the Board's decision, erroneously characterize and marginalize them as "cumulative effects" that would occur *independent* of the Railway's construction and/or operational impacts, instead of as "indirect effects" *caused by* the construction and operation of the railroad. Decision 18; *see also* FEIS 3.15-3-3.15-6, T-42-43.

Indirect impacts are "*caused by* the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b) (emphasis added). In contrast, a cumulative impact is *not* caused by the action under review. Rather, it is

> the impact on the environment which results from the *incremental impact of the action* [i.e., its direct and indirect effects] when added to the effects of *other* past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-federal) or person undertakes such other actions.

20

*Id*. § 1508.7 (emphases added).

The distinction between the two categories matters, both as matter of correct NEPA analysis and in the Board's own weighing of the project's environmental harms and transportation benefits. As explained in Board member Oberman's dissent objecting to the mischaracterization of oil development spurred by the Railway as cumulative impacts:

> Considering the environmental impacts in the Basin only in the context of a cumulative impact analysis, and not as reasonably foreseeable impacts attributable to the Line itself, materially affects how those effects are factored by the Board when weighing the Line's transportation merits against its environmental impacts.

Decision 32.

For example, by limiting the project's indirect greenhouse gas emissions ("GHGs") to emissions from operations along the Railway—or 131,169 tons per year—the EIS vastly understated the project's contribution to climate change. FEIS 3.7-26. If the EIS had calculated indirect GHGs by totaling this amount with the GHGs generated from oil and gas operations and from combustion of the oil transported by the Railway, plus operations along the downline route between the Railway's Kyune terminal and Denver,[2] the project's indirect GHGs would have

---

[2] The EIS calculated the project would result in 719,204 tons of annual GHGs between Kyune and Denver (FEIS 3.7-17), but the Board's decision dismisses these and all other downline operational emissions, finding downline emissions

totaled 56,078,436 tons annually (*see* FEIS 3.15-34, 3.15-36, 3.7-17)—*427 times* the amount the Board attributed to the Railway. *See* Decision 15. In the former case, the project would contribute only 00.0019 percent of U.S. emissions; in the latter (i.e., using the correct characterization for NEPA purposes) 0.84 percent of U.S. emissions—a potentially critical difference in the Board's analysis.[3]

Further, the EIS treated truck trips generated by increased oil production—up to 6,285 *daily* (2.29 million annually)—as only cumulative impacts that would significantly increase traffic on local roads (and adversely affect neighboring Ute Indian Tribe communities), but not as consequences of Railway approval. FEIS 3.15-12-13. Instead, it found rail operations would generate, at most, 144 vehicle trips per day—or 2.2 percent of the cumulative impact—and minimized the Railway's consequences on traffic. FEIS 3.1-18-19; *see also* FEIS 3.15-38 (showing volatile organic compounds from "rail operations" versus oil production to comprise 2 percent and 98 percent of cumulative emissions, respectively).

Likewise, the EIS significantly underestimated the project's consequences for the ESA-protected Pariette and Uinta Basin hookless cacti. It found the

---

analysis "neither required nor useful." Decision 20; *id*. at 15 (only acknowledging emissions along Railway).

[3] This calculation is based on the EIS's assertion that burning of oil transported by the rail would result in 53,269,873 tons of GHGs, or 0.80 percent of U.S. emissions (FEIS 3.15-36), and performing a simple ratio calculation from there to determine the percentage of U.S. emissions from other sources.

Railway's construction and operation would disturb only 504.7 acres of their

suitable habitat, including 60.5 acres of Core Conservation Areas. FEIS S-17, 3.4-

56.[4] But it failed to disclose that the project, by inducing greater oil production,

would degrade vastly more acreage, given that oil fields "overlay close to 350,000

acres of [the cacti's] suitable habitat … and more than 94,000 acres of Core

Conservation Area," and instead improperly attributed this "substantial potential

for disturbance or removal of suitable habitat" to oil production occurring

independent of project approval. *See* FEIS 3.15-56-57.

The EIS's mischaracterization of indirect effects as cumulative therefore

resulted in the EIS minimizing the project's consequences, contravening NEPA's

hard look requirement and skewing the weighing of environmental costs and

projects benefits the Board itself undertakes pursuant to its statutory authority. In

short, this legally flawed approach improperly "put a thumb on the scale" for the

project. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*

("*CBD*"), 538 F.3d 1172, 1198 (9th Cir. 2008).

> **3. Even if Cumulative and Indirect Effects Analyses Were Interchangeable, Neither Analysis Here Disclosed Significant Upstream and Downstream Impacts.**

---

[4] These figures include both temporary and permanent disturbance.

Even if the consideration of downstream and upstream oil production impacts as "cumulative" rather than "indirect effects" could be dismissed as just a "labeling" issue, Decision 18 n.15—which it cannot—the EIS failed to disclose as either indirect or cumulative effects significant consequences of increased oil production.

For example, the EIS failed to disclose the downstream environmental impacts of increased crude oil refining along the Gulf Coast. The EIS established these air quality and environmental justice effects are reasonably foreseeable, predicting half the oil production increase—up to 175,000 bopd—would be delivered to Houston and/or Port Arthur, Texas, and another 35 percent to the Louisiana Gulf Coast. FEIS T-37. Increased oil refining at these levels would be equivalent to *the addition of one or more refineries in Texas and Louisiana each*, *see* STB_U.S. EIA 2020i 11, 17 (documenting Louisiana and Texas refinery capacities in tens to hundreds of thousands of barrels of oil per day). Petroleum refineries are a major source of toxic air pollutants such as benzene. CG_FEIS_Haz. Subst. Research Ctr., 2. Studies show higher cancer rates among people who live closer to refineries. CG_FEIS_Williams; CG_FEIS_Borasin, 28-29. Refineries are also a major source of air pollutants regulated under the Clean Air Act, including nitrogen oxides and volatile organic compounds, which combine to form ozone. CG_FEIS_Haz. Subst. Research Ctr., 2. Ozone causes

difficulty breathing and shortness of breath; inflames and damages airways; aggravates asthma, emphysema, and chronic bronchitis; and increases asthma attacks. CG_FEIS_USEPA Ozone Health Effects, 2. Elevated ozone concentrations are correlated with deaths from respiratory causes. *Id*.

Increased oil train deliveries of millions of gallons daily and related refinery emissions could worsen already poor air quality in Houston, a "serious" nonattainment area for ozone or smog (https://www3.epa.gov/airquality/greenbook/map/mapnpoll.pdf, cited in EI-30611, 24); 84 Fed. Reg. 44238, 44245 (Aug. 23, 2019) (reclassifying Houston area "serious" nonattainment area). It would also worsen pollution burdens in communities already overburdened by pollution. Port Arthur, Texas contains a disproportionately high number of industrial polluters in relation to its population of 55,000—a third of which is African American—and the largest oil refinery in the country. CG_FEIS_Tigue, 3, 6. When combined with neighboring Beaumont, the region hosts one of the highest concentrations of facilities that must report toxic chemical emissions to EPA. *Id*. at 3. Louisiana's "Cancer Alley"—the stretch of the Mississippi River between New Orleans and Baton Rouge—attracts a high concentration of petrochemical facilities due to its location along the river and lax regulatory environment—and has increasingly worse air quality and toxic emissions relative to its peers. CG_FEIS_Baurick, 5-7, 14, 20-23.

25

Given existing pollution burdens and the concentration of refineries and petrochemical plants in Houston, Port Arthur, and Louisiana's Cancer Alley, the EIS was required to analyze the potential for tens of thousands of additional barrels of oil shipments daily and their processing in these locales to further worsen pollution burdens. These potentially severe impacts on already overburdened Gulf Coast communities were reasonably foreseeable. For example, in *Sabal Trail*, "reasonable forecasting" of the gas pipelines' downstream effects was possible because FERC identified potential power plant destinations and estimated the quantity of gas to be transported. *Sabal Trail*, 867 F.3d at 1371, 1374. Similarly, here, the EIS identified the oil volumes likely to go to Texas and Louisiana communities (FEIS T-38), and "target" refineries that would likely accept the oil (EIS C-2; ID-300875, PDF 265, 278, 453). Moreover, in *Mid States*, the Board was required to consider the air quality effects from burning coal delivered by trains to power plants *despite their unknown destinations*, finding the "nature of the effect" of burning coal, such as the impacts of increased mercury pollution in areas near power plants "far from speculative." 345 F.3d at 549. Here, beyond doubt, increased oil deliveries and refining or petrochemical processing would exacerbate toxic chemical exposure and unhealthy air in these Gulf Coast communities.

In addition, the EIS declined to address most oil drilling impacts on vegetation, including the spread of noxious weeds and increased wildfire risk,

because "[the Railway's] impact area and oil and gas development impact area must overlap for there to be a cumulative impact." FEIS 3.15-23. Likewise, with respect to special-status species, such as greater sage-grouse, the endangered fish, and ESA-protected plants, the EIS stated cumulative impacts would occur "if [o]il and gas development projects … were to take place in the same area as the proposed rail line and affect the same special-status species habitat as the proposed rail line," and would be limited to within "several hundred feet" of the Railway. FEIS 3.15-24. But induced industrial growth, in the form of 3,330 new oil wells and associated pipelines, roads, and tanks, plus thousands of daily truck trips (*see supra* at 19, FEIS 3.15-6), would foreseeably occur throughout the region, and not just within a narrow strip adjacent to the Railway. FEIS 3.15-4. The EIS's indirect and cumulative effects analysis thereby excluded a vast area in which well and road construction, drilling, and truck traffic could destroy and degrade habitat.

Indeed, habitat for one ESA-listed species, endangered Barneby ridge-cress, is limited to three populations within a 9-mile-long stretch in the Uinta Basin occurring largely within existing oil fields. FWS_01808-1809; CG_FEIS_2021 Barneby Habitat Map. The Railway itself will damage habitat for 23.6 percent of its population. *See* FWS_01841. The EIS did not disclose the compounding potential for oil drilling to undermine the species' viability throughout its entire existing habitat totaling 985 acres (FWS_01808), nor even mention Barneby ridge-

27

cress. Rather, through its statement that cumulative impacts to special-status species "would generally be limited to within several hundred feet" of the Railway and therefore "not … extensive" (FEIS 3.15-24), it at most suggests damage to the species' habitat would be narrowly confined to roughly 150 acres within and around the Railway path, within 300 feet of the tracks. *See* FEIS 3.4-56.

In short, even if it were permissible for the Board to substitute a cumulative impacts analysis for a proper indirect effects analysis, which it is not, neither analysis here took a hard look at the Railway's significant upstream and downstream consequences.

### 4. *Public Citizen* Does Not Excuse the Board's Failure to Properly Disclose the Project's Upstream and Downstream Impacts.

The Board erroneously rejected Conservation Groups' contention that increased oil drilling and downstream emissions enabled by the new rail line are indirect effects. Relying on *DOT v. Public Citizen*, 541 U.S. 752 (2004), it asserted that "when an agency 'has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect' for NEPA purposes." Decision 18 (citing *Public Citizen*, 541 U.S. at 770). It further rationalized, because "the Board has no authority or jurisdiction over [oil development] … nor any authority to control or mitigate [its] impacts," it "properly declined to treat oil and gas development as an indirect effect." *Id*.

28

The Board's reliance on *Public Citizen* is misplaced because unlike the agency at issue there, the Board here has the authority to prevent or fully mitigate the impacts of the proposed action at issue. In *Public Citizen*, the Supreme Court held NEPA did not require the Federal Motor Carrier Safety Administration to consider air pollution from increased cross-border traffic that would result from its adoption of Mexican-truck safety rules. *Public Citizen*, 541 U.S. at 769. The Court found the "legally relevant cause" of increased border traffic was Congressional action and the lifting of a presidential moratorium that had prevented the agency from registering Mexican trucks. *Id*. at 769. Because the agency was statutorily required to register trucks and could not "countermand" the President's lifting of the moratorium or otherwise exclude Mexican trucks from the U.S., *id*. at 766, analysis of these effects would not have served NEPA's informed-decisionmaking purpose. *See id*. at 768-69.

In *Sabal Trail*, this Court explained the "touchstone" of *Public Citizen*'s holding is that "[a]n agency has no obligation to gather or consider environmental information if it has no statutory authority *to act on that information*." *Id*. at 1372 (emphasis in original). *Sabal Trail* therefore rejected applying *Public Citizen* to excuse FERC from disclosing the proposed Sabal Trail pipelines' downstream power plant GHG emissions from combustion of gas delivered via the pipeline. FERC had authority to act on this information, given its broad authority to deny a

pipeline certificate on environmental grounds: Congress "broadly instructed the agency to consider 'the public convenience and necessity'" in its pipeline decisions, and FERC was required to "balance the 'public benefits against the adverse effects of the project.'" *Id*. at 1373 (citations omitted).

Similarly, here, the Board's approval is the "legally relevant cause" of the Railway and its direct and indirect impacts. The Board has the authority to grant the Railway's requested exemption, grant it with conditions, or deny it, and that menu of potential decisions rests in part on the agency's analysis of the project's environmental impacts. *See, e.g.*, Decision 6 ("Under NEPA and related environmental laws, *the Board must consider significant potential environmental impacts in deciding whether to authorize a railroad construction as proposed, deny the proposal, or grant it with conditions (including environmental mitigation conditions*.") (emphasis added).

This is not a case like *Public Citizen* where the agency had "no authority to prevent the effect[s]," and so evaluating them would not serve NEPA's purposes. *Public Citizen*, 541 U.S. at 767. Indeed, just as the Board had discretion to consider the direct effects of the project, it also had discretion (indeed, obligation) to consider all of the indirect effects in deciding whether to issue the proposed exemption, and specifically its evaluation of whether the project was consistent with section 10101(8)'s goal "to operate transportation facilities and equipment

without detriment to the public health and safety," as required by 49 U.S.C. § 10502(a)(1). The Board may also require "compliance with conditions [it] finds necessary in the public interest," including environmental conditions. 49 U.S.C. § 10901(c). The Board could have also denied the Railway as not in the public interest, based on environmental concerns. *See* Decision 25 (stating that "an exemption from § 10901 is appropriate" where "the transportation merits of the project outweigh the environmental impacts").

In sum, the Board's authority here is not constrained as was the agency's in *Public Citizen* but is rather like FERC's broad authority in *Sabal Trail*. The Board was therefore required to disclose and analyze the upstream drilling and downstream refining and burning effects as *consequences* of the proposed action, i.e., as indirect effects.

### 5. The EIS's Consideration of the Project's Economic Benefits Without Full Consideration of Its Environmental Costs Violated NEPA.

The EIS's skewed analysis was compounded by its consideration of the project's purported economic benefits of rail construction and operations, *and necessarily, from increased oil production and shipments*, while at the same time disclaiming that the project would cause the environmental harms stemming from the increased oil production. The Railway could not viably operate—and therefore not produce economic benefits—without producing its intended effect of dramatically ramping-up Basin oil production and exports. *Supra* at 17. This

31

selective consideration of harms and benefits violated NEPA. *Chelsea Neighborhood Ass'n. v. U.S. Postal Serv.*, 516 F.2d 378, 387 (2nd Cir. 1975) (EIS's touting project's providing housing as "virtue," while "ignoring many of its associated disadvantages" violated NEPA).

For example, in *Sierra Club v. Sigler*, the Army Corps authorized construction of an oil terminal and deepening of Galveston Bay to accommodate oil terminal activities and bulk commodity carriers that would not use the terminal. 695 F.2d 957, 962-63 (5th Cir. 1983). The EIS analyzed the environmental impacts of construction and dredging, but not of new bulk carrier traffic, while "paint[ing] a rosy picture" of its economic benefits. *Id*. at 976. These unanalyzed activities were not "speculative possibilities," because "once the Corps *chose* to trumpet the benefits of bulk cargo activities in the EIS as a 'selling point' for the oil project, it rendered a decision that these activities were imminent." *Id*. at 979 (emphasis in original). Accordingly, the Corps could not "tip the scales of an EIS by promoting possible benefits while ignoring their costs." *Id*.; *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1192 (D. Colo. 2014) (invalidating NEPA analysis that quantified mine's economic benefits but "effectively zeroed out the [environmental] cost").

The EIS's analysis of the project's indirect, socioeconomic effects similarly touted the economic benefits from the project's operations (but without support for

the project's viability, as argued in Eagle County's brief). These purported benefits include "lower transportation costs and access to new markets" for oil producers, job growth, increased tax revenues for state and local governments, and diversification of the Basin's economy (despite there being "no reasonably foreseeable plans" for transporting commodities other than frac sand and oil). FEIS 3.13-13, 3.13-30-31. Although the EIS did not disclose that these benefits necessarily require growth in Basin oil production and corresponding oil shipments by rail, they are entirely dependent on the anticipated increase (*supra* at 16-17), which itself would be induced by the Railway's authorization and construction. But the EIS failed to account for the corresponding environmental harms from quintupling oil production.

In short, the EIS fell short of NEPA's demand for "objective[]" analysis. *See Sigler*, 695 F.2d at 979; *Sabal Trail*, 867 F.3d at 1375 (EIS must consider "'both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial'" (quoting 40 C.F.R. § 1508.8); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 503, 519, 985 F.3d 1032, 1048 (D.C. 2021) ("The purpose of judicial review under NEPA is to ensure the procedural integrity of the agency's consideration of environmental factors in the EIS and in its decision to issue permits.") (quoting *Sigler,* 695 F.2d at 966).

**B. The EIS Failed to Take a Hard Look at the Railway's Geological Risks.**

33

Local residents and the Forest Service raised serious concerns about the project's landslide hazards. *See, e.g.*, EI-30176; EI-26672, 2; EI-26560, 1; EI-26515, 2. But the EIS's "direct effects" analysis failed to take NEPA's required "hard look" at these risks, instead unlawfully entrusting the Coalition to study them post-project-approval. This improper delegation and deferral prevented the Board and public from understanding the project's landslide hazards, and potential consequences for soil, wildlife habitat, and water resources, *before* project approval, and meaningful comparison of the action alternatives. 40 C.F.R. § 1500.1(b) (NEPA "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.").

Landslide hazards include landslides, rockfall, debris flows, and avalanches. STB_Utah Geological Survey, Circular 122 ("C-122") 4-6, 28. These hazards endanger public health and safety and impair wildlife habitats. For example, the EIS disclosed landslides could damage rail facilities and cause oil train derailments (FEIS 3.5-20, 3.5-25), which could result in oil spills. FEIS E-2-E-3. Poorly sited development can worsen landslide risks by removing and destabilizing soils (C-122 28, FEIS 3.5-23-24)), and landsides themselves can lead to soil erosion and water quality deterioration. EI-26515, 2 (Forest Service commenting "mass wasting" or landslides could "impair watersheds").

34

Normal precipitation saturating soil can trigger landslides, as can

earthquakes. *Id*.; C-122, 64. The project area is prone to flash floods, including

"cloudburst storms" of torrential rain (EI-30176, EI-26698, EI-26588, FEIS 3.3-

17-18), and is seismically active. FEIS 3.3-17-18, 3.5-13, 3.5-25. The EIS found

that the selected Whitmore Park Alternative would cross the potentially seismically

active Duchesne-Pleasant Valley fault system on its eastern end. FEIS 3.5-25.

Thus, landslides pose a serious risk to oil train safety, which could be worsened by

poor siting.

With respect to landslide hazards within a half mile of the project area

(FEIS3.5-1), the EIS disclosed approximately 2,220 acres in the study area have

been mapped as landslide, debris flow, and rockslide areas, but that landslide

hazards throughout the bulk of the study area are unknown:

> Mapped landslides lie primarily in the southwestern portion of the
> study area underlain by the Green River Formation. However, this
> portion of Utah has not undergone an extensive landslide mapping;
> accordingly, this mapped acreage *likely represents only a small
> proportion of areas affected by mass movement*.

FEIS 3.5-7 (emphasis added); *see also* FEIS 3.5-8 (map of landslide deposits).

It further disclosed project construction would "create steep slopes or disturb

the surface within unstable geologic units" and "could cause geologic hazards such

as landslides, debris flows, and rockslide," especially in areas excavated for

tunnels, bridges, embankments, and culverts. FEIS 3.5-20. And, "[i]f mass

movement were to occur during or following construction, it could dislocate, damage, or destroy rail-related facilities and result in both environmental damage and potentially cause injury or death." *Id.*

Rather than gathering site-specific information as to whether unmapped landslide areas are subject to landslide hazards and the severity of those risks, the EIS recommended collecting that information *after* project approval. FEIS 3.5-21. The Board adopted this approach, requiring that the Coalition "shall conduct geotechnical investigations to identify soils and bedrock in cut areas with potential for mass movement or slumping," and that "[w]here appropriate, the Coalition shall implement engineering controls to avoid mass movement or slumping." Decision 52 (GEO-MM-2).

By kicking the can down the road (and to the Coalition), the Board undermined NEPA in two ways. First, the EIS could not fulfill its function to inform the agency and public of the project's environmental risks, much less whether the project is consistent with the rail transportation policy objective "to operate transportation facilities and equipment without detriment to the public health and safety." 49 U.S.C. § 10101(8).

For example, in *PEER*, this Court held that an agency's approval of seafloor leases for an offshore wind farm violated NEPA, owing to the EIS's "dearth of geophysical data." 827 F.3d at 1082. The Court found that "[w]ithout adequate ...

[geological hazard] surveys, [the agency] cannot ensure that the seafloor [will be] able to support wind turbines." *Id*. at 1083. The requirement for post-approval geophysical surveys did not excuse this failure, because "NEPA does not allow agencies to slice and dice proposals in this way." *Id*.; *see also Robertson*, 490 U.S. at 349 (NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast").

Likewise, in *Northern Plains Resource Council v. Surface Transportation Board*, the Ninth Circuit found the Board's reliance on post-approval species surveys to further assess the impacts of a rail project violated NEPA. 668 F.3d 1067, 1085 (9th Cir. 2011). It explained, "NEPA requires that the agency provide the data on which it bases its environmental analysis," and "[s]uch analyses must occur before the proposed action is approved, not afterward." *Id.* at 1083. This is because post-approval surveys or studies would not help the agency understand the impact to inform its decisionmaking nor facilitate public participation. *Id*. at 1085.

Here, the EIS concludes that if the Coalition implements mitigation measures, including post-approval surveys, "engineering controls," and "appropriate remedial actions," "[geological] impacts would not be significant." FEIS 3.5-28. The EIS's response to comments cursorily suggests that information collection would only be appropriate after project approval, "during the final

37

engineering and design phase," because "the precise locations of engineering features and site-specific construction methods would not be known before that phase." FEIS T-241.

This puts the cart before the horse. Because the EIS neither identified nor analyzed site-specific hazards, the nature and extent of the problem are unknown, and thus the Board cannot, consistent with NEPA, assume that the problem "would not be significant" with the application of post-approval surveys and other (unspecified) measures. Conceivably, geological risks may be serious enough that they cannot be mitigated. Indeed, the very guidance the Board requires the Coalition to follow for post-approval surveys, Utah Geological Survey Circular 122 (Decision 52), explains geological hazard surveys must inform whether development is compatible with the surrounding environment in the first place, not simply identify problems to engineer around. *See* C-122 28 ("Once the geologic conditions and hazards at a site have been identified and investigated, the suitability of a proposed development in relation to these conditions and hazards must be determined."). But even post-approval, the Coalition will not be required to fill the significant informational gap identified in the EIS. The post-approval survey only requires the Coalition to "identify soils and bedrock *in cut areas* with potential for mass movement or slumping," and not existing hazards in

38

surrounding areas that may still risk an oil train derailment. Decision 52 (GEO-MM-2) (emphasis added).

Second, the failure to gather more complete information thwarted meaningful comparison of alternatives. In comparing alternative routes, the EIS represented that the Wells Draw Alternative would have "the largest area … of unstable Green River Formation and existing mapped landslide areas," and thus "a greater risk of mass movement" than the Indian Canyon and Whitmore Park alternatives (FEIS 3.5-26), despite the spotty understanding of landslide areas. FEIS 3.5-7. The Board, in turn, erroneously relied in part on the *unfounded* assumption that the Whitmore Park Alternative "would cross a smaller area of land that may be prone to landslides" than the other action alternatives to find it was the "environmentally preferred alternative" and should be adopted. Decision 22.

In sum, the EIS's failure to take a "hard look" at landslide hazards violated NEPA's "look before you leap" mandate and undermined the Board's evaluation of alternatives. *See Oglala Sioux Tribe*, 896 F.3d at 532 n.9.

## III. THE BIOP FAILED TO CONSIDER IMPORTANT EFFECTS ON THE ENDANGERED FISH, AND THE BOARD UNLAWFULLY RELIED ON THE DEFICIENT BIOP.

Four endangered fish inhabit the Colorado River and its tributaries, including parts of the Green, White, and Yampa rivers, in Utah's Uinta Basin and western Colorado. CG_FEIS_CBD Fish Map. These river stretches include

designated "critical habitat" for the four species—areas "essential to the conservation of the species and … which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). This includes highly important spawning and adult foraging areas, within the Green River and the Colorado River's "15-mile reach" in Colorado's Grand Valley near Grand Junction, and habitat for nurseries and migration. CG_FEIS Osmundson 2000, i-3, 5, 8, 11-13; FWS_4383.

The BiOp arbitrarily determined that the project would not jeopardize the continued existence of the endangered fish or adversely modify its critical habitat by narrowly limiting its effects analysis to the project's construction-related water depletion impacts. The BiOp failed to consider the potential impact of oil train spills and leaks from 35 loaded oil trains per week, each carrying over a million gallons of oil, on critical habitat along the Union Pacific Line ("UP Line") downline route. The UP Line crosses the Green River in Utah and roughly follows Colorado River critical habitat between the Utah-Colorado border and Rifle, Colorado, plus areas upstream of critical habitat to Glenwood Springs, for over 100 miles. *See* CG_FEIS_CBD Fish Map.

When conducting formal consultation, the Service and the action agency must evaluate the "effects of the action." 50 C.F.R. §§ 402.14. "Effects of the action" means "all consequences to listed species … that are caused by the

proposed action, including the consequences of other activities that are caused by the proposed action." 50 C.F.R. § 402.02. "[A] consequence is caused by the proposed action if it would not occur but for the proposed action, and it is reasonably certain to occur." *Id*. Such effects "may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id*.[5] The action agency "shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation." 50 C.F.R. § 402.14(d).

The effects analysis informs the Service's biological opinion, which determines whether the proposed action is likely to "jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4); *American Rivers*, 895 F.3d at 45. In carrying out its Section 7 duty to avoid jeopardy to listed species, the action agency "must not blindly adopt the conclusions of the [Service], citing that agency's

---

[5] This definition was in effect when the BiOp was issued, under regulations promulgated in 2019. *See* 84 Fed. Reg. 44,976, 45,016 (Aug. 27, 2019) ("2019 Regulations"). Subsequently, the 2019 Regulations were vacated, reverting to the "Pre-2019 Regulations." *Ctr. for Biological Diversity v. Haaland*, No. 19-cv-05206-JST, 2022 WL 2444455, *5 (N.D. Cal. July 5, 2022). Under the Pre-2019 Regulations, "effects of the action" includes "indirect" effects "caused by" the proposed action and "later in time," but "still reasonably certain to occur." 50 C.F.R. § 402.02. The Service was required to address the effects at issue regardless of which definition applies.

expertise. Rather, the ultimate responsibility for compliance with the ESA falls on the action agency." *Tacoma II*, 460 F.3d at 76 (citing 16 U.S.C. § 1536(a)(1)-(2)).

The BiOp fails to analyze the effects of spills and leaks from oil trains traveling near critical habitat along the UP Line where it crosses the Green River and roughly parallels nearly 100 miles of critical habitat between the Utah-Colorado border and Rifle, Colorado and more river stretches upstream. CG_FEIS_CBD Fish Map. The EIS predicts that along the UP Line between Kyune and Denver—which includes long stretches near or upstream of endangered fish critical habitat, *id.*—train accidents (primarily collisions and derailments (FEIS E-1)) will double and involve up to roughly one loaded oil train annually *See* FEIS 3.2-6-7. This figure is likely a significant underestimate as argued in Eagle County's Opening Brief. In any case, the BiOp does not examine the reasonably certain potential for large oil spills in or upstream of critical habitat, despite *the EIS* predicting 26 percent of accidents involving loaded trains will release crude oil, including 17 percent at least 30,000 gallons, and 2 percent at least 90,000 gallons. FEIS E-4-5. Nor does it examine the potential for over 3,600 trains traversing the UP Line annually to chronically leak and contaminate critical habitat, even though high concentrations of polycyclic aromatic hydrocarbons, heavy metals, and other toxins harmful to aquatic life are found around railways, including adjacent waterways. EI_26553, 1-3; FWS_06285; FEIS 3.3-28-29. The

endangered fish, especially Colorado pikeminnow, are vulnerable to bioaccumulation, i.e., harmful bodily accumulation of contaminants from eating contaminated prey. FWS_01838. Bioaccumulation of polycyclic aromatic hydrocarbons can be highly toxic. FEIS 3.3-28. The BiOp's unexplained failure to consider these effects was arbitrary. *American Rivers*, 895 F.3d at 47.

Moreover, in relying on the flawed BiOp, the Board violated its duty to avoid jeopardy of listed species and adverse modification of critical habitat. *See* 16 U.S.C. § 1536(a)(2). The Board itself did not consider operational effects in its Biological Assessment initiating consultation with the Service. *See* FWS_00597, FWS_00635-36. Subsequently, in their comments on the draft EIS and, later, on the final EIS and BiOp, Conservation Groups raised with the Board the potential for oil trains to cross or run along nearly 100 miles of critical habitat and the potential for contamination from spills and leaks. EI-30487, 104-105; ID-303098, 90. Accordingly, the Board could (and should) have raised these issues with the Service in the formal consultation process. Its reliance on the BiOp without doing so was arbitrary. *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir. 1994) (agency's reliance on biological opinion was "not justified" because it failed to provide Service with "all of the data and information required by 50 C.F.R. § 402.14(d)," i.e., "best scientific and commercial data available").

## IV.    THE BOARD'S FAILURE TO CONSIDER RELEVANT FACTORS VIOLATED ICCTA AND THE APA.

43

The Board's reliance on the flawed EIS and BiOp resulted in a faulty determination that the project qualified for an exemption from ICCTA's section 10901 application requirement. Further, in weighing the project's transportation benefits and environmental harms the Board improperly put a thumb on the scale for the project by (1) crediting unsubstantiated claims about the project's speculative economic benefits from its anticipated effect of opening access to new refining markets and inducing expanded oil production, and (2) failing to consider the associated upstream and downstream environmental harms, also in reliance on the flawed EIS.

One of two prerequisite findings for an exemption is that the "application ... of a provision of [ICCTA] ... is not necessary to carry out the transportation policy of section 10101." 49 U.S.C. § 10502(a)(1); *see Ill. Commerce Comm'n v. ICC*, 787 F.2d 616, 626 (D.C. Cir. 1986) (emphasis added). The Board "must consider all aspects of the [rail transportation] policy bearing on the propriety of [an] exemption and must supply an acceptable rationale therefor." *Id*. at 627.

The Board rejected Conservation Groups' contentions that the project would not carry out the rail transportation policy's section (8) objective, "to operate transportation facilities and equipment without detriment to the public health and safety," 49 U.S.C. § 10101(8), finding that the EIS and required mitigation measures adequately addressed concerns about the project's impacts. Decision 24-

44

25; *see also id*. at 23-24. This ostensible finding that the project would not detrimentally harm public health and safety is unfounded: the EIS failed to consider that the project itself would quintuple Basin oil production, and cause massive Basin truck traffic and air pollution, greater toxic pollution burdens in Gulf Coast communities, and GHGs comprising nearly one percent of U.S. emissions—with the potential to intensify drought, wildfires, flooding, and mass extinction, among other climate change harms. Further, its conclusion that the project's geological risks were not significant was based on a weak understanding of the project area's landslide hazards. The Board's unsupported issuance of an exemption violated ICCTA. *Cf. Butler, Warren and Hamilton Counties*, 9 ICC 2d 783, 791 (1993) (rail construction application denied due to "public safety concerns").

Moreover, the Board's reliance on the flawed EIS resulted in its arbitrarily weighing the project's speculative economic benefits from expanded oil production without considering its environmental harms, in violation of the APA.

The Board found that the project qualified for an exemption from the Board's full application proceedings, in part, because the Railway is consistent with section 10101 rail transportation policy objectives (4) and (5) (Decision 5), which each broadly entail consideration of the "public interest," among other factors. *Texas Cent. R.R. and Infrastructure, Inc.—Pet. for Exemption—Passenger*

45

*Rail Line between Dallas & Houston, Tex.*, FD 36025, 2020 WL 4036897, *12 (July 16, 2020). The Board then determined that the exemption should issue because the transportation merits outweighed the environmental harms, and because the project was in the "public interest." *See* Decision 25.

Specifically, the Board found the project would have "substantial transportation *and economic* benefits," which entirely depend on the project boosting oil production, citing letters in support of the project from Utah's congressional delegation, Utah's governor, and the Ute Indian Tribe ("Tribe"). Decision 24 (emphasis added). These letters claimed the project would "boost economic opportunity and local job creation by allowing energy … products … to reach global markets more easily," ID-302609 (Congressional letter), and diversify the Basin's local economy," ID-302947 (Governor letter). *See also* Eagle Cty. Op'g Br. at 24-26 (detailing unaddressed financial viability concerns).

The Board weighed these purported economic benefits against the environmental harms, and found they *weighed against selecting the No-Action Alternative*. Decision 24. It reasoned: "While the No-Action Alternative would avoid environmental impacts …, it would not bring these benefits to the Basin or meet the goals of … the Coalition or the … Tribe," *id*.—that is, their goals to grow Basin oil production. *See supra* at 16-17; ID-303060 ("[E]conomic growth from

[Tribe's] mineral estate cannot be fully realized due to limited access to refineries. The [Railway] … presents a critical opportunity to expand Tribal access ….").

The benefits weighed by the Board are entirely premised on the Railway expanding access to refineries and allowing Basin drillers to produce and sell more oil. Necessarily, then, an objective weighing of the transportation merits versus environmental harms required the Board to weigh the harms of higher production levels, including the damage from thousands of new wells, exacerbated refinery pollution burdens, and combustion of billions of gallons of oil annually. *Cf. CBD*, 538 F.3d at 1198 (agency "put a thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent standards").

But because the Board relied on the flawed EIS to determine "[t]he environmental impacts identified … in the EIS have been sufficiently mitigated *so that they do not outweigh the Line's transportation benefits*"—and the EIS itself promoted the Railway's economic benefits without considering the corresponding environmental harms—the Board could not have fully considered those harms. Decision 24 (emphasis added). Moreover, because some of the project's most consequential and far-reaching impacts were obscured as cumulative and not indirect effects, including its massive GHGs from downstream oil combustion, the Board presumably did not weigh them as *the project's* harms.

This skewed weighing of harms and benefits was arbitrary and violated the APA. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018) (failure to consider relevant factors for discretionary action violates APA); *cf. N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1188 (D.C. Cir. 2004) (Board's "fail[ure] … to properly balance all of the competing interests involved" was arbitrary).

## V.    THE BOARD'S DECISION SHOULD BE VACATED.

"The ordinary practice ... is to vacate unlawful agency action." *Standing Rock*, 985 F.3d at 1050 (citation omitted); *see also* 5 U.S.C. § 706(2)(A). In weighing whether to depart from vacatur, this Court considers the "seriousness" of the agency's deficiencies, and the "disruptive consequences" of vacatur. *Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

This Court should vacate the Board's decision because the EIS suffers from significant deficiencies regarding the project's most significant environmental impacts, including its large contributions to climate change, worsening air pollution in already-burdened Gulf Coast communities, dangerous landslide risks threatening public safety, and harm to ESA-protected plants and fish. More than mere failures of explanation, *cf. Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013), these defects require additional analysis, public involvement, and substantive consideration by the Board. *See Standing Rock*, 985 F.3d at 1052

48

("[B]ecause NEPA is a 'purely procedural statute,' where an agency's NEPA review suffers from 'a significant deficiency,' refusing to vacate the corresponding agency action would 'vitiate' the statute." (citation omitted)).

   In addition, the Board's ESA violation is a "serious deficiency" thwarting the ESA's intent to insure the recovery of endangered species. *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 20–21 (D.D.C. 2014) (violation of "substantive" duty to prevent harm to species warranted vacatur). Likewise, the Board's reliance on a flawed EIS and BiOp undermined its substantive duty to ensure rail operations "without detriment to the public health and safety," 49 U.S.C. § 10101(8), and its skewed weighing of harms and benefits is serious error.

   The importance of reconsidering this massive project in an informed and unbiased manner heavily outweighs any disruptive consequences of vacatur. *See Standing Rock*, 985 F.3d at 1051, 1054 (upholding vacatur despite its significant economic consequences because allowing the decision to stand would subvert NEPA's objectives). Railway construction has not yet begun, so vacatur is unlikely to substantially disrupt the project. On the other hand, vacatur is essential to ensuring the Board considers the project's harms and benefits on a clean slate and upholds its environmental protection duties under the ESA and ICCTA.

## CONCLUSION

   For the foregoing reasons, the Board's decision should be vacated.

49

Dated: August 18, 2022.

/s/ *Wendy Park*
Wendy Park
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
wpark@biologicaldiversity.org


Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity, Living Rivers,*
*Sierra Club, Utah Physicians for a Healthy Environment, and*
*WildEarth Guardians*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 10,993 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ *Wendy Park*
 Wendy Park

*Counsel for Petitioners Center for Biological Diversity et al.*