**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1019 (consolidated with No. 22-1020)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――

EAGLE COUNTY, COLORADO,

Petitioner,

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,

Petitioners,

v.

SURFACE TRANSPORATION BOARD, ET AL.,

Respondents,

SEVEN COUNTY INFRASTRUCTURE COALITION, ET AL.,

Intervenors.

―――――――――

ON PETITION FOR REVIEW OF FINAL ACTION OF THE
SURFACE TRANSPORTATION BOARD

―――――――――

**ADDENDUM OF PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY, ET AL.**

―――――――――

Wendy Park
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7138
wpark@biologicaldiversity.org

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity, Living Rivers,
Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians*

# ADDENDUM TABLE OF CONTENTS

**Statutes**

16 U.S.C. § 1536 ................................................................................1

42 U.S.C. § 4332 ..............................................................................10

49 U.S.C. § 10101 ............................................................................12

49 U.S.C. § 10502 ............................................................................14

49 U.S.C. § 10901 ............................................................................16

**Regulations**

40 C.F.R. § 1500.1(b) .......................................................................18

40 C.F.R. §§ 1508.7 & 1508.8 (1978) ..............................................20

50 C.F.R. § 402.02 (2016) ................................................................21

50 C.F.R. § 402.02 (2019) ................................................................24

**Standing Declarations**

Declaration of Chad Hamblin ...........................................................27

Declaration of Tom Elder ..................................................................57

Declaration of Courtney Henley ........................................................68

Declaration of Jeremy Nichols...........................................................79

Declaration of John Weisheit.............................................................93

Declaration of Brandt Mannchen.....................................................112

Declaration of Miyoko Sakashita.....................................................121

## *16 USCS § 1536*

Current through Public Law 117-166, approved August 5, 2022.

***United States Code Service  >  TITLE 16. CONSERVATION (Chs. 1 — 35)  >  CHAPTER 35. ENDANGERED SPECIES (§§ 1531 — 1544)***

# § 1536. Interagency cooperation

**(a) Federal agency actions and consultations.**

**(1)** The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act [*16 USCS § 1533*].

**(2)** Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

**(3)** Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

**(4)** Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 4 [*16 USCS § 1533*] or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

**(b) Opinion of Secretary.**

**(1)**

**(A)** Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

**(B)** In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)—

**(i)** if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth—

**(I)** the reasons why a longer period is required,

**(II)** the information that is required to complete the consultation, and

**(III)** the estimated date on which consultation will be completed; or

**(ii)** if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

**(2)** Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

**(3)**

**(A)** Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

**(B)** Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

**(4)** If after consultation under subsection (a)(2), the Secretary concludes that—

**(A)** the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

**(B)** the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

**(C)** if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972 [*16 USCS §§ 1361* et seq.]

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

**(i)** specifies the impact of such incidental taking on the species,

**(ii)** specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

**(iii)** in the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 [*16 USCS §§ 1361* et seq.] with regard to such taking, and

**(iv)** sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

**(c) Biological assessment.**

**(1)** To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on the date of enactment of the Endangered Species Act Amendments of 1978 [enacted Nov. 10, 1978], request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (*42 U.S.C. 4332*) [*42 USCS § 4332*].

**(2)** Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

**(d) Limitation on commitment of resources.**   After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2).

**(e) Endangered Species Committee.**

**(1)**   There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

**(2)**   The Committee shall review any application submitted to it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

**(3)**   The Committee shall be composed of seven members as follows:

**(A)**   The Secretary of Agriculture.

**(B)**   The Secretary of the Army.

**(C)**   The Chairman of the Council of Economic Advisors.

**(D)**   The Administrator of the Environmental Protection Agency.

**(E)**   The Secretary of the Interior.

**(F)**   The Administrator of the National Oceanic and Atmospheric Administration.

**(G)**   The President, after consideration of any recommendations received pursuant to subsection (g)(2)(B) shall appoint one individual from each affected State, as determined by the Secretary, to be a member of the Committee for the consideration of the application for exemption for an agency action with respect to which such recommendations are made, not later than 30 days after an application is submitted pursuant to this section.

**(4)**

(A)  Members of the Committee shall receive no additional pay on account of their service on the Committee.

(B)  While away from their homes or regular places of business in the performance of services for the Committee, members of the Committee shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in the Government service are allowed expenses under *section 5703 of title 5 of the United States Code* [*5 USCS § 5703*].

(5)

(A)  Five members of the Committee or their representatives shall constitute a quorum for the transaction of any function of the Committee, except that, in no case shall any representative be considered in determining the existence of a quorum for the transaction of any function of the Committee if that function involves a vote by the Committee on any matter before the Committee.

(B)  The Secretary of the Interior shall be the Chairman of the Committee.

(C)  The Committee shall meet at the call of the Chairman or five of its members.

(D)  All meetings and records of the Committee shall be open to the public.

(6)  Upon request of the Committee, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Committee to assist it in carrying out its duties under this section.

(7)

(A)  The Committee may for the purpose of carrying out its duties under this section hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Committee deems advisable.

(B)  When so authorized by the Committee, any member or agent of the Committee may take any action which the Committee is authorized to take by this paragraph.

(C)  Subject to the Privacy Act [*5 USCS § 552a* and note], the Committee may secure directly from any Federal agency information necessary to enable it to carry out its duties under this section. Upon request of the Chairman of the Committee, the head of such Federal agency shall furnish such information to the Committee.

(D)  The Committee may use the United States mails in the same manner and upon the same conditions as a Federal agency.

(E)  The Administrator of General Services shall provide to the Committee on a reimbursable basis such administrative support services as the Committee may request.

(8)  In carrying out its duties under this section, the Committee may promulgate and amend such rules, regulations, and procedures, and issue and amend such orders as it deems necessary.

(9)  For the purpose of obtaining information necessary for the consideration of an application for an exemption under this section the Committee may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents.

(10)  In no case shall any representative, including a representative of a member designated pursuant to paragraph (3)(G) of this subsection, be eligible to cast a vote on behalf of any member.

**(f) Promulgation of regulations; form and contents of exemption application.**  Not later than 90 days after the date of enactment of the Endangered Species Act Amendments of 1978 [enacted Nov. 10, 1978], the Secretary shall promulgate regulations which set forth the form and manner in which applications for exemption shall be submitted to the Secretary and the information to be contained in such applications. Such regulations shall require that information submitted in an application by the head of any Federal agency with respect to any agency action include, but not be limited to—

**(1)** a description of the consultation process carried out pursuant to subsection (a)(2) of this section between the head of the Federal agency and the Secretary; and

**(2)** a statement describing why such action cannot be altered or modified to conform with the requirements of subsection (a)(2) of this section.

**(g) Application for exemption; report to Committee.**

**(1)** A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action would violate subsection (a)(2). An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5). The applicant for an exemption shall be referred to as the "exemption applicant" in this section.

**(2)**

**(A)** An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license. For purposes of the preceding sentence, the term "final agency action" means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review. Such application shall set forth the reasons why the exemption applicant considers that the agency action meets the requirements for an exemption under this subsection.

**(B)** Upon receipt of an application for exemption for an agency action under paragraph (1), the Secretary shall promptly (i) notify the Governor of each affected State, if any, as determined by the Secretary, and request the Governors so notified to recommend individuals to be appointed to the Endangered Species Committee for consideration of such application; and (ii) publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed.

**(3)** The Secretary shall within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary—

**(A)** determine that the Federal agency concerned and the exemption applicant have—

**(i)** carried out the consultation responsibilities described in subsection (a) in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2);

**(ii)** conducted any biological assessment required by subsection (c); and

**(iii)** to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d); or

**(B)** deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii).

The denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of title 5, United States Code [*5 USCS §§ 701* et seq.].

**(4)** If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the

Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of title 5, United States Code [*5 USCS §§ 554*, *555*, *556*], and prepare the report to be submitted pursuant to paragraph (5).

**(5)** Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit to the Committee a report discussing—

**(A)** the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

**(B)** a summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance;

**(C)** appropriate reasonable mitigation and enhancement measures which should be considered by the Committee; and

**(D)** whether the Federal agency concerned and the exemption applicant refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

**(6)** To the extent practicable within the time required for action under subsection (g) of this section, and except to the extent inconsistent with the requirements of this section, the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of title 5, United States Code.

**(7)** Upon request of the Secretary, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Secretary to assist him in carrying out his duties under this section.

**(8)** All meetings and records resulting from activities pursuant to this subsection shall be open to the public.

**(h) Grant of exemption.**

**(1)** The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—

**(A)** it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—

**(i)** there are no reasonable and prudent alternatives to the agency action;

**(ii)** the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

**(iii)** the action is of regional or national significance; and

**(iv)** neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

**(B)** it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.

Any final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of title 5 of the United States Code [*5 USCS §§ 701* et seq.].

**(2)**

**(A)** Except as provided in subparagraph (B), an exemption for an agency action granted under paragraph (1) shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action—

**(i)** regardless whether the species was identified in the biological assessment; and

**(ii)** only if a biological assessment has been conducted under subsection (c) with respect to such agency action.

**(B)** An exemption shall be permanent under subparagraph (A) unless—

**(i)** the Secretary finds, based on the best scientific and commercial data available, that such exemption would result in the extinction of a species that was not the subject of consultation under subsection (a)(2) or was not identified in any biological assessment conducted under subsection (c), and

**(ii)** the Committee determines within 60 days after the date of the Secretary's finding that the exemption should not be permanent.

If the Secretary makes a finding described in clause (i), the Committee shall meet with respect to the matter within 30 days after the date of the finding.

**(i) Review by Secretary of State; violation of international treaty or other international obligation of United States.**   Notwithstanding any other provision of this Act, the Committee shall be prohibited from considering for exemption any application made to it, if the Secretary of State, after a review of the proposed agency action and its potential implications, and after hearing, certifies, in writing, to the Committee within 60 days of any application made under this section that the granting of any such exemption and the carrying out of such action would be in violation of an international treaty obligation or other international obligation of the United States. The Secretary of State shall, at the time of such certification, publish a copy thereof in the Federal Register.

**(j) Exemption for national security reasons.**   Notwithstanding any other provision of this Act, the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security.

**(k) Exemption decision not considered major Federal action; environmental impact statement.**   An exemption decision by the Committee under this section shall not be a major Federal action for purposes of the National Environmental Policy Act of 1969 (*42 U.S.C. 4321* et seq.): *Provided,* That an environmental impact statement which discusses the impacts upon endangered species or threatened species or their critical habitats shall have been previously prepared with respect to any agency action exempted by such order.

**(l) Committee order granting exemption; cost of mitigation and enhancement measures; report by applicant to Council on Environmental Quality.**

**(1)** If the Committee determines under subsection (h) that an exemption should be granted with respect to any agency action, the Committee shall issue an order granting the exemption and specifying the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out and paid for by the exemption applicant in implementing the agency action. All necessary mitigation and enhancement measures shall be authorized prior to the implementing of the agency action and funded concurrently with all other project features.

**(2)** The applicant receiving such exemption shall include the costs of such mitigation and enhancement measures within the overall costs of continuing the proposed action. Notwithstanding the preceding sentence the costs of such measures shall not be treated as project costs for the purpose of computing benefit-cost or other ratios for the proposed action. Any applicant may request the Secretary to carry out such mitigation and enhancement measures. The costs incurred by the Secretary in carrying out any such measures shall be paid by the applicant receiving the exemption. No later than one year after

the granting of an exemption, the exemption applicant shall submit to the Council on Environmental Quality a report describing its compliance with the mitigation and enhancement measures prescribed by this section. Such a report shall be submitted annually until all such mitigation and enhancement measures have been completed. Notice of the public availability of such reports shall be published in the Federal Register by the Council on Environmental Quality.

**(m) Notice requirement for citizen suits not applicable.**   The 60-day notice requirement of section 11(g) of this Act [*16 USCS § 1540(g)*] shall not apply with respect to review of any final determination of the Committee under subsection (h) of this section granting an exemption from the requirements of subsection (a)(2) of this section.

**(n) Judicial review.**   Any person, as defined by section 3(13) of this Act [*16 USCS § 1532(13)*], may obtain judicial review, under chapter 7 of title 5 of the United States Code, of any decision of the Endangered Species Committee under subsection (h) in the United States Court of Appeals for (1) any circuit wherein the agency action concerned will be, or is being, carried out, or (2) in any case in which the agency action will be, or is being, carried out outside of any circuit, the District of Columbia, by filing in such court within 90 days after the date of issuance of the decision, a written petition for review. A copy of such petition shall be transmitted by the clerk of the court to the Committee and the Committee shall file in the court the record in the proceeding, as provided in *section 2112, of title 28, United States Code*. Attorneys designated by the Endangered Species Committee may appear for, and represent the Committee in any action for review under this subsection.

**(o) Exemption as providing exception on taking of endangered species.**   Notwithstanding sections 4(d) and 9(a)(1)(B) and (C) [*16 USCS §§ 1533(d)*, *1538(a)(1)(B)*, (C)], sections 101 and 102 of the Marine Mammal Protection Act of 1972 [*16 USCS §§ 1361* et seq.], or any regulation promulgated to implement any such section—

   **(1)**  any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

   **(2)**  any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

**(p) Exemptions in Presidentially declared disaster areas.**   In any area which has been declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act, the President is authorized to make the determinations required by subsections (g) and (h) of this section for any project for the repair or replacement of a public facility substantially as it existed prior to the disaster under section 405 or 406 of the Disaster Relief and Emergency Assistance Act [*42 USCS § 5171* or *§ 5172*], and which the President determines (1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of this section to be followed. Notwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection.

## History

**HISTORY:**

Dec. 28, 1973, *P. L. 93-205*, § 7, *87 Stat. 892*; Nov. 10, 1978, *P. L. 95-632*, § 3, *92 Stat. 3752*; Dec. 28, 1979, *P. L. 96-159*, § 4, *93 Stat. 1226*; Oct. 13, 1982, *P. L. 97-304*, §§ 4(a), 8(b), *96 Stat. 1417*, 1426; Nov. 14, 1986, *P. L. 99-659*, Title IV, § 411(b), *100 Stat. 3741*, 3742; Nov. 23, 1988, *P. L. 100-707*, Title I, § 109(g), *102 Stat. 4709*.

United States Code Service
Copyright © 2022 All rights reserved.

**End of Document**

## *42 USCS § 4332, Part 1 of 2*

Current through Public Law 117-166, approved August 5, 2022.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 163)  >
CHAPTER 55. NATIONAL ENVIRONMENTAL POLICY (§§ 4321 — 4370m-12)  >  POLICIES AND
GOALS (§§ 4331 — 4335)*

# § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act [*42 USCS §§ 4321* et seq.], and (2) all agencies of the Federal Government shall—

**(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act [*42 USCS §§ 4341* et seq.], which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations;

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

　**(i)** the environmental impact of the proposed action,

　**(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

　**(iii)** alternatives to the proposed action,

　**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

　**(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by *section 552 of title 5, United States Code*, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

　**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

　**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

(iii)  the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv)  after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this Act [*42 USCS §§ 4321* et seq.]; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction. [;]

(E)  study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F)  recognize the worldwide and longrange character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G)  make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H)  initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I)  assist the Council on Environmental Quality established by title II of this Act [*42 USCS §§ 4341* et seq.].

# History

**HISTORY:**

Jan. 1, 1970, *P. L. 91-190*, Title I, § 102, *83 Stat. 853*; Aug. 9, 1975, *P. L. 94-83*, *89 Stat. 424*.

United States Code Service
Copyright © 2022 All rights reserved.

**End of Document**

## *49 USCS § 10101*

Current through Public Law 117-166, approved August 5, 2022.

*United States Code Service  >  TITLE 49. TRANSPORTATION (§§ 101 — 80504)  >  Subtitle IV. Interstate Transportation (Pts. A — C)  >  Part A. Rail (Chs. 101 — 119)  >  CHAPTER 101. General Provisions (§§ 10101 — 10388)*

# § 10101. Rail transportation policy

In regulating the railroad industry, it is the policy of the United States Government—

**(1)** to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

**(2)** to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

**(3)** to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Board;

**(4)** to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

**(5)** to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

**(6)** to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

**(7)** to reduce regulatory barriers to entry into and exit from the industry;

**(8)** to operate transportation facilities and equipment without detriment to the public health and safety;

**(9)** to encourage honest and efficient management of railroads;

**(10)** to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

**(11)** to encourage fair wages and safe and suitable working conditions in the railroad industry;

**(12)** to prohibit predatory pricing and practices, to avoid undue concentrations of market power, and to prohibit unlawful discrimination;

**(13)** to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information;

**(14)** to encourage and promote energy conservation; and

**(15)** to provide for the expeditious handling and resolution of all proceedings required or permitted to be brought under this part [*49 USCS §§ 10101* et seq.].

# History

**HISTORY:**

Added Dec. 29, 1995, *P. L. 104-88*, Title I, § 102(a), *109 Stat. 804.*

United States Code Service
Copyright © 2022 All rights reserved.

---

**End of Document**

## *49 USCS § 10502*

Current through Public Law 117-166, approved August 5, 2022.

***United States Code Service  >  TITLE 49. TRANSPORTATION (§§ 101 — 80504)  >  Subtitle IV. Interstate Transportation (Pts. A — C)  >  Part A. Rail (Chs. 101 — 119)  >  CHAPTER 105. Jurisdiction (§§ 10501 — 10562)***

## § 10502. Authority to exempt rail carrier transportation

**(a)**  In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Board under this part [*49 USCS §§ 10101* et seq.], the Board, to the maximum extent consistent with this part [*49 USCS §§ 10101* et seq.], shall exempt a person, class of persons, or a transaction or service whenever the Board finds that the application in whole or in part of a provision of this part [*49 USCS §§ 10101* et seq.]—

   **(1)**  is not necessary to carry out the transportation policy of section 10101 of this title [*49 USCS § 10101*]; and

   **(2)**  either—

      **(A)**  the transaction or service is of limited scope; or

      **(B)**  the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.

**(b)**  The Board may, where appropriate, begin a proceeding under this section on its own initiative or on application by the Secretary of Transportation or an interested party. The Board shall, within 90 days after receipt of any such application, determine whether to begin an appropriate proceeding. If the Board decides not to begin a class exemption proceeding, the reasons for the decision shall be published in the Federal Register. Any proceeding begun as a result of an application under this subsection shall be completed within 9 months after it is begun.

**(c)**  The Board may specify the period of time during which an exemption granted under this section is effective.

**(d)**  The Board may revoke an exemption, to the extent it specifies, when it finds that application in whole or in part of a provision of this part [*49 USCS §§ 10101* et seq.] to the person, class, or transportation is necessary to carry out the transportation policy of section 10101 of this title [*49 USCS § 10101*]. The Board shall, within 90 days after receipt of a request for revocation under this subsection, determine whether to begin an appropriate proceeding. If the Board decides not to begin a proceeding to revoke a class exemption, the reasons for the decision shall be published in the Federal Register. Any proceeding begun as a result of a request under this subsection shall be completed within 9 months after it is begun.

**(e)**  No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title [*49 USCS § 11706*]. Nothing in this subsection or section 11706 of this title [*49 USCS § 11706*] shall prevent rail carriers from offering alternative terms nor give the Board the authority to require any specific level of rates or services based upon the provisions of section 11706 of this title [*49 USCS § 11706*].

**(f)**  The Board may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement.

**(g)**  The Board may not exercise its authority under this section to relieve a rail carrier of its obligation to protect the interests of employees as required by this part [*49 USCS §§ 10101* et seq.].

# History

**HISTORY:**

Added Dec. 29, 1995, *P. L. 104-88*, Title I, § 102(a), *109 Stat. 808.*

United States Code Service
Copyright © 2022 All rights reserved.

**End of Document**

### [49 USCS § 10901](#)

Current through Public Law 117-166, approved August 5, 2022.

*United States Code Service  >  TITLE 49. TRANSPORTATION (§§ 101 — 80504)  >  Subtitle IV. Interstate Transportation (Pts. A — C)  >  Part A. Rail (Chs. 101 — 119)  >  CHAPTER 109. Licensing (§§ 10901 — 10936)*

## § 10901. Authorizing construction and operation of railroad lines

**(a)** A person may—

   **(1)** construct an extension to any of its railroad lines;

   **(2)** construct an additional railroad line;

   **(3)** provide transportation over, or by means of, an extended or additional railroad line; or

   **(4)** in the case of a person other than a rail carrier, acquire a railroad line or acquire or operate an extended or additional railroad line,

only if the Board issues a certificate authorizing such activity under subsection (c).

**(b)** A proceeding to grant authority under subsection (a) of this section begins when an application is filed. On receiving the application, the Board shall give reasonable public notice, including notice to the Governor of any affected State, of the beginning of such proceeding.

**(c)** The Board shall issue a certificate authorizing activities for which such authority is requested in an application filed under subsection (b) unless the Board finds that such activities are inconsistent with the public convenience and necessity. Such certificate may approve the application as filed, or with modifications, and may require compliance with conditions (other than labor protection conditions) the Board finds necessary in the public interest.

**(d)**

   **(1)** When a certificate has been issued by the Board under this section authorizing the construction or extension of a railroad line, no other rail carrier may block any construction or extension authorized by such certificate by refusing to permit the carrier to cross its property if—

      **(A)** the construction does not unreasonably interfere with the operation of the crossed line;

      **(B)** the operation does not materially interfere with the operation of the crossed line; and

      **(C)** the owner of the crossing line compensates the owner of the crossed line.

   **(2)** If the parties are unable to agree on the terms of operation or the amount of payment for purposes of paragraph (1) of this subsection, either party may submit the matters in dispute to the Board for determination. The Board shall make a determination under this paragraph within 120 days after the dispute is submitted for determination.

## History

**HISTORY:**

Added Dec. 29, 1995, *P. L. 104-88*, Title I, § 102(a), *109 Stat. 822*.

49 USCS § 10901

United States Code Service
Copyright © 2022 All rights reserved.

**End of Document**

## *40 CFR 1500.1*

This document is current through the Aug. 12, 2022 issue of the Federal Register, with the exception of the amendments appearing at 87 FR 47116.

*Code of Federal Regulations  >  Title 40 Protection of Environment  >  Chapter V — Council on Environmental Quality  >  Subchapter A — National Environmental Policy Act Implementing Regulations  >  Part 1500 — Purpose and Policy*

## Notice

 . This section has more than one version with varying effective dates.

## § 1500.1 Purpose.

**(a)** The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

**(b)** NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

**(c)** Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork — even excellent paperwork — but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## Statutory Authority

NEPA, the Environmental Quality Improvement Act of 1970, as amended (*42 U.S.C. 4371* et seq.), sec. 309 of the Clean Air Act, as amended (*42 U.S.C. 7609*) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

*Authority Note Applicable to 40 CFR Ch. V, Pt. 1500*

## History

40 CFR 1500.1

[43 FR 55990, Nov. 28, 1978; *85 FR 43304*, 43357, July 16, 2020]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2022 All rights reserved.

**End of Document**

**§ 1508.6  Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

**§ 1508.7  Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**§ 1508.8  Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**§ 1508.9  Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**§ 1508.10  Environmental document.**

*Environmental document* includes the documents specified in §1508.9 (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent).

**§ 1508.11  Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

**§ 1508.12  Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**§ 1508.13  Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not

*2016 50 CFR 402.02*

2016 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 50 -- WILDLIFE AND FISHERIES  > CHAPTER IV -- JOINT REGULATIONS (UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR AND NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, DEPARTMENT OF COMMERCE); ENDANGERED SPECIES COMMITTEE REGULATIONS  >  SUBCHAPTER A  >  PART 402 -- INTERAGENCY COOPERATION -- ENDANGERED SPECIES ACT OF 1973, AS AMENDED  > SUBPART A -- GENERAL*

## § 402.02 Definitions.

Act means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq.

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

    **(a)** actions intended to conserve listed species or their habitat;

    **(b)** the promulgation of regulations;

    **(c)** the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

    **(d)** actions directly or indirectly causing modifications to the land, water, or air.

Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

Applicant refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action.

Biological assessment refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat.

Biological opinion is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

Conference is a process which involves informal discussions between a Federal agency and the Service under section 7(a)(4) of the Act regarding the impact of an action on proposed species or proposed critical habitat and recommendations to minimize or avoid the adverse effects.

Conservation recommendations are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

Critical habitat refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

Designated non-Federal representative refers to a person designated by the Federal agency as its representative to conduct informal consultation and/or to prepare any biological assessment.

Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not

2016 50 CFR 402.02

limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

Director refers to the Assistant Administrator for Fisheries for the National Oceanic and Atmospheric Administration, or his authorized representative; or the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out.

Early consultation is a process requested by a Federal agency on behalf of a prospective applicant under section 7(a)(3) of the Act.

Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

Formal consultation is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

Framework programmatic action means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

Listed species means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11-17.12.

Major construction activity is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].

Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Preliminary biological opinion refers to an opinion issued as a result of early consultation.

Proposed critical habitat means habitat proposed in the FEDERAL REGISTER to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

Proposed species means any species of fish, wildlife, or plant that is proposed in the FEDERAL REGISTER to be listed under section 4 of the Act.

Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be

implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

Reasonable and prudent measures refer to those actions the Director believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take.

Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

Service means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.

## Statutory Authority

16 U.S.C. 1531 et seq.

## History

[51 FR 19957, June 3, 1986; 73 FR 76272, 76286, Dec. 16, 2008; 74 FR 20421, 20422, May 4, 2009; 80 FR 26832, 26844, May 11, 2015; 81 FR 7214, 7225, February 11, 2016]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2022, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**End of Document**

### *2019 50 CFR 402.02*

2019 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS     >  TITLE 50 -- WILDLIFE AND FISHERIES  > CHAPTER IV -- JOINT REGULATIONS (UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR AND NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, DEPARTMENT OF COMMERCE); ENDANGERED SPECIES COMMITTEE REGULATIONS  >  SUBCHAPTER A  >  PART 402 -- INTERAGENCY COOPERATION -- ENDANGERED SPECIES ACT OF 1973, AS AMENDED  > SUBPART A -- GENERAL  >  § 402.02 Definitions.*

## § 402.02 Definitions.

Act means the Endangered Species Act of 1973, as amended, *16 U.S.C. 1531* et seq.

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

**(a)** actions intended to conserve listed species or their habitat;

**(b)** the promulgation of regulations;

**(c)** the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

**(d)** actions directly or indirectly causing modifications to the land, water, or air.

Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

Applicant refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action.

Biological assessment refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat.

Biological opinion is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

Conference is a process which involves informal discussions between a Federal agency and the Service under section 7(a)(4) of the Act regarding the impact of an action on proposed species or proposed critical habitat and recommendations to minimize or avoid the adverse effects.

Conservation recommendations are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

Critical habitat refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

Designated non-Federal representative refers to a person designated by the Federal agency as its representative to conduct informal consultation and/or to prepare any biological assessment.

Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species. Director refers to the Assistant

Administrator for Fisheries for the National Marine Fisheries Service, or his or her authorized representative; or the Director of the U.S. Fish and Wildlife Service, or his or her authorized representative.

Director refers to the Assistant Administrator for Fisheries for the National Oceanic and Atmospheric Administration, or his authorized representative; or the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out.

Early consultation is a process requested by a Federal agency on behalf of a prospective applicant under section 7(a)(3) of the Act.

Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.

Formal consultation is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

Framework programmatic action means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

Listed species means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in *50 CFR 17.11-17.12*.

Major construction activity is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, *42 U.S.C. 4332(2)(C)*].

Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Preliminary biological opinion refers to an opinion issued as a result of early consultation.

Programmatic consultation is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

Proposed critical habitat means habitat proposed in the FEDERAL REGISTER to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

Proposed species means any species of fish, wildlife, or plant that is proposed in the FEDERAL REGISTER to be listed under section 4 of the Act.

Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

Reasonable and prudent measures refer to those actions the Director believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take.

Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

Service means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.

## Statutory Authority

16 U.S.C. 1531 et seq.

## History

[51 FR 19957, June 3, 1986; 73 FR 76272, 76286, Dec. 16, 2008; 74 FR 20421, 20422, May 4, 2009; 80 FR 26832, 26844, May 11, 2015; 81 FR 7214, 7225, February 11, 2016; 84 FR 44976, 45016, Aug. 27, 2019; 84 FR 50333, Sept. 25, 2019]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2022, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

End of Document

## DECLARATION OF CHAD HAMBLIN

I, Chad Hamblin, hereby declare as follows

1.      I have personal knowledge of the facts set forth herein which are known by me to be true and correct and, if called as a witness, I could and would competently testify to them.

2.      I have been a current member of the Center for Biological Diversity since 2020. I am providing this declaration in support of the Center for Biological Diversity's lawsuit challenging the Surface Transportation Board's authorization of the construction and operation of the Uinta Basin Railway by the Seven County Infrastructure Coalition (SCIC).

3.      I live in Cedarview, Utah, six miles northwest of Roosevelt. I have worked in education for 18 years as a high school teacher and teacher's aide. I have owned my home in Roosevelt, Utah for 17 years. I live here with my wife, Kristina. Except for a nine-month period when I lived in Oregon (between August 2018 and May 2019), my permanent residence has been in Utah all my life.

4.      I oppose construction of the Uinta Basin Railway because I do not want to see more oil and gas development in the Uinta Basin, and particularly on public lands. I understand that the purpose of the railway is to spur increased oil production in the Uinta Basin by providing a cheaper means of oil transport out of the Basin. Further, I am concerned about the impact of the railroad's construction

1

and operations in the areas it could be built. The route for the railway goes through Indian Canyon, near and around areas I recreate in.

5.    In the area I live, we are surrounded by oil wells. South of the road that goes by our house, there is an oil well less than a quarter of a mile away. Half a mile to the north of us is another oil well, and a mile or so to the east is another oil well. A gas refinery is located a couple miles to the northwest of our home (Figure 1). Sometimes from my house at night I can see the flames from the gas refinery burning off waste product, and often even hear the flaring from inside my home. I've spent some time working as a classroom aide at Altamont Elementary School, and I am concerned about another gas refinery that also burns waste product, just about two miles upwind from that school (Figure 2).

 

**Figure 1 (left).** Me at the refinery near my house. **Figure 2 (right).** A view of the refinery near the school.

6.    Our water comes from an artesian well, which means we don't need a pump to draw water—pressure down in the water table pushes it out. I worry about

our well water being vulnerable to pollution from all the oil wells around us. I'm

concerned about fracking and the chemicals oil drillers are putting into the ground,

which I understand some oil companies keep secret even from their own workers.

Some of these chemicals could be toxic and could ruin our well water. I worry that

development of the Uinta Basin Railway could lead to more drilling and oil

operations near and around my home and could increase the risk of pollutants

contaminating the water. If fracking operations use the local groundwater, the

water withdrawals could deplete the aquifer we rely on.

7.       I also worry increased oil and gas drilling in the Uinta Basin will

increase truck traffic around my home. A lot of oil field traffic already goes past

my house, which causes noise, pollution, and an inconvenience when I'm driving.

More traffic on the roads makes accidents more likely, creates more congestion,

and makes it harder for me to pull out onto the road from my home. More traffic

makes me concerned about my own safety but also increased hazards for wildlife,

such as deer and snakes, which I enjoy seeing around my home. I once saw that

adolescent great horned owls that lived in a spruce tree by my home had been hit

on the road. Animals that are struck might also create hazards attracting other

wildlife to the roads. More truck traffic will endanger wildlife and reduce my

ability to see wildlife near my home.

8.    Ozone pollution from oil and gas development is a problem in the Uinta Basin. Odors are a problem, too. For about the last 7 years, my wife Kristina and I have hiked and skied in the desert on Bureau of Land Management (BLM) land in Uintah County between Roosevelt and Vernal. We sometimes go every week, but on average we visit this area twice a month. Occasionally the air smells bad, like chemicals. Because there isn't much human activity out in this area except for oil and gas wells, the smell is probably from oil and gas operations. One time when we were there the air smelled so bad, we turned around and went back home. It felt like we were breathing in something that was bad for our health. Sometimes, around our house, we can smell the settling ponds used for wastewater from oil drilling operations. If the wind is right, we can smell the odors coming off the ponds, and it smells like rotten eggs. I am concerned that if the Uinta Basin Railway is built, increased oil and gas development the Railway is designed to induce could worsen these odor and air quality problems around my home and the areas where I recreate.

9.    Kristina and I both love the outdoors, and we do a lot of outdoor recreation in the Uinta Basin. The main activities we enjoy are camping, hiking and cross-country skiing. I ski on public lands all around the Uinta Basin every year at least once a month when there's enough snow, and I go hiking in the Uinta

Basin throughout the year. This year we have visited natural areas on public lands in the Uinta Basin every month up to August.

10.    My parents nurtured my love of nature from early childhood. We spent time hiking, camping, and horseback riding as a family. My mother was my Cub Scout leader, and my father was my Scoutmaster when I was a boy, and I spent a lot of time in the outdoors as a Cub Scout and Boy Scout and I earned the rank of Eagle Scout. In turn, I was a Scoutmaster for about 20 years, taking kids on trips around the Uinta Basin. My father's side of the family has lived in and loved this area for decades, and I am a fifth-generation resident of the Uinta Basin. I have an older brother who loves to hunt and fish, and spending time with him outdoors has greatly contributed to my love of wild places and the creatures that live in them. I love being out in nature observing, learning, teaching, and creating with family and friends especially on public lands. I also love spending time in nature alone and appreciate the solitude I find in wild places.

11.    I am concerned that the Uinta Basin Railway will lead to increased oil and gas development on public lands that I enjoy for recreation, or lands around these areas. For example, Kristina and I hike on BLM land between Roosevelt and Vernal. This includes areas around Halfway Hollow (about 14 miles from the railway, see Figure 3 below) and Twelve-Mile Wash, among other places. We last came here on July 8, 2022, and we try to visit this area at least once or twice a

5

month. We call part of that area "the Yellow Flower Desert," because we see so many pretty yellow flowers blooming there. We also find wild onions, which we enjoy nibbling on. We have set out trail cameras in this general area to photograph wildlife, and have captured photos of rabbits, coyotes, pronghorn, bobcats, a golden eagle, black rosy-finch ("critically imperiled" in Utah and "endangered" according to the International Union for Conservation of Nature), and other wildlife (Figure 4).





**Figure 3 (top).** Kristina hiking with me near Halfway Hollow. **Figure 4 (bottom).** One of our trail camera photos.

6

12.    I have seen and heard oil and gas development while hiking in this area, and I worry that the railway will bring increased oil and gas development across the Uinta Basin, including this region. I know there is an oil well next to Halfway Hollow, about three-quarters of a mile from where the black rosy finches and other wildlife were photographed. More well pads and roads would cause habitat loss for the wildlife I enjoy viewing and habitat fragmentation of wild areas, reducing my ability to view and photograph wildlife. Oil operations on these lands would make it harder to find solitude and quiet that I seek when I go hiking. I'm also worried about oil companies engaging in illegal activities, which could harm the places I recreate in. I've heard about people illegally hauling oil wastewater out in the middle of the desert at night and dumping waste in washes or canyons, and I have wondered whether reports of unexplained foam pollution in streams could result from this type of illegal dumping.

13.    I am also concerned the railway could lead to more tar sands development on BLM lands in the Book Cliffs. The SCIC has talked about using the railway for moving tar sands out of the Basin. The railroad could facilitate increased strip mining in that area, and potentially it could be a huge strip mine. I have skied, camped, and hiked around the Book Cliffs for 20 years. I went there in the fall of 2013 with my dad, who was seventy-eight years old at the time. We traveled Seep Ridge Road, which goes through the Book Cliffs, and camped at PR

7

Springs—a popular campsite on BLM land that's within a mile of the existing mine. We had a great time exploring the area around our campsite. We drove the short distance to the summit and enjoyed the vast view of the rugged canyons of the Book Cliffs to the south, and beyond them the La Sal Mountains. On our way home we stopped and enjoyed the views at the Willow Creek overlook. Being there in the Book Cliffs area with my dad was a priceless experience. I plan on going back to visit the area this November (2022), with Kristina.

14.     Seep Ridge Road was paved several years ago to improve access for tar sands mining in the Book Cliffs. The road has already changed the experience of this area. It feels busier with traffic from industry vehicles and other vehicles. I do not visit here as regularly as other public lands in the Uinta Basin because of this traffic, but I plan to go back for hiking around PR Springs, including during the November trip with Kristina, and I also plan to go back for skiing this winter. Expanded tar sands development in this area would take away from the experience of solitude, quiet, and scenic recreation that I seek when I visit this area by bringing in more traffic and development and by harming deer and other wildlife that I enjoy viewing.

15.     Kristina and I used to enjoy hiking in the Ouray National Wildlife Refuge here in the Uinta Basin, but after we learned about plans for an oil well to be developed right in the middle of the refuge, next to the Green River, we have

8

not had the heart to go back. Seeing the impacts once the well is put in would be too upsetting for us. There is a tourist attraction in the Uinta Basin called Fantasy Canyon, known for its weird hoodoo rock formations. It is surrounded by a sea of oil and gas development, but the county promotes it as a tourism site. The first time I took Kristina there she was amazed by the awesome hoodoos at the site, and she was shocked by the negative impacts of oil drilling on the land all around Fantasy Canyon. A stone's throw from this site is an oil well and warning signs to stay away from the well due to poisonous gas around the well. Encountering scenes like this in the places I recreate would spoil the experience for me.

16.     The potential for the railway to increase drilling near and around Dinosaur National Monument is another concern I have. I like to hike the narrow little canyons on BLM land close to the monument, and in the flats above the canyons. I also do wildlife photography and skiing in this area. I visit this area two to three times a year and plan to continue visiting this area every year. I believe this area could be threatened with oil and gas development if the railway were to be built, as there have been controversial proposals for oil and gas leasing near the monument in recent years. Several years ago, my dad and I took one of my co-workers and his family on a trip to the area. We camped on BLM land on Wagon Road Ridge, just outside of the Island Park part of Dinosaur National Monument. I got up early the next morning and took photos of the incredible scenery, and as I

9

was doing so, I found the tracks of a mountain lion that had passed by our camp in the night. I was thrilled and made plaster casts of the tracks. As we were leaving the area, we talked to a local photographer who had come to visit the area and he told us that there had been plans to put an oil well exactly in the location where we had camped, but that conservationists had succeeded in stopping the proposed well from being developed. I am so grateful a well wasn't put there, and so worried that the railway could lead to development there, and in other places around Dinosaur National Monument—a region that is a national treasure that should be protected for the present and future generations to enjoy. I revisited Dinosaur National Monument in June 2021, to view the area BLM proposes to build oil and gas wells next to the west boundary of the national monument. I submitted comments to the agency protesting the building of oil and gas wells in this beautiful area. Dinosaur National Monument is designated as an international dark sky park by the International Dark Sky Association because of its remote location and no light pollution. Oil and gas development would impact this designation because of the light pollution that happens with oil and gas construction. "[M]assive oil and gas development projects, often located far from populated areas, are incredibly bright affairs that produce light pollution on a scale few people realize…which have

significant ecological impacts for birds."[1] Dinosaur National Monument is one of the twelve national parks most threatened by oil and gas drilling.[2]

17.    Another place that has been impacted by the oil and gas industry here in the Uinta Basin is the area around the White River. I once participated in a rafting trip down the White River, and I would love to do that again, but I know that area is being encroached upon by oil and gas development. See Figures 5 and 6 below. When I was a Scoutmaster, I took my troop once every three years to a district campout at a site overlooking the White River. I remember one year sitting by a little campfire with my troop. One of the boys told stories while the other boys and I listened intently. It was a magical experience. I talked to the boys about the importance of conserving resources by doing things like only burning little dead limbs and not harming the vegetation. When I took my troop back to the area three years later, I hoped to camp at the same site but was shocked to see that in the place where our little camp had been there's now a big oil well pad with an oil well on it. A lot of people here in the Basin would love to see what remains of the wild

---

[1] Kadaba, Dipika, Blinded by the Light Pollution, The Revelator, May 21, 2018, available at: https://therevelator.org/blinded-light-pollution/.

[2] National Parks Conservation Association, The 12 Parks Most Threatened by Oil & Gas Drilling, Blog Post, Nov. 1, 2019, available at: https://www.npca.org/articles/2329-the-12-parks-most-threatened-by-oil-gas-drilling.

11

White River area protected, but the Uinta Basin Railway would make that much more unlikely.

 

**Figure 5 (left).** A satellite image of the White River area, including oil and gas well pads and access roads north of the river. **Figure 6 (right).** Friends on the raft with me on the White River.

18.    I have looked at the Surface Transportation Board's (STB's) maps of the rail route for the Uinta Basin Railway. The Whitmore Park route selected by the STB is near areas that I enjoy visiting in the southern part of the Ashley National Forest, including Sowers Canyon and Anthro Mountain, which are adjacent to each other. Sower's Canyon is about five to eight miles east of the railway route and Anthro Mountain and other areas I visit are east of that. For the last five or six years, I have visited this general area two to three times a year - for hiking, skiing, and wildlife viewing. In the fall of 2019 Kristina and I hiked on the west side of Sowers Canyon, in an area that is part of the Cottonwood unit that was recently evaluated by the Forest Service for its potential to be added to the

12

038

country's wilderness preservation system. This is the same roadless/potential wilderness unit that the Uinta Railway would cut through on the east side of Indian Canyon. My enjoyment of the wild lands between Indian Canyon and Sowers Canyon, and beyond, would be drastically negatively impacted by the railway.

19.    Oil and gas drillers have already developed parts of the national forest for oil and gas, and I am also concerned that the railway will lead to more oil and gas drilling around the southern part of the Ashley National Forest (Anthro Mountain, Sowers Canyon, Antelope Canyon, and other canyons) that I visit. For example, the U.S. Forest Service and Bureau of Land Management approved a 400-well project in the south Ashley, which was challenged by the conservation group WildEarth Guardians in 2014 (but I am not sure what has happened with the lawsuit since).  This part of the national forest is mostly wild, and I have surveyed the Anthro Mountain area for wilderness values for the organization Utah Environmental Congress (UEC), which is now part of WildEarth Guardians. The opportunities for solitude, being surrounded by natural scenery, and viewing wildlife or observing and tracking their footprints attract me to this place. One of my favorite sights in the area is in Mine Hollow (on the east side of Sowers Canyon), where an outstanding ice flow that I enjoy viewing and photographing forms each winter. See Figure 7 below. I've been to the ice flow multiple times, and in March 2021 Kristina and I hiked there with our dogs. We plan to visit the

13

ice flow again this winter. The 400-well project included plans to put an oil well right next to the ice flow, and if an oil well is put there the magic of the place will be destroyed, and I will not go there anymore.



**Figure 7.** Me at the ice flow at the mouth of Mine Hollow. At one time there were plans to put an oil well right next to this ice flow.

20.    I have observed, or observed the tracks of, mule deer, bobcats, mountain lions, coyotes, and elk around Sowers Canyon and Anthro Mountain. I worry that the increased oil and gas activities, and the associated increase in truck traffic, that would result from the railway could result in collisions with these animals, scare them away with noise, or change their behavior, making it more difficult to come across them and view them (similar to how I worry about direct impacts to wildlife from the railway and trains that would take place in Indian

Canyon). In the far eastern part of the southern unit of the Ashley National Forest the 400-well project would impact the Antelope Canyon area. In May 2021, I did a three-day trip in this area, and I most recently visited the area in January 2022 when I cross-country skied up a side canyon on the west side of Left Fork Antelope Canyon. I've also hiked in the Antelope Canyon area alone and with my wife. Last October, I hiked on a ridge with large old-growth pinyon and juniper trees and beautiful views, and as I enjoyed the scenery and the solitude, I thought about the fact that there had once been plans to build a road and oil wells on that ridge. I plan to continue going back to the area to hike and ski, but if increased oil and gas development from the railway leads to roads and oil wells being constructed there, I will have no reason to go back and will have lost one of my favorite places to hike, ski, and observe nature.

21.     Increased drilling in and around Sowers Canyon and other parts of the national forest would harm my ability to enjoy the forest, because the landscape would be fragmented with oil wells, development, and bare, broken land where there used to be forested areas interspersed with naturally open sagebrush/grassland areas. It would also harm my ability to observe the greater sage-grouse in the national forest, which provides habitat to sage-grouse. I have enjoyed viewing this bird in a part of the Ashley National Forest where an oil and gas driller planned to develop oil and gas wells as part of the 400-well project

mentioned above. I would like to photograph it in its natural habitat, but I may not be able to do so if increased oil and gas drilling forces sage-grouse out of this area.

22.     I also worry about the effects that increased drilling could have on archaeological sites in the region. While doing survey work for the UEC around Anthro Mountain I saw and photographed a stone tool in a place where there were signs for the development of a new oil well. I hope that artifact wasn't destroyed by the project, and I worry about all the other artifacts and archaeological sites that could be destroyed by increased oil and gas development—and by the railway itself.

23.     On May 5, 2020, I visited an area called Wide Hollow that would be impacted by the Whitmore Park route, and I hiked and skied in this area. This canyon is about a mile wide and connects Indian Canyon to the ridge to the south (between Indian Canyon and Argyle Canyon). I hiked near the planned railway route which tunnels through the ridge of the mouth of Wide Hollow. While hiking and skiing in the area I observed bear claw marks on trees, mountain lion tracks, deer tracks, elk, and a horned lizard. In May of 2021, I hiked from Indian Canyon, in the vicinity of the proposed railway route, up over the ridge to the north and down into Trail Hollow. I observed many signs of bears and other wildlife. If the railway were built along the planned Whitmore Park route, I may not be able to see wildlife as much, as construction and operation will destroy some of their habitat,

and noise and other disturbance caused by up to ten two-mile-long trains per day will likely cause wildlife to avoid the areas near the tracks.

24.    One of my favorite things to do is cross-country ski, and Indian Canyon is one of my favorite places to ski. I had ski trips in Indian Canyon in January, February, and March of this year. I also found an area with enough snow to ski on in April – in an unnamed hollow on the south side of Indian Canyon. It was one of the best places I've ever found to ski, and I had so much fun that I didn't want to stop (I kept skiing until it got too dark to see). I was disappointed when I looked at a map of the planned railway and realized that the railway would cut through the place where I skied. The railway would ruin the opportunity for myself and others to ski there, and in the other areas in the Canyon where I have previously skied, by scarring them with construction, and by filling the backcountry with noise. A photo of me skiing in the unnamed hollow, and a map of its location, are included here as Figures 8 and 9.

17

 

**Figure 8 (left).** Me skiing in an unnamed hollow. **Figure 9 (right).** Aerial view, with the hollow I skied in visible in the center and proposed railway route shown in green and tunnel shown in yellow.

25.     I enjoy seeing bristlecone pines in Indian Canyon. There are two stands of them, and in February of 2021 the Utah Native Plant society published an article I wrote about one of those stands. The railway would detract from the enjoyment of visiting the stands, especially since it would pass right next to one of them. In April of this year, I camped for three days in a dispersed camping area on National Forest land in Indian Canyon called Spring Hollow Road. The railway would run right next to the area where people camp and picnic and would cause people, including myself, to no longer want to or be able to camp there. See Figures 10 and 11, below.

18



**Figure 10 (left).** Me camping in Indian Canyon (April 2022).
**Figure 11 (right).** Aerial view, with the proposed railway route shown running between Highway 191 and the dirt road and dispersed camping sites.

26.    I've enjoyed photographing elk and other wildlife in Indian Canyon, and I worry about the impact the railway would have on wildlife and my ability to photograph them. Crossing Highway 191 is dangerous for wildlife, and I've seen road-killed elk and other animals in the canyon. I know that if the railway is built the animals will have two dangerous crossings to make (the road and the railway). I've seen maps in the railway environmental studies showing that elk and mule deer migrate across the railway route in Indian Canyon, and I'm concerned that rail construction and rail traffic could interfere with their ability to migrate and reduce my sightings of them in the future.

27.    There is an old historic (currently unusable) guard station in Indian Canyon, that I have visited on several occasions. See Figure 12. In the fall of 2020, the Forest Service proposed demolishing it - and proposed selling the Stockmore

19

Guard Station (which is in the Uintas). I submitted comments with my thoughts about the issue and received a response from Jeffrey Rust, Ashley National Forest Heritage Program Lead/Forest Archaeologist, in which he said, "Your recommendation to use the funds from the sale of the Stockmore Ranger Station to rebuild Indian Canyon Ranger Station and use it for a recreation cabin rental is an option that we will consider." I hope the Forest Service does rebuild the guard station, because it is in such a great location - but if the railway is built, I don't think that would be done because the railway would be so close to the guard station. In my comment to the Forest Service, I noted that I suspected the historic guard station was being demolished because of the railway – something Mr. Rust neither confirmed nor denied in his response to me. Demolition of the old guard station will reduce my interest in visiting this area and will harm my enjoyment of it.



**Figure 12**. Me at the historic Indian Canyon Guard Station, which the Forest Service plans to demolish.

20

28.    Across the road from the potential Cottonwood wilderness area is another area that the UEC included in their proposal and that was evaluated by the Forest Service for its wilderness potential. It's the Right Fork Indian Canyon unit. Kristina and I skied into it from Indian Canyon in January of 2020, in an area called Grass Hollow. See Figure 13 below. We could see that a bunch of other people had snowshoed in the area, and we could see why—the snow was great, and the scenery was beautiful, and it was so quiet. Kristina said it was the quietest of any of the places we've hiked or skied together. I felt bad telling her that the quiet might soon be gone if the Uinta Basin Railway is built, because the planned Whitmore Park route would pass right by the mouth of Grass Hollow, just across the road from it. Kristina and I have returned to the area since then. We returned to Grass Hollow and hiked the area with our dogs on December 27, 2020. In February 2021, I returned to the area for a solo ski trip. If the Uinta Basin Railway is built, I will be less likely to revisit this area because the quiet that I and my wife enjoy will almost certainly be diminished.

**Figure 13.** Kristina skiing in Grass Hollow. The railway would pass just below the sunlit slopes in the distance, at the mouth of the hollow.

29.     Immediately south of Anthro Mountain is a feature called the Bad Land Cliffs – a rugged canyon area where I've spent a lot of time. As a teenager, I went there for Boy Scout activities, and I still like to go there for hiking or skiing. I have also surveyed this area to look for areas with wilderness potential while doing work for the Southern Utah Wilderness Alliance. I believe this area should be protected as wilderness, because it is undisturbed BLM land that connects with unroaded Forest Service land. I remember one evening several years ago standing on top of Anthro Mountain and looking down at the vast Bad Land Cliffs in the beautiful evening light and thinking about how wild and deserving of protection that area is. Constructing the Railway would harm me if it results in increased oil and gas development in and around the Bad Land Cliffs (there is already some oil

22

and gas development in the vicinity), because it would fragment and disrupt a large chunk of beautiful wild country that I enjoy visiting and recreating in.

30.    I've driven through Emma Park many times over the years. I've driven there alone, with family, and numerous times while taking Boy Scouts to or from Camp Scofield or Camp Maple Dell. I've always known the road as "The Emma Park Cutoff," and I've always thought of it as a quiet, peaceful, scenic route (generally quieter and more peaceful alone than with a carload of Boy Scouts). During a hike in Emma Park earlier this summer I enjoyed climbing on some big boulders, and I enjoyed the view from the top of the hill next to them. It was a great place to relax and eat my lunch. Unfortunately, the proposed railway would go right next to the hill and boulders - and it would no longer be a pleasant place to visit, and so I would be less likely to return. I saw a lot of sego lilies, the official state flower of Utah, in Emma Park. They are beautiful flowers, and they played an important role in the prehistory and history of Utah because their roots were a food source used by Native Americans and by the pioneers who came to Utah in the 1800's. Many sego lily plants would be destroyed by the railway. Photos of my most recent trip to Emma Park are included here as Figures 14 and 15.

 

**Figure 14 (left).** Me enjoying the view from a boulder in Emma Park – near the proposed railway route. **Figure 15 (right).** A sego lily in Emma Park. Construction of the railway would destroy many sego lilies – the Utah state flower.

31.     While earning my Biology Degree at Utah State University, I also earned a minor in Anthropology, and one of the courses I took for the minor was a Field Archaeology course. When I'm hiking, I'm always watching for archaeological evidence, and on my hike in Emma Park I saw several artifacts: a piece of lithic scatter (chipping), a scraper, and two projectile points (arrowheads). As I always do when I find such things, I photographed them and left them where they were. See Figure 16. One of the projectile points was only about forty-five yards from the center of the proposed railway. I'm afraid it will be destroyed if the railway is built, and I also wonder how many other artifacts would be destroyed.



**Figure 16**. A beautiful arrowhead in Emma Park. This arrowhead is only about 45 yards from the center of the proposed railway route and will likely be destroyed if the railway is built.

32.     I understand that Emma Park provides habitat for greater sage-grouse. I did not see any sage grouse in the Emma Park area that day, but I saw a lot of the sagebrush habitat that they depend on. I do look for them when I'm in this type of habitat and I hope to see the species in future trips to the area. I plan to return in late April or early May of next year (according to Sage Grouse Initiative, "Late April is the best time to visit leks because most breeding is complete, but the males are still actively strutting."). I'm concerned that the railway will disrupt the sage grouse due to its proximity to the leks where they breed. The railway would be bad for the grouse, and for myself and other people who enjoy seeing them.

33.     I enjoyed the two graduate-level botany classes I took at Utah State University, and I've enjoyed identifying plants for many years while visiting the

25

backcountry. Whenever I go on hikes, I observe and take photos of plants, old-growth trees, and, in the spring and summer, wildflowers. I enjoy the challenge of trying to identify them in my plant books and learning about native plants. I am always learning something new when I observe and identify plants. I find it interesting to learn how they relate to wildlife and connect to Native American uses and ethnobotany. I'm curious about taxonomy and like to learn different families of plants. Learning plant identification is also good for outdoor skills. I am interested in learning which plants are edible and sometimes nibble on edible plants when I'm hiking. The last time I hiked in Indian Canyon in late July, I found and nibbled on currants, gooseberries, sumac, and mint. I also encountered hops for the first time on that hike and identified it. When I view and identify plants, I am paying attention to what I see, and I enjoy the challenge of learning all the different species. Last summer, I took a master naturalist course focused on watershed investigations and learned about riparian plants. I will take a desert course and a mountain course in the future, where I will learn about plants in those habitats. As a teacher of environmental science and ecology to high school students, it's important for me to teach students about plants and get them interested in the plants around them. I share my photos to encourage them to figure out what's around them.

34.    I'm particularly interested in rare plants, and I'm concerned about the conservation of threatened and endangered species. They're the natural part of the ecosystem and important for wildlife, insects, and the food chain, so it's important to have native species rather than nonnatives. I spend time browsing my Utah rare plant books so I can one day identify them. I'm concerned about the impact of increased oil and gas activities and the construction of the railway on rare native plants. Their populations are so limited, especially for plants endemic to certain areas, they would be vulnerable to roads, pipelines, and increased access from people on ATVs, and it wouldn't take much to eliminate them.

35.    The Uinta Basin Railway would harm my interest in learning about and identifying rare Utah native plants, including species endemic to the Uinta Basin. I recently observed a rare, endangered plant that is endemic to the Indian Canyon area - Barneby ridgecress, *Lepidium barnebyanum*. I posted photos from my observation to the iNaturalist website, where my post is only the third for the species. See Figure 17 below. One of the two other people who have posted the species to the website is a member of a Utah rare plants team, and he looked at my observation and confirmed that the identification is correct. The railway could directly impact the species since it would go through the plant's range. The increased oil and gas development if the railway is built would harm me because it would likely destroy or degrade ridge-cress habitat, making it harder for me to find

27

this plant, and in fact could cause the extinction of this beautiful species. (here's a link to my post on iNaturalist). The ridge-cress plant that I saw is only a quarter mile from an existing oil well. The railway construction and increased oil and gas development would also lead to the spread of invasive species, which thrive in disturbed habitats. They compete with native species, putting them at risk. Cheatgrass is a common invasive species that increases the risk of wildfires. While native plants are adapted to fire, more frequent fires make it hard for them to reestablish. The spread of invasive species, including cheatgrass, and resulting increased risk of wildfire would harm my ability to view, learn about, and enjoy rare native Utah plants. I plan to go back to find the ridge-cress next May to show my wife when they're in bloom.



**Figure 17**. The iNaturalist page with my observation and photo of Barneby Ridgecress, *Lepidium barnebyanum*, an endangered species endemic to the Indian Canyon area.

36.     Should a court set aside approval of the Uinta Basin Railway, I will not be subjected to the additional harms from light and air pollution, and noise of increased oil production induced by the railway, air pollution from increased oil drilling, or the destruction of habitat, natural areas, and places I now enjoy for

29

recreation, photography, and my educational pursuits. Accordingly, the harm that I would otherwise suffer from the railway construction and train traffic would be redressed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed in Cedarview, Utah.

August 17, 2022
Date

Chad Hamblin

30

# DECLARATION OF TOM ELDER

I, Tom Elder, hereby declare as follows:

1.      I have personal knowledge of the facts set forth herein which are known by me to be true and correct and, if called as a witness, I could and would competently testify to them.

2.      I am a member of the Center for Biological Diversity and have been since 2019. I am providing this declaration in support of the Center for Biological Diversity's lawsuit challenging the Surface Transportation Board's authorization of the construction and operation of the Uinta Basin Railway by the Seven County Infrastructure Coalition (SCIC) and Uinta Basin Railway, LLC.

3.      I have made Vernal, Utah in Uintah County my permanent home since 1988. I taught high school science for 25 years, including biology, geology, anatomy, and physiology, and retired in 2013.

4.      I am concerned about the impact that the Uinta Basin Railway would have on the air quality of the Uinta Basin and potential risk to my health. The SCIC has said that if the railway were to be built, production of petroleum in the Uinta Basin could quadruple.[1] Clearly, the main reason for the railway is to

---

[1] Maffly, Brian, Disputed rail project seeking to ship eastern Utah oil to more lucrative markets clear hurdle with $21 million funding boost, The Salt Lake Tribune, June 13, 2019, available at https://www.sltrib.com/news/environment/2019/06/13/disputed-rail-project/.

1

facilitate the shipment of fossil fuels, because currently there is not an efficient way of getting fossil fuels out of the Basin. I oppose the railway because it would mean drilling more wells, and further developing the oil industry in the Uinta Basin, which I expect to degrade the quality of our air. Volatile organic compounds (VOCs) leaking from wells in the Basin pollute our air. Among these VOCs, methane is also a potent greenhouse gas, which is one of the most potent greenhouse gases and therefore has global climate change implications.

5.      The air quality has degraded significantly in the Uinta Basin in the several decades I've lived here. From the valley floor where I live, when I look horizontally into the horizon and across the valley floor, I can sometimes see smog obscuring the bottom half of the hills that surround Vernal. Likewise, when I look down into the valley from a hilltop, I sometimes see a band of murky smog below on the valley floor, which is especially striking in the winter. Haze created by pollution from more oil wells in the Basin will certainly worsen these conditions and visibility and reduce my general aesthetic appreciation of the Uinta Basin.

6.      I believe air quality is the single biggest environmental health problem in Vernal. I have had friends who moved away because the air pollution was a serious hazard to their health. I attended a talk by Doctor Brian Moench of Utah Physicians for a Healthy Environment, which addressed air pollution on the Wasatch Front and the implications for human health in the Uinta Basin, and it

convinced me of the serious health threat posed by air pollution. Dr. Moench pointed out that while the pollution problems on the Wasatch Front are mostly from transportation, the same kind of problems are afflicting rural areas in Utah due to oil and gas drilling.

7.      Particularly, the Uinta Basin episodically suffers from inversions, which, in combination with VOC emissions from oil and gas operations, cause unhealthy spikes of ozone during brilliant winter days. We are in a mountain valley, and during the winter, a cap of warmer air traps cool air at the ground level so that the cold air cannot rise through this warmer air. Any pollution generated at ground level is trapped and doesn't get a chance to disperse. The phenomenon tends to occur when there are very cold temperatures, a lot of snow cover, and brilliant winter sun. VOCs and other ozone precursors released by oil and gas operations are struck by UV light from the sun, which catalyzes a reaction to create ozone. The snowy surface is important, because the sunlight gets a chance to work through air twice, once when it hits the ground, and again when it bounces back up reflecting off the snow's surface. Because of the presence of such extensive oil and gas extraction operations, this phenomenon can sometimes lead to unhealthy wintertime ozone levels in the Basin. For this reason, the Environmental Protection

Agency has designated the Uinta Basin as a nonattainment zone for ground level ozone.[2]

8.      I worry that I have sensitivity to air pollution and am at higher risk of complications from ozone exposure. I grew up in Kansas, and in my teen years my family moved to southern Indiana, where there was a coal-fired power plant across from the Ohio River. The air pollution was dramatically worse than in Kansas, where pollution disperses quickly—the wind blows often and hard on the Kansas plains, and there are no inversions on the flat landscape. In Indiana, the pollution was so thick I could see scum collect on the windshields. I had a massive reaction to it, which included asthma attacks and wheezing. The asthma attacks would keep me up at night and were very scary. After about ten years my asthma had declined to the point it had stopped bothering me. I haven't been troubled by asthma since my twenties. Still, my pulmonary system and lungs are sensitive to pollutants. I tend to get wheezy when there are dust storms in the desert or when I am moving hay. I have a couple of horses and if there's plant dust coming off the hay, I tend to get wheezy. These wheezy periods may last a couple hours before I regain normal breathing. While these episodes are not disabling, they are unpleasant.

---

[2] Utah Department of Environmental Quality Division of Air Quality, Ozone: EPA Designates Marginal Nonattainment Areas in Utah (last updated Apr. 8, 2022), available at https://deq.utah.gov/communication/news/ozone-marginal-nonattainment-areas-utah.

4

9.      I also have a history of long periods of persistent dry cough during the wintertime when it is very dry and cold, which I have experienced for at least a decade. While the persistent cough does not occur every year, it only occurs in the winter. It usually starts off like a cold, but at the end of my recovery, I experience a long epilogue of coughing for weeks or a month or two. It occurred to me that this persistent cough might have to do with air pollution around Vernal, because it only happens in winters when it is cold and dry, and my respiratory system may be more prone to irritation. I understand that ozone pollution is intermittent and erratic, and there can be fairly long periods of time when the air is good in the Basin. If ozone levels were to sharply increase in the wintertime due to increased oil production in the Basin, I am concerned that this pollution could increase my risk of persistent cough or worsen or prolong coughing in the winter.

10.      Young people are the most at risk to ozone exposure, but age is also a risk factor. I turned sixty-seven this year, and have sleep apnea, because my unassisted breathing sometimes stops at night. I have used a CPAP machine for the last 17 years to help me breathe normally at night. These health conditions and my age make increased lung irritation from pollutants a big concern for me.

11.      I usually spend two to three hours minimum outside each day, which is likely to increase my risk of exposure to ozone and other pollutants. The most important part of my lifestyle is being able to walk outside in pretty country, which

I expect to do daily. These hikes are essential to my quality of life and are the most valuable part of my daily exercise. The ability to access scenic hikes and wide-open landscapes on public lands is the best part of living in Vernal, and why I chose to live here. From my home, I can reach a trailhead in 15 minutes. I walk at least one mile on my daily walks, and at least twice a week I will walk two or three miles across rugged landscape. I also do longer hikes (five to seven miles) about twice a month and recently hiked six miles of a backcountry trail. In addition, I go outside twice a day to take care of my horses, which requires bringing them the hay, turning them out, putting them back in their paddock, and managing the field. If I were to experience increased health problems from increased exposure to air pollution in the Basin, it would reduce my enjoyment of the outdoor activities that make me want to live here, and dramatically worsen my quality of life. I plan to continue my daily and weekly walks, and caring for my horses, indefinitely into the future.

12.     I am also concerned about the potential for increased drilling due to the Uinta Basin Railway to worsen light and noise pollution. For seven weeks during the summer, I am a volunteer interpretive ranger for the National Park Service at Dinosaur National Monument two days a week, and a volunteer interpretive ranger for the U.S. Forest Service at Flaming Gorge National Recreation Area one day a week. As part of this volunteer work, I present night sky

6

programs for visitors in the evenings three times per week. I have done these programs for 30 years and plan to continue them in the future. The skies around these public lands are mostly clear and dark. However, in the evenings, as it gets dark, I have noticed lighting from oil fields stippling the Uinta Basin on the Colorado end of Dinosaur National Monument. In addition, south of Vernal stars are less visible due to lighting from the oil and gas fields, and I can hear noise from the oil field compressor stations. Increased drilling throughout the Uinta Basin would harm my ability to enjoy dark skies and quiet nights. I plan to continue my volunteer work with the National Park Service for the rest of this summer, next summer, and for the foreseeable future.

13.    I am also concerned about the potential for increased drilling in the Uinta Basin to harm plants that I enjoy viewing. I am a plant enthusiast and have participated in Utah Native Plant Society field trips and Bureau of Land Management (BLM) counts for Graham's beardtongue. I regularly visit the BLM Vernal Field Office's Dry Fork Red Mountain Area of Critical Environmental Concern—an area open to fossil fuel development—to view the rare plant Ackerman's Green Gentian at least ten times a year, and report to the BLM how the plant is doing. I email them reports because I am concerned that the BLM may not be monitoring them. I am especially concerned about sensitive and endangered

species and protecting biodiversity. I plan to continue my regular visits to public lands to view rare plants in the coming months and for the foreseeable future.

14.    On at least two occasions I have had the opportunity to view Uinta Basin hookless cactus in the Uinta Basin, once at Pelican Lake in Ouray National Wildlife Refuge, two years ago, and another time east of Myton, Utah in an oil field near the Duchesne River, probably a decade ago. It is a very pretty plant in bloom, and I would like to see it again. I have every intention of looking for this cactus in the future and hope to see it when I make a planned visit to Ouray National Wildlife Refuge next spring. I visit the Refuge one to two times a year. I am concerned that an increase in density of well pads and other oil and gas development in the Uinta Basin will further imperil the cactus, Graham's beardtongue (which grows on oil shale formations), and other rare and endemic plants of the Uinta Basin and reduce my ability to see them. There is oil and gas development within the Ouray National Wildlife Refuge, which the Uinta Basin Railway could put at risk of more drilling.

15.    The development of the Uinta Basin Railway also concerns me greatly because of its potential to worsen climate change. I am persuaded by scientific evidence prepared by the Intergovernmental Panel on Climate Change and other such bodies that climate change is a serious problem. Greenhouse gas levels have created circumstances which generations to come are going to be paying for—for

8

example, hotter summers in Utah, warmer winters, and increased fire risks all concern me, and all will harm me in my lifetime. My deep concern about climate change has led me to become an advocate for renewable energy, and I run my house almost entirely on solar panels and have a fully electric car.

16.    I am also concerned about climate change's harmful effects on plants and wildlife. One of the central pleasures of my life is viewing plants and animals in the wild and feeling a connection to these species. For example, I enjoy seeing pikas when I hike above the timberline, which are already restricted to higher elevation areas. Rising temperatures threaten to push the species farther up into higher elevations and strand them on smaller and smaller habitat islands. The ptarmigan (grouse) is another high-altitude species that I enjoy viewing and am concerned about for the same reasons. I visit the high country in the Uinta Mountains where these creatures live once a year, and plan to do so this summer and next summer. Increased drilling in the Uinta Basin and the burning of the fossil fuels produced will lead to the release of massive amounts of methane, carbon dioxide, and other greenhouse gases into the atmosphere. This will further compromise these species' habitats and put their populations at risk, reducing my ability to see them on my hikes.

17.    Climate change also concerns me because it is reducing snowpack and water availability. The Uinta Mountains are not as snowcapped as they once were.

I rely on water from the local irrigation district to water a small pasture I have at my home. The irrigation water comes from Ashley Creek in the Uinta Mountains, which is fed by snowmelt. The irrigation district's water supply has been in serious decline, and I am not sure how much water I will receive for my pasture this year. I have one horse and a donkey that feed on the pasture's grass. If the amount of available irrigation water continues to decrease, I will not be able to feed my horse and donkey off it any longer.

18.     I have enjoyed taking river trips through Desolation and Gray canyons in the past, as well as other stretches of the river in the Uinta Basin. I have floated the Green River through Desolation and Gray canyons three times on five- to seven-day trips and on one overnight trip and floated the Green River through Split Mountain Canyon thirty times. I have also taken trips down the White River, which is less crowded, and these trips are easier to take because you don't need a permit to get on it. I have taken ten to twelve trips along the White River, each lasting two to three days. Increased drilling and fracking for oil would require vast amounts of water and deplete the White and Green rivers, ultimately preventing me from taking future trips. I do not want to see these rivers drained. I plan to revisit both rivers in the future. I am sometimes invited by river guides to go on river trips to provide a local's perspective of the Uinta Basin and would go if I were invited again. The Green River is not a big river, and the river is already overallocated.

Any industrial development using it as a water source or otherwise diminishing flows to the river could significantly lower river flows and prevent me from taking future river trips.

19.    Should a court set aside approval of the Uinta Basin Railway, I will not be subjected to the additional harms from light and air pollution, and noise of increased oil production induced by the railway, and so the harm that I would otherwise suffer from worsened air, light, and noise pollution and will be redressed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed in Vernal, Utah.

Aug 9, 2022
Date

Tom Elder

11

067

## DECLARATION OF COURTNEY HENLEY

I, COURTNEY HENLEY, declare as follows:

1.     The facts set forth in this declaration are based on my personal knowledge. If called as a witness in these proceedings, I could and would testify competently to these facts.

### Background

2.     I currently reside in Salt Lake City, Utah, and have done so since 1999. I am from Florida, but I have lived in Salt Lake City longer than anywhere else in my life and feel like a native.  I am a board-certified Physician Anesthesiologist in private practice.

3.     I am a member of Sierra Club. I have been a member since about 2012. I wholeheartedly support Sierra Club's mission which is: to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. I have been a contributing member of the John Muir Society for many years. I feel passionately that the conservation John Muir dedicated himself to over 100 years ago is even more important to America today.

4.      I am also a member of Utah Physicians for a Healthy Environment (UPHE), and have been since 2007. Currently, I serve on UPHE's Board of Directors, which I joined in 2020. I am very familiar with and support UPHE's mission which is to protect the health and well-being of the residents of Utah by promoting science-based education and interventions that result in progressive, measurable improvements to the environment. I dedicate two volunteer hours per week to actively advancing the mission of UPHE.

5.      I am also a member and supporter of the Center for Biological Diversity. I have been a member since 2006. I am generally familiar with and support the Center's mission which is to work to secure a future for all species, great and small, hovering on the brink of extinction, and to do so through science, law and creative media, with a focus on protecting the lands, waters and climate that species need to survive. It is my civic duty to my neighborhood and world community to advocate for the prosperity of all God's creatures.

**The Uinta Basin Railway**

6.      I am familiar with the Uinta Basin Railway project. As I understand it, the project will require the construction of more than 80 miles of rail line in the Uinta Basin southwest of Vernal, including a roughly 12-mile stretch up Indian Canyon near Highway 191. The rail line will then proceed south into Emma Park, and will connect with the Union-Pacific line near Highway 6 at Kyune, UT, near

the Price Canyon Recreation Area. I am familiar with Utah's history of fossil fuel

extraction, consumption, and export. I breathe in the pollution produced by Utah's

fossil fuel industry every day. Through advocacy at the Utah State Capitol, I know

that oftentimes the fossil fuel extraction industry in Utah cuts transparency and

honesty corners so that insider government employees and representatives can

expedite projects that primarily serve private interests while hurting the public

good.

7.      I am familiar with the environmental impact statement (EIS) prepared

by the Surface Transportation Board on the project, and submitted personal

comments opposing the project in response to the Draft EIS. I am also aware of the

project through communications from the Center for Biological Diversity and

Sierra Club, and through reading articles in the Salt Lake Tribune and Deseret

News. I am aware that the Final EIS projects that construction of the railway will

take many months. I am aware that the Final EIS predicts that operation of the

railway will involve up to five nearly-two-mile long trains pulling 110 tank cars

full of oil per day along the rail line, and that the rail line's purpose is to increase

oil production in the Uinta Basin. *See* the Surface Transportation Board's Final EIS

at 1-4. The Final EIS predicts that rail line could induce an increase oil production

in the Uinta Basin of as much as an additional 350,000 barrels per day, depending

on the price of oil, and result in the drilling of up to 3,330 new oil wells. *Id*. at

3.15-4 – 3.15-6.

## My Use and Enjoyment of the Uinta Basin

8.    Over the last 17 years or so, I have traveled from my home in Salt

Lake City to the Uinta Basin about six times each year. I travel to the area to enjoy

the Basin's scenic beauty and to enjoy mountain biking. I travel with the mountain

bike team of West High School to races in the area, including diversions to McCoy

Flats, south of Vernal. I have also traveled to this area on several occasions to

reach Dinosaur National Monument, including to the museum there, to learn about

fossils and enjoy the landscape there, and to raft the mighty Green River.

9.    The drive along Highways 40 and 191 between Duchesne and Vernal

provides good views to the south where the rail line will be built, generally less

than five miles from the highway. There are beautiful high desert landscapes with

the pastel pinks and peaches of red rock country. This is mixed with the

moonscapes of grays and tans that constitute ancient geologic time. Where the

Duchesne River runs along Highway 191 there are some alluvial habitats with river

grasses and wildlife on the south side of the highway. Sadly this stretch of highway

is one where I saw a moose struck dead by the side of the road. In recent years

there has been more unsightly drilling in the area and it really detracts from my enjoyment the scenery.

10.    I enjoy mountain biking at McCoy Flats and elsewhere in the Uinta Basin because of the area's iconic scenery, natural beauty, and wildlife, including hawks and lizards which I see nearly every time I'm at McCoy Flats. I also enjoy the quiet and natural sounds I can enjoy there. McCoy Flats is one of the few mountain biking areas in Utah where there are true beginner and intermediate flow trails.  Bikers of all ages and abilities can enjoy the terrain including little kids and the elderly. Because there is very little development in this area it is an unofficial dark sky sanctuary where campers can enjoy the Milky Way and all of the stars of the night sky unimpeded by man-made lights

11.    Having driven and explored in the Uinta Basin along highways 40 and 191 for many years, I am also aware of the significant oil and gas development that occurs in the area, including the spider-web of roads, numerous drilling pads, and the pipelines, tanks, and other facilities that accompany such development. I have also feared for my life as the huge double oil tank long haul trucks barrel along these highways in both directions. They frequently surpass the speed limit and pass other vehicles on what is often a two-lane road without a passing lane. The development and associated truck traffic interferes with and harms my ability to enjoy the scenery. I know that this development also destroys wildlife habitat,

results in roadkill, and has caused health-threatening ozone (smog) pollution in the area.

12.    Development of the Uinta Basin Railway will harm my enjoyment of this area in numerous ways. The railway itself will carve a wide gash through scenic vistas, marring the beauty I now enjoy. Construction could take more than a year, and that will worsen traffic and increase noise and air pollution. The train, once operating, will increase noise in an otherwise relatively quiet area. The drilling of up 3,330 additional wells in the area that the EIS predicts the rail line could induce will harm me by increasing noise, truck traffic, and air pollution. The destruction of habitat scraped bare for drill pads and roads will mar the scenery, and will make it harder for me to enjoy viewing wildlife when in the area.

13.    I plan to continue visiting the Uinta Basin in sight of the lands where the Uinta Basin Railway will be built (particularly along Highway 191 between Duchesne and Vernal), and in sight of lands where increased oil development will likely occur as a result of construction of the Railway, about six times a year every year for the foreseeable future. I have a trip scheduled to the area on October 7-9, 2022.

### My Use and Enjoyment of Indian Canyon

14.    I drive to and from Moab several times a year to enjoy hiking and mountain biking. I have also traveled from Salt Lake to the area around the town of

Green River, Utah. Upstream from the town, I have rafted the Green River where it exits Desolation Canyon and flows south into the town of Green River on 14 occasions in the last 15 years. I have also rafted the Green River south of the town. I also regularly drive two times a year through Green River along Highway 70 to and from my sister's residence in Denver. I also drive to Price at least once a year to attend a mountain bike race there. To travel to and from Green River and to and from Price, I usually drive on Highway 6 through Price Canyon, but have on two occasions taken the very scenic route along 191 through Indian Canyon along Indian Creek. I understand from the Final EIS that the Uinta Basin Railway will be constructed through approximately 12 miles of the Ashley National Forest in Indian Canyon to the east of the highway and through lands protected by the Forest Service's Roadless Area Conservation Rule.

15.    I enjoy the drive through Indian Canyon for its scenery, including spectacular red rock cliffs, groves of cottonwood trees, and sandy river beaches. Remote canyons like this are the best place to see bighorn sheep and mountain goats, which I saw both times that I drove the highway. One hundred percent incidence of wildlife sightings is pretty awesome. As I was born in Florida, I appreciate that this is the sort of desert beauty that most of the world can only dream about as it is so precious and rare. The construction and operation of a railroad line carrying up to five loaded oil trains daily will harm me by marring the

generally unspoiled landscape to the east of the highway, and by directly and indirectly degrading habitat for wildlife that I enjoy seeing. I know that traffic on Highway 191 in this area can kill wildlife, because I've seen the carcass of a road-killed moose here. In addition to the habitat destruction resulting from rail line construction, trains travelling through this canyon are likely to strike and kill wildlife, or frighten wildlife from the rail line onto the highway, further resulting in wildlife death. This destruction of wildlife and that habitat will harm my enjoyment of the area. I am also concerned that rail line construction and operation could cause landslides, avalanches or rockslides in this steep canyon. Such occurrences could threaten my safety, or damage the scenery and wildlife habitat that I now enjoy.

16.     I plan to drive through Indian Canyon in November 2022 when I travel to Moab, where I will stay with friends in a rented house to go mountain biking.

### The Colorado River

17.     I enjoy recreating on and viewing the scenery of the Colorado River. I have camped on several occasions in Fruita, Colorado, in a state park campground right on the River, on trips to enjoy the area's mountain biking trails. I have also twice rafted the Colorado River through Westwater Canyon near the Colorado/Utah border. I drive frequently along the Colorado River on I-70 to meet

my sister and my husband's brother who live in Denver. I enjoy watching the light on the River, seeing ducks and other birds (including sandhill cranes) on the River, and camping and mountain biking in Rabbit Valley. The mountain biking in this area is red rock country with pink and pastel cliffs and also grays and tans of limestone geologic layers. There are very nice beginner and intermediate trails where one enjoys some world class mountain biking and then all of a sudden gets to enjoy world class scenery looking down on the winding majestic canyons of the Colorado River. A person could pause to soak up the beauty for hours.

18.    I'm aware that the Uinta Basin Railway EIS predicts that up to 30, nearly-two-mile-long oil trains per week will travel on the Union Pacific line which is adjacent to the Colorado River through the state of Colorado from Fruita to Granby, Colorado. The EIS also predicts that oil train accidents and derailments, including oil spills, while uncommon, are likely to occur over time. An accident on the 200 miles of track that are directly adjacent to the Colorado River could cause tank cars and oil to reach the River, kill fish, waterfowl, and other wildlife, and degrade habitat along and in the River. Derailments or accidents could also lead to an increased risk of fire along the train route, which also threatens wildlife habitats, and the cottonwood forests along the River. All of these impacts would degrade the natural and scenic values I enjoy when camping and recreating near, viewing, and rafting on the Colorado River. Further, increased train traffic along the Union

Pacific line next to the River will result in noise, air pollution, and disturbance in the River corridor for hundreds of miles, which will harm my ability to enjoy the area, including the campground at Fruita.

19.    I plan to drive along and enjoy the scenery of the Colorado River in October 2022 when I travel to meet my husband's brother and his family in Denver.

## The National Environmental Policy Act

20.    UPHE, our members, and I rely on accurate information in EISs and other documents prepared pursuant to the National Environmental Policy Act (NEPA), to understand the impacts of major federal actions including the proposed Uinta Basin Railway on the Uinta Basin, Indian Canyon, and on the Colorado River. The EIS's inadequate NEPA analysis that does not disclose the impact of rail line construction, the oil and gas development the rail line is intended to induce, and climate change pollution on these lands, means that I and others are deprived of key information about impacts to these lands and their wildlife, and increases the chances that an ill-informed decision will be approved. I am familiar with the Draft and Final EISs prepared for the Uinta Basin Railway. Had the Surface Transportation Board complied with NEPA in preparing these documents, the decision makers would have been better informed, the public would have been better able to provide comments on overlooked impacts and alternatives, and the

ultimate decision could have been more protective of the environment. The Board's

failure to comply with NEPA therefore harmed me, UPHE, the public, the public

process required by law, and the environment.

21.    If this Court sets aside and vacates the approval of the Uinta Basin

Railway, the harm to my use and enjoyment of scenery, wildlife, clean air, and

clean water would be redressed, because the railway would not be built, there would

be no significant increase in oil train traffic, and there would be no harm from

increased oil and gas drilling which the railway is designed to induce.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the

foregoing is true and correct.

Executed on August 12, 2022 in Salt Lake City, Utah.

Courtney Henley

11

## DECLARATION OF JEREMY NICHOLS

I, Jeremy Nichols, declare as follows:

1. The facts set forth in this declaration are based on my personal knowledge. If called as a witness in these proceedings, I could and would testify competently to these facts.

2. I am a dues-paying member and employee of WildEarth Guardians and have been since July 2008. WildEarth Guardians is a non-profit environmental advocacy organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. A statement of WildEarth Guardians' mission and its general goals is online at https://wildearthguardians.org/about-us/mission-vision-history/. WildEarth Guardians is headquartered in Santa Fe, New Mexico, but maintains offices in Denver, Missoula, Portland, Seattle, and Tucson. I personally strongly support and believe in the mission of WildEarth Guardians.

3. I am also the Director of WildEarth Guardians' Climate and Energy Program and have been for 14 years. WildEarth Guardians' Climate and Energy Program aims to confront the effects of global climate change to protect the wildlife, wild places, and wild rivers of the American West. As Director of the Climate and Energy Program, I advocate for clean energy solutions that can help

our society shift away from the use of fossil fuels in order to safeguard our climate, our clean air, and our communities.

4.      I am also a member of the Center for Biological Diversity ("the Center") and have been since at least 2012. The Center is dedicated to protecting and restoring imperiled species and natural ecosystems. I share this interest with the Center, which includes protecting public lands and wildlife habitat in and around the Uinta Basin.

5.      I am also a member of the Sierra Club and have been since 2011. The Sierra Club has more than 1.4 million members and supporters who work for a safe and healthy community in which to live, smart energy solutions to combat global warming and an enduring legacy for America's wild places. Since 1892, the Sierra Club has been working to protect communities, wild places, and the planet itself. Sierra Club is the oldest and largest environmental organization in the United States.  It has been a priority of the Sierra Club nationally and locally to protect public lands, stop irresponsible oil and gas extraction, curb global warming and ensure clean air and clean water for all.

6.      I am very familiar with the U.S. Surface Transportation Board's ("STB's") December 15, 2021 decision authorizing the construction and operation of the Uinta Basin Railway, an 88-mile-long oil railway proposed in northeastern Utah's Uinta Basin that would provide Uinta Basin oil producers access to the

national rail network and Gulf Coast oil markets. I am also familiar with the Final Environmental Impact Statement supporting that decision.

7.     I am very concerned over the impacts that construction and operation of the Uinta Basin Railway will have on public lands and resources in northeastern Utah and nearby areas that will be affected by oil train traffic. I am an avid outdoor recreationist and regularly use and enjoy public lands throughout the western United States, including in and around the Uinta Basin. The construction and operation of the Uinta Basin Railway will transform the Uinta Basin, enabling more intensive industrialization of undeveloped lands and unleashing the attendant impacts of more noise and air pollution, more water contamination, more disturbance of wildlife habitat and open spaces, and more loss of public lands. These impacts will significantly diminish my recreational enjoyment of public lands in the region. The Uinta Basin is a large expanse of open, high desert country with extensive views. While construction and operation of the Uinta Basin Railway will directly impact lands in the region, its overall impact will be far larger when considering the air and noise pollution, the sight of locomotives and trains operating from long distances away, and the water and land contamination that could result from derailments and spills.

8.     My use and enjoyment of public lands in the region that will be impacted by the Uinta Basin Railway are extensive and longstanding. I regularly

visit public lands in and around the Uinta Basin to hike, view wildlife, enjoy the natural scenery, and rockhound. I have visited and enjoyed public lands in the Uinta Basin every year since 2009, including lands that will be affected by the Uinta Basin Railway. These lands include areas managed by the U.S. Bureau of Land Management ("BLM"), U.S. Forest Service ("USFS"), U.S. Fish and Wildlife Service ("USFWS"), and lands managed by the State of Utah. Areas I regularly visit for recreational enjoyment include, but are not limited to:

- BLM lands in the Wells Draw area in eastern Duchesne County, including lands along the Nine Mile Canyon Backcountry Byway and in Gilsonite Draw and Fivemile Canyon. The Wells Draw area is located directly to the south of where the Uinta Basin Railway will be constructed and operated south of the town of Myton. I've hiked on these lands, enjoyed the views while hiking, particularly of the Uinta Mountains to the north of the Uinta Basin and the Tavaputs Plateau to the south of the Uinta Basin, and viewed wildlife and generally enjoyed being outside in a remote and relatively undeveloped landscape.

- BLM lands in the Pariette Bench and Eight Mile Flat area in southwestern Uintah County. These lands are also located south of where the Uinta Basin Railway will be constructed and operated south of the town of Myton. I've hiked on these lands, enjoyed the views while hiking, particularly of the

4

Uinta Mountains to the north of the Uinta Basin and the Tavaputs Plateau to the south of the Uinta Basin, and viewed wildlife and generally enjoyed being outside in a remote and relatively undeveloped landscape.

- USFS lands in the Indian Canyon area in the western portion of the Uinta Basin. The Uinta Basin Railway will be directly routed through Indian Canyon and will directly impact lands and resources in this area. I've mainly hiked in Indian Canyon and enjoyed the rugged views of the rising cliffs and peaks of the mountains in this area. The Ashley National Forest in this area is very undeveloped and remote and a beautiful place to visit and explore.

9.     My most recent visit to the Uinta Basin was in May of this year. I visited and enjoyed recreating upon BLM managed public lands in the Wells Draw area south of the town of Myton and USFS lands that are part of the Ashley National Forest in Indian Canyon southwest of the town of Duchesne. Below is a picture of a portion of the Ashley National Forest that I hiked within during my visit. During my visit I hiked, enjoyed the natural scenery of the outdoors, and saw wildlife, including raptors and deer. The Indian Canyon area is especially scenic. I greatly enjoy visiting this portion of the Ashley National Forest. I previously visited the Ashley National Forest in the Indian Canyon area and the Wells Draw area in March 2019 and October 2020. I intend to visit these lands for recreational enjoyment again in May of 2023 and every year throughout the foreseeable future.



10.     The construction and operation of the Uinta Basin Railway will diminish my ability to enjoy hiking, viewing wildlife, and observing scenic beauty, and experiencing quiet away from the highway. The sights and sounds of the new train line will add to the industrialization of the landscape and diminish my enjoyment of the natural scenery and the outdoors. There is currently no rail line. After construction of the Uinta Basin Railway, there will, for the first time, be a railroad in service in the Uinta Basin and in the Indian Canyon area. This rail line will be imposing and impossible not to notice and to be impacted by. In the Wells Draw and Pariette Bench areas, for example, the new rail line will run from east to west approximately 2 miles north of BLM-managed public lands south of Myton. The rail line will be visible from those public lands and the sounds of train traffic will be audible while recreating in the area. In the Indian Canyon area, the rail line

6

will drastically alter the character of this scenic byway and require intensive industrial construction. My recreational enjoyment of the outdoors in these areas will be diminished irreparably because of the permanent construction of the railway. The Final Environmental Impact Statement prepared by the STB for the Uinta Basin Railway confirms that construction and operation of the rail line will lead to negative impacts to visual resources, will increase noise, and will directly alter the natural character of the lands in the region.

11.    As I have recreated on public lands in the Uinta Basin, my recreational enjoyment has already been diminished by the construction and operation of oil and gas extraction facilities, including wells, pumpjacks, tanks, compressor stations, pipelines, processing plants, and waste disposal facilities. The sights and sounds of this development have degraded the scenic integrity of public lands, made hiking and rockhounding outdoors less enjoyable, and have even interfered with my ability to visit certain lands due to safety and health concerns. As oil and gas extraction activities have occurred in the Uinta Basin, there has also been a noticeable decline in air quality, including hazier skies, more particulate matter, and more smog. Much of the region is now considered a "nonattainment" area because the air quality has gotten so bad that it violates federal air quality standards for ground-level ozone. Ozone is normally an urban problem, but

because of unchecked pollution from oil and gas extraction activities, it's also a problem in the Uinta Basin.

12.    The Uinta Basin Railway will further degrade the landscape and air quality of the Uinta Basin and further diminish my enjoyment of public lands, particularly in areas like the Wells Draw area, Pariette Bench and Eight Mile Flat areas, and Indian Canyon. The rail line will directly contribute more unsightly and toxic air pollution, including diesel locomotive exhaust and ozone-forming vapors from oil tanks and oil tank loading operations, and add more industrial development to the landscape. The rail line will also promote more development of oil and gas, which will lead to the construction and operation of more oil and gas extraction facilities, more well pads, traffic, and pollution. Cumulatively, construction and operation of the rail line will further diminish and interfere with my recreational enjoyment of public lands in the Uinta Basin by adding to the industrialization of the land and undermining my ability to fully enjoy my experiences outdoors.

13.    The construction and operation of the Uinta Basin Railway will also lead to more oil train traffic on the main rail line (the Union Pacific line) that traverses along the Colorado River in western Colorado. This is an area I visit regularly for recreational enjoyment, particularly river floating and paddling in rafts or kayaks. At least once a year since 2011, I have hiked, rafted, camped,

birdwatched, and rockhounded on and along portions of the Colorado River between the towns of Dotsero and Kremmling, where the main rail line in Colorado currently operates, and where the rail line is for many miles just a few yards from the River. I enjoy this relatively calm, easy stretch of the River for rafting with its towering red-rock formations, dinosaur tracks on rocks, willow and cottonwoods on the banks, and abundant wildlife like deer, beaver, river otters, and bighorn sheep. My last visit was in July of this year when I hiked on BLM lands north of Dotsero in the Lyons Gulch area. I intend to return to visit the Colorado River to hike in September of this year and to visit every year for the foreseeable future to engage in hiking and other enjoyable outdoor recreation activities.

14.    The passage of Uinta Basin oil trains along the Colorado River - an average of up to 10 trains a day, every day for years - will diminish my recreational enjoyment of the River and public lands in the area. The sights and sounds will interfere with my enjoyment of natural scenery and the quality of the outdoor experience. Already, trains hauling coal travel on these rails and whenever they pass through, they create a massive uproar of locomotive engines, clanging rail cars, squeaky rail lines, and extensive vibrations that shake the nearby land. More trains will increase the amount of extremely disruptive rail traffic and interfere with my ability to enjoy the Colorado River. More oil trains also heighten the risk of derailments and spills into the Colorado River. Any spill would harm my

recreational enjoyment of the River and adjacent public lands. Spills could permanently contaminate the clean water of the Colorado River, contaminate soils along the river, and create noxious odors and unsightly stains and/or slicks, and harm fish and other wildlife.

15.    I am aware that in approving the Uinta Basin Railway, the STB failed to analyze, assess, and disclose a number of potentially significant environmental consequences, contrary to the National Environmental Policy Act ("NEPA"), including the impacts of increased oil production in the Uinta Basin and increased rail use along the Colorado River. I am also aware that the STB relied on a flawed Endangered Species Act ("ESA") analysis of impacts of the Uinta Basin Railway to threatened and endangered species and their critical habitats, including fish in the Colorado River and rare plants in the area.

16.    If the STB is required to comply with NEPA, the agency would be more likely to fully and accurately weigh the project's significant damage compared to the alleged benefits of increased oil drilling, transport, and combustion. Full consideration of environmental consequences, particularly the indirect and foreseeable impacts of increased oil production, would have prompted the agency to consider limiting the scope of its approval and constraining development in order to mitigate impacts, or rejecting the Railway's application. Overall, compliance with NEPA would have ensured the agency was well-

informed, which would open the door for less environmentally destructive

development in the Uinta Basin. Overall, compliance with NEPA could have led

the STB to adopt the No Action alternative and reject construction and operation of

the Uinta Basin Railway. Less environmentally destructive development, or no

development for that matter, would not diminish my enjoyment of public lands that

would be affected by the Railway. Consequently, if the agency was required to

comply with NEPA, it would redress the harms that I would otherwise experience.

My recreational visits to public lands in and around the Uinta Basin would be more

enjoyable, my enjoyment of the scenery of the area would not be as diminished,

and my ability to enjoy hiking, observing wildlife, and undertaking other activities

outdoors would not be as undermined.

17.    If the STB was required to fully comply with NEPA before approving

the Uinta Basin Railway, the harms that myself, WildEarth Guardians, the Center

for Biological Diversity, and the Sierra Club are experiencing and will continue to

experience would be ameliorated. My future visits to recreate outdoors in the Uinta

Basin would be more enjoyable if the agency was to fully comply with federal law.

This would also ameliorate the harms to WildEarth Guardians, the Center for

Biological Diversity, and the Sierra Club.

18.    If the STB were required to comply with the ESA and properly

consult with the USFWS, the agency would have taken steps to better protect

threatened and endangered species and their critical habitats, in particular threatened and endangered fish that inhabit the Colorado River drainage and threatened plant species that reside in the Uinta Basin. I know that threatened and endangered fish in the Colorado River drainage, including the Colorado pikeminnow and razorback sucker, are being negatively impacted by habitat loss and degradation and climate change. These fish species inhabit streams in the Uinta Basin, including the Green and White Rivers, and downstream of the area that will be impacted by the Uinta Basin Railway. The Uinta Basin Railway will impact these fish and their habitats by contributing to more air and water pollution and by contributing to climate change. Protecting these threatened and endangered species and their habitats would have led the STB to approve less environmentally destructive development or even to disapprove entirely of the Uinta Basin Railway.

19.    I've hiked along the Green and White Rivers in the Uinta Basin. I've hiked along the Green River in the Ouray National Wildlife Refuge, which is located east of the lands that will be impacted by the Uinta Basin Railway. The Ouray National Wildlife Refuge is where the Ouray National Fish Hatchery is located, where they raise Colorado pikeminnow and razorback sucker to assist in recovering the species. I intend to continue visiting the Green and White River, including the Ouray National Wildlife Refuge, in the summer of 2023 and in foreseeable years. The health of these fish populations are indicators of whether the

Uinta Basin's streams are also healthy. I value the existence of these fish species and the healthy streams they need to survive.

20.     Threatened plant species in the Uinta Basin are also being negatively impacted by industrial development and climate change, including the Uinta Basin hookless cactus and Pariette cactus. I've tried to observe these plants while recreating on public lands in the Uinta Basin, particularly in the Pariette Bench area. It concerns me that these unique plant species could become extinct within my lifetime. I intend to continue to return to the Pariette Bench area to hike and attempt to view the Uinta Basin hookless cactus and Pariette cactus. My next visit is planned for May 2023. The Uinta Basin Railway is likely to adversely affect these species by directly destroying plants and the habitats they need to survive and by inducing oil development in their habitat such as the Pariette Bench. Protecting these threatened and endangered species and their habitats would have led the STB to approve less environmentally destructive development or even to disapprove entirely of the Uinta Basin Railway.

21.     If the STB was required to fully comply with the ESA before approving the Uinta Basin Railway, the harms that myself, WildEarth Guardians, the Center for Biological Diversity, and the Sierra Club are experiencing and will continue to experience would be ameliorated. My future visits to recreate outdoors in the Uinta Basin would be more enjoyable if the agency was to fully comply with

federal law. This would also ameliorate the harms to WildEarth Guardians, the Center for Biological Diversity, and the Sierra Club.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this 17th day of August 2022

_____

Jeremy Nichols

## DECLARATION OF JOHN WEISHEIT

I, John Weisheit, hereby declare as follows:

1.      I have personal knowledge of the facts set forth herein which are known by me to be true and correct and, if called as a witness, I could and would competently testify to them.

2.      I am a current member of Living Rivers, Sierra Club, and Center for Biological Diversity. I am providing this declaration in support of these organizations' lawsuit challenging the Surface Transportation Board's authorization of the construction and operation of the Uinta Basin Railway by the Seven County Infrastructure Coalition (SCIC).

3.      I am the Conservation Director and co-founder of Living Rivers and have served in this position since Living Rivers was founded in January 2000. I have a long history of river advocacy and have served on the boards of Utah Guides and Outfitters, Colorado Plateau River Guides, Headwaters Institute, and the Glen Canyon Group of the Sierra Club. I am also a voting member of the Waterkeeper Alliance and have had a contractual obligation to serve as the Colorado Riverkeeper and since 2002.

4.      Living Rivers was founded in 2000 and functions as an environmental advocacy group based in Moab, Utah. Living Rivers is a non-profit corporation dedicated to the preservation, protection, and restoration of rivers and

1

watersheds in the Colorado Plateau and promotes river restoration through mobilization. By articulating conservation and alternative management strategies to the public, we seek to revive the natural habitat and spirit of rivers by undoing the extensive damage done by dams, diversions, and pollution on the Colorado Plateau. Living Rivers works to ensure the long-term health and viability of human, animal, and plant species, as well as environmental quality threatened by mining and oil and gas operations in the region. With a principal focus of reestablishing a free-flowing Colorado River through Glen and Grand Canyons, Living Rivers has mobilized more than 200 organizations to aid in promoting a new federal Environmental Impact Statement on Glen Canyon Dam operations; generated hundreds of articles in the United States and around the world concerning the viability of decommissioning Glen Canyon Dam; exposed the Bureau of Reclamation's failure to comply with the Grand Canyon Protection Act and to provide adequate recovery for endangered native fish species in the Grand Canyon; launched efforts aimed at decommissioning Navajo Dam on the San Juan River and Flaming Gorge Dam on the Green River; and has established a program with Native American activists to propose the healing of rivers in the Southwest.

5.     I am also a member of the Sierra Club since 1999 and of Center for Biological Diversity since 2016.

## Background and Expertise

6.      I have been drinking the water of the Colorado River since my birth in 1954 in Los Angeles County. In 1959, I began to recreate in the Colorado River Basin and, since 1966, I have resided within the Colorado River Basin in Arizona and Utah. I have been a resident since 1987 and homeowner since 1991 in Grand County, Utah. The flowing rivers I enjoy in Grand County include the Green River, the Colorado River, and the Dolores River. I am a certified river guide and naturalist. I am a co-author of several academic publications related to the natural and human history of the Colorado River and its tributaries. As a professional river guide, I am out on the rivers of the Upper Colorado River Basin every year during the spring, summer, and fall, on trips that last from one day to one week at a time. I also go out on the river with friends for fun. I intend to continue taking river trips throughout the Colorado River Basin, both for fun and professionally, for as long as I can and my health allows. My cumulative time on boats in the Colorado River Basin amounts to a total of about 15 years. My first whitewater rafting trip in the Uinta Basin was in 1980 and my last rafting trip was in August 2022; my total amount of week-long river trips through the Uinta Basin is over 100 times. I also completed multiple-day excursions into the Uinta Basin by way of 4x4 vehicle to camp and enjoy the solitude and the abundant plant and animal wildlife. My last such land-based trip was in 2020 and we camped at Evacuation Creek and Fantasy

3

Canyon. I understand how the federal Energy Policy Acts transformed the Uinta Basin in the decades between 1980 and 2020. During the Reagan administration, I watched oil and gas development increase significantly. I remember how the Uinta Basin ecosystems looked and functioned before the Uinta Basin Synfuels Development Program of 1983, the Utah Combined Hydrocarbon Program of 1983, the Bureau of Land Management (BLM) Resource Management Plans of 1984, and the Air Quality Assessment of the Uinta Basin in 1984.

7.      I have a strong interest in the management of wildlife and water resources on public lands. My interest stems from my years as a professional raft guide and my life-long love of the outdoors. I continue to run rivers often, and remain an avid hiker, backpacker, and camper. Detrimental impacts to the natural environment where I raft, hike, backpack, and camp affect my enjoyment of natural, wild, and untrammeled nature of the places I choose to enjoy.

8.      I am a co-author of a book titled, "Cataract Canyon: A Human and Environmental History of the Rivers of the Canyonlands." Because of my intimate knowledge of this remote and sacred area, which is downstream of the Uinta Basin, I have been able to derive income from the sale of the book. I am planning a river trip to Cataract Canyon (below the confluence of the Green and Colorado rivers) in September (2022).

9.      Proponents of the Uinta Basin Railway speculate that it could

facilitate increased extraction of oils derived from oil shale and tar sands mining in the region by lowering transportation costs for such fuels. I have personally visited many lands opened to oil and gas drilling in the Uinta Basin. I have also visited nearly all the lands opened to oil shale and tar sand leasing and development in the State of Utah—most of which are in the Uinta Basin and Tavaputs Plateau—including the PR Springs Tar Sands Mine, Redleaf Resources Oil Shale Mine, TomCo Oil Shale Mine, various tar sand mines at Asphalt Ridge, and the Enefit America Oil Shale Mine. I have a keen interest in rare or endangered fish, plant, and bird species, and during nearly all my visits to these areas I carry with me a birding book and binoculars. I derive great enjoyment from viewing rare species in their natural environment and am constantly on the lookout for not only federally-listed endangered and threatened species, but BLM and state-listed special species as well. During my camping, hiking, and river trips to these areas, I also enjoy the clean air and water provided by these remote areas, the quietness and solitude provided by the surroundings, and the ability to share my knowledge of the areas with others.

10.    My land-based camping trips into the Uinta Basin and Tavaputs Plateau began in 2010 and has occurred every year since. The Tavaputs Plateau is a high plateau of the Greater Colorado Plateau and in the Uinta Basin. The Green River divides this plateau into a western and eastern section. The river's upper

gorge is called Desolation Canyon and the lower gorge is called Gray Canyon. The highest point of this plateau is 10,000 feet and the landscapes support woodlands of aspen, firs, pines, junipers, and oaks. These sensitive highlands are especially threatened by potential tar sand mining. These highlands condense water vapor into rain and snow that provide the Colorado River Basin with about 400,000 acre-feet of water per year. These trips created my growing awareness of the impacts from the Energy Policy Act of 2005, which launched the development of unconventional fossil fuels, including fracked oil and natural gas, hard rock oil shale, and bituminous sand, all of which may increase if the Uinta Basin Railway is built. Impacts from these forms of fossil fuel extraction include heavy vehicle traffic, noise, habitat fragmentation, soil erosion, air quality degradation, and water depletion and pollution.

11.    One of my trips to the Uinta Basin was in May 2020 for the purpose of enjoying the spring wildflowers and the migratory birds of the Tavaputs Plateau and the watershed of the White River and Evacuation Creek. The geology of this area is especially unique and interesting, because its sedimentary rock types, which are from the Late Eocene Period, are very rare finds in the Colorado Plateau. On this trip I explored the area where Evacuation Creek joins the White River in a 4-day river trip down the White River between the bridge at Highway 45 and the Enron boat ramp. This part of the White River has the biggest cottonwood

6

galleries, which I enjoy seeing. I also visited the Gilsonite mining operations at Bonanza, Utah; the Chipeta Natural Gas Field; the Bonanza Generation Station; and the railway that delivers coal to this power station. I intend to continue visiting this landscape for the rest of my days. I also intend to initiate hiking, biking, and rafting trips to enjoy these natural ecosystems with my friends and professional colleagues. In May 2022, I took the same river trip along the White River between the bridge at Highway 45 and the Enron boat ramp.

12.     I have conducted field trips into the Uinta Basin for the non-profit educational organization Canyonlands Field Institute. In 2013, I conducted field trips into the Uinta Basin with Professor William Johnson and his students from the University of Utah for the purpose of understanding the basin's quantity and quality of groundwater resources.

13.     I have personally visited the lands governed by the BLM Price Field Office, including lands opened to oil and gas leasing and drilling and to oil shale and tar sands (OSTS) exploration, leasing, and potential development, which may increase if the Uinta Basin Railway is built. I pass through areas governed by the Price Field Office opened to oil and gas and OSTS development often to gain access to the Green River in Desolation Canyon, which I have rafted numerous times. Specifically, to get to river access points, I often travel through the Sunnyside, Argyle Canyon, Pariette special tar sands area (STSA), and other

STSAs and areas open to oil and gas development. Some of these areas stand to be impacted by a potential increase in OSTS extraction.

14.    In 1995, I visited the San Rafael area within the Price Field Office area, which is highly praised for its outstanding petroglyphs, while enjoying a river trip down the San Rafael River. I also visited the area via fixed-wing aircraft three times. Additionally, I often pass through the area while travelling on Interstate 70. The San Rafael River trip was one of the best river trips of my life, and I plan on returning the next time the San Rafael River flows again, hopefully sometime very soon.

15.    The Sunnyside area of the Price Field Office area is a remote and hard-to-get-to area. I have hiked up Range Creek several times and have enjoyed camping in this area. Although I have looked, I have failed to see any threatened or endangered species in this area. In March 2022, I flew over the area with the environmental advocacy organization EcoFlight and noticed it was a very dry winter. There was very light snowpack.

16.    I have personally visited many of the lands opened to oil and gas leasing and drilling and to oil shale exploration within the lands managed by the Vernal Field Office. My first visit to the area was in 1985, and my first visit to the oil shale area south of the White River was in 2010. In 2013, I visited both Bitter and Parachute Creeks near the White River mine (Enefit oil shale mine site).

Additionally, I have visited the area west of the Green River in Desolation Canyon frequently over the past several decades to gain river access. I have also visited the area around Monument Ridge just off Seep Ridge Road close to the U.S. Oil Sands exploration site as recently as May of 2020. While camping at Monument Ridge in 2010 I heard, but did not see, a sage grouse. Additionally, in September 2011, I viewed a spotted owl on Seep Ridge Road, but was unable to tell if it was a federally listed Mexican or other species of spotted owl. In 2021, I drove through the area via Seep Ridge Road on my way to Roosevelt.  I like to take the byways to see what is going on in the area, and while passing through I also visited Redleaf Resources' oil shale mine.

17.    I have personally visited the Asphalt Ridge "Special Tar Sand Area" (STSA) as recently as March 2013 and again in 2014, where I viewed the mine sites, went to the Temple Mountain mining site, and climbed the Asphalt Ridge. I plan to return to this site within the next several years.

18.    I have personally visited the Pariette STSA many times traveling to and from river trips to the Green River in Desolation Canyon. I have not camped in this area, but plan to return to the area. Desolation Canyon is my favorite area to do a river trip, and I plan to do a family trip in 2023 with Dr. Robin Silver, co-founder of the Center for Biological Diversity, and his family.

19.    In July 2014, I visited several BLM planning areas in Colorado, Utah,

and Wyoming with Dr. Robin Silver. We visited the Vernal and Price Field Offices in Utah and areas spanning the Uinta Basin, including the East Tavaputs Plateau. We camped, hiked, and took photographs of these areas. We also visited the ongoing tar sands development at the PR Spring site on state lands adjacent to BLM lands that are allocated as available for tar sand leasing. We visited proposed oil shale extractions sites along Seep Ridge Road, including the Redleaf Resources project site, and the Enefit oil shale extraction site near Evacuation Creek.

20.    I have rafted the rivers of the Upper Colorado River Basin for several decades, including the areas below, and plan to raft them on future trips:

(1) Yampa River in Dinosaur National Monument in western Colorado

(2) Green River in Dinosaur National Monument in eastern Utah

(3) White River in the Uinta Basin

(4) Reach 2 of the Green River (about 100 trips)

(5) Reach 3 of the Green River, in Desolation Canyon, until Highway 70 (about 100 trips), and also below Highway 70 to the Colorado River confluence in Labyrinth Canyon (about 100 trips)

(6) Gunnison River in western Colorado

(7) Colorado River below Grand Junction, Colorado to the Utah border

(8) Westwater Canyon, along the Colorado River below the Utah Border (about 200 trips)

(9) Colorado River below Dolores River to Moab, Utah (about 400 trips)

(10) Colorado River from Moab to the confluence with the Green River (over 1000 trips).

21.    These trips have occurred within critical habitat for the four Colorado River endangered fish, Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub ("endangered fish"), as shown in the following map (the numbers in the map below correspond to the numbers in the list above, and a larger size map is attached as Exhibit A):



11

These river stretches also provide habitat for other imperiled fish species such as the flannelmouth sucker, roundtail chub, and bluehead sucker.

22.    My most recent rafting trip was a five-day river trip along the Yampa River to the Green River in Lodore Canyon this month (August 2022).

**Impact on Conservation, Professional, and Recreational Interests**

23.    I enjoy visiting the areas listed above, and I plan to use and enjoy them on a continuing and ongoing basis. I have a strong interest in the protection of endangered and threatened species, and my interests dictate that I will continue these activities. I have every intention of returning to these and other areas in which endangered and threatened species are known to inhabit. I plan to return to the lands identified above within the next several years.

24.    My recreational interests, as well as those of Living Rivers and its members, will be harmed by development of the Uinta Basin Railway. The purpose of the Uinta Basin Railway is to increase both conventional and unconventional (OSTS) oil production, which would occur in areas including those discussed above that I have visited and/or plan to visit in the future. My ability, and other Living Rivers' members' ability, to see and enjoy the natural features of these areas, including threatened and endangered species, will also be adversely impacted due to the impacts to air, water, vegetation, soil, and habitat from the railway's construction and the growth in oil production it would induce in the

12

region.

25.    In total, 29,303 acres of land in the BLM's Price Field Office, and 463,054 acres of land in the BLM's Vernal Field Office have been opened to oil shale and tar sand leasing and development in the State of Utah, which includes hundreds of thousands of acres that have been opened to conventional oil and gas development since the 2005 Energy Policy Act was enacted by Congress. My personal, professional, and recreational interests are threatened by the planned development of the railway. The development of the railway is likely to attract investors and visitors interested in profiting from the exploitation of conventional oil and gas and oil shale and tar sand deposits (as the railway is intended); instigate development of infrastructure to support expansive mining and drilling operations; and result in widespread destruction of natural habitat.

26.    My recreational interests will be harmed by conventional oil drilling and OSTS development on vast amounts of land that would be spurred by development of the railway, including the lands that I recreate on. For example, with the anticipation of substantial OSTS development, Seep Ridge Road, once a quiet dirt road, has now become a massive, paved thoroughfare recently developed by the State of Utah. My ability to enjoy the solitude I once enjoyed while driving on and camping near Seep Ridge Road is already impaired. Development of the lands surrounding Seep Ridge Road for OSTS mining will cause even greater

13

industrial traffic on Seep Ridge Road and habitat destruction and fragmentation on surrounding lands, and my recreational interests will be consequentially detrimentally impacted. Further, the wilderness quality of the Winter Ridge Wilderness Study Area, which is adjacent to Seep Ridge Road at the northeast boundary, and my recreational interests in this area would be impacted by OSTS development around Seep Ridge Road. The ponderosa forests of Winter Ridge and its numerous seeps and springs have an important ecosystem value to this landscape as well as to me personally.

27.    In addition, oil trains traveling from Kyune, Utah, where the Uinta Basin Railway ends, along the Union Pacific Line through Utah and Colorado, on their way to the Gulf Coast, will harm my professional and recreational interests in rafting along the rivers of the Upper Colorado River Basin, and the Colorado River endangered fish that have inhabited the Basin for 3 million years since time immemorial. More trains traveling along the Union Pacific Line will increase the risk of spills along the Green and Colorado rivers. More petroleum production throughout the Uinta Basin, which is entirely within the Green River drainage, will increase runoff pollution from oil and gas development and the risk of oil spills within this drainage. I have seen oil spills in the White and Green rivers, and I am concerned that increased oil production will result in contaminated production water from oil extraction activities entering the rivers either through accidental

14

spills or illegal dumping. Illegal dumping has happened in years past. The healthiest and most abundant populations of endangered fish occur in the Colorado River, in Westwater Canyon, very close to the Union Pacific Line at the Utah border and would be endangered by oil spills upstream of the canyon. On my rafting trips, I swim and bathe in the river every day. We usually do not drink water from the river, because it contains sediment, selenium, and heavy metals so we carry our own water. But if we run out of water we are carrying, we use alum to settle the sediments and a heavy pump with filters to screen out contaminants. An oil train spill along the Colorado or Green River could prevent me from taking rafting trips, swimming, bathing and/or drinking river water in areas downstream of the spill, harming my professional and recreational interests.

28.    More trains traveling along this route will also harm my enjoyment of the beautiful scenery and wildlife and wilderness hikes during my rafting trips. I've seen big horned sheep, deer, bobcats, mountain lions, beavers, muskrats, porcupines, and otters, among other animals in or around the rivers. Wildlife could be harmed by train spills and leaks, noise, and train collision. As a naturalist guide, my job is to create appreciation for Earth's wonder and beauty, and I try to make my trips educational. Noise, fumes, and pollution from oil trains, and less abundant wildlife, would harm my ability to do that.

29.    Oil production also uses enormous amounts of water and the increased

15

extraction and burning of oil induced by the Railway will contribute to climate change. The Colorado River Basin is already under tremendous water stress due to climate change. The railway's water depletion and climate change effects could worsen low flow conditions in the Colorado River and its tributaries. Low flows in the river corridor create dangerous rafting conditions—rocks are closer to the surface, increasing the risk of breaking equipment and oars on rocks, or getting stuck in shallow areas, or ripping holes in our boats.

30.    Every year during the irrigation season, especially when irrigation is at its maximum in the late summer, I regularly see dead flannelmouth suckers and, every once in a while, bonytail chubs belly-up on the water's surface. (Bonytail have been entirely extirpated from the Colorado River system, but hatchery-grown fish are released into the river.) Water depletions and pollution in the Upper Colorado River Basin are a threat to all the fish that use the Colorado River Basin, including the endangered fish, and even nonnative fish. During these irrigation months, flows are low, water temperatures are high, and pollution is more concentrated. Insect hatches, which the fish depend on for food, are also compromised by low flows. It breaks my heart and angers and depresses me to see the fish like this. If we can't take care of the fish, we are next in line. And we keep losing populations. I read every annual Fish and Wildlife Service "sufficient progress memo" regarding the health of endangered fish populations. After many

16

years of Fish and Wildlife Service's fish recovery efforts, populations are not stabilizing. We've lost a humpback chub cohort in the Green River in Dinosaur National Monument, in eastern Utah, and another in Whirlpool Canyon. A small cohort of 500 humpback chub in Cataract Canyon is not increasing. I feel spiritual harm when I see dead fish on the water, and worry these incidents will increase with the railway, because the conditions that are killing them are also endangering us humans. Taking care of them is about taking care of humans and human health and longevity.

31.    Should a court set aside approval of the Uinta Basin Railway, I will not be subjected to the additional harms from the destruction and degradation of habitat, natural areas, and places I now enjoy for recreation and my professional pursuits, and so the harm that I would otherwise suffer from the railway construction and train traffic would be redressed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed in Moab, Utah.

8/17/22
Date

John Weisheit

17

109

# EXHIBIT A



## DECLARATION OF BRANDT MANNCHEN

I, Brandt Mannchen, hereby declare as follows:

1.      I have personal knowledge of the facts set forth herein which are known by me to be true and correct and, if called as a witness, I could and would competently testify to them. I am providing this declaration in support of the Center for Biological Diversity's lawsuit challenging the Surface Transportation Board's authorization of the construction and operation of the Uinta Basin Railway by the Seven County Infrastructure Coalition (SCIC) and Uinta Basin Railway, LLC.

2.      I live in the Houston, Texas area, where I have resided for over sixty-five years. I live in the Montrose neighborhood. I grew up in Harris County, and I have lived in Harris County for the past 47 years and intend to continue living here for the foreseeable future. I have a Bachelor of Science Degree in Environmental Science and a Master of Science Degree in Environmental Management. Though I am currently retired, I worked for the City of Houston Health Department from 1975 to 2004. I spent 26 of those years in the Bureau of Air Quality Control, where I served as an air quality investigator. I want Harris County to be a cleaner place to live, and I am keenly aware of the impact of air pollution on public health.

3.      I have worked as a volunteer advocate in Texas on oil and gas issues, and many other environmental concerns, for decades. I have been a member of the

1

Sierra Club since 1977 and a member of the Center for Biological Diversity since 2017. As a volunteer, I have provided written and oral comments for myself, the Sierra Club, and other organizations for 40 years regarding the hazardous effects of air pollution and the need to reduce volatile organic compounds (VOCs), ozone, hazardous air pollutants, and greenhouse gases (GHG) air pollutants.

4.      I am the Forest Management Issue Chair for my local Sierra Club chapter, and I often interact with the U.S. Forest Service when they propose new projects. I am also the Forestry Chair and an outings leader for the Houston Regional Sierra Club, so I organize trips to parks and national forests so that Sierra Club members can learn more about nature and foster a greater sense of environmental stewardship.

5.      I understand that the environmental studies for the Uinta Basin Railway predict that oil trains from the Uinta Basin could deliver 175,000 barrels of oil per day to the Houston and Port Arthur areas, increasing train traffic and oil throughput at refineries. Increased train traffic and refining of oil in the Houston area will result in greater pollution and worsen local air quality.

6.      I am familiar with many harmful air pollutants emitted from oil and gas refineries, including VOCs, methane, and hazardous air pollutants.[1] I am

---

[1] Allison, E. and B. Mandler, Air Quality Impacts of Oil and Gas Emissions from production, processing, refining, and use, American Geosciences Institute (2018),

2

concerned about these air pollutants for numerous reasons. During my almost 26-year career with the City of Houston Bureau of Air Quality Control, I conducted leak detection and repair investigations and used a portable hydrocarbon analyzer to detect leaks at oil refineries and petrochemical plants. Some of the leaks of VOCs that I found during these investigations, from components like flanges, valves, compressors, and pumps, included benzene, toluene, xylene, other air pollutants that EPA has determined are hazardous to human health, and ozone-creating air pollutants like VOCs and nitrogen oxides.

7.     These releases harm the local environment, first, by worsening air quality problems that can impact people and wildlife. I know that methane and VOC air pollutants can lead to the formation of ozone, the primary component of smog, which in turn can exacerbate asthma and other human health conditions that are sensitive to air quality degradation. The Houston area has long been well known for its smog problems, and these releases are certainly a contributing factor. Currently, EPA has designated the Houston-Galveston-Brazoria area as "serious nonattainment" for the 2008 eight-hour ozone standard and "marginal non-attainment" for the 2015 eight-hour ozone standard. It appears that the region

available at https://www.americangeosciences.org/geoscience-currents/air-quality-impacts-oil-and-gas.

3

did not meet the 2008 standard by the 2021 deadline and could be bumped up to "severe nonattainment."[2]

8. Based on my personal experience as an air quality investigator and on my review of scientific data, I know that oil refineries also release particulate matter, which are 2.5 microns or smaller. These microscopic particles are so small, they can act like gases and elude bodily defenses, getting past the nose and throat and down into the lungs and alveoli. These particles can pick up or adsorb VOCs like benzene, which are carcinogenic. Breathing in these particles and other pollutants like ozone decreases the elasticity of your lungs, reducing oxygen intake.[3] Hazardous air pollutants are another concern. The synergistic effects of exposure to these many different pollutants are largely unknown.

9. Second, I am aware that methane is a potent greenhouse gas, the release of which contributes to the excessive air pollution that is fueling climate change. In September of 2017, Hurricane Harvey brought devastation to South Texas and Houston with incredible winds, flooding, and storm surge. In 2019, Tropical Storm Imelda dumped an unprecedented amount of rain. It is well-

---

[2] Douglas, Erin, EPA seeks more smog controls in Houston, Dallas after they fail to meet standards, Texas Tribune, https://www.texastribune.org/2022/04/13/texas-epa-pollution-smog-dallas-houston/.

[3] U.S. Environmental Protection Agency, Health Effects of Ozone Pollution (last updated Jun. 14, 2022), available at https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution.

4

established that these extreme weather events are tied to our ongoing greenhouse gas pollution,[4] and thus I am extremely concerned that allowing this unnecessary methane air pollution from oil and gas operations will only further harm the environment around me and my home in Houston.

10.    Oil trains bringing in more oil for refining to Houston and Port Arthur will worsen air quality in the areas that I live and recreate. Rail cars are likely to leak fugitive emissions. Increased oil refining will increase my exposure to particulate matter, ozone, and VOCs. While the nearest oil refinery to my home is about eight miles away along the Houston Ship Channel, the sea breeze from the Gulf of Mexico moves pollutants back and forth between the Gulf and city daily.[5] In the morning, refinery emissions may be transported 20 to 40 miles out into the Gulf, where VOCs and oxides of nitrogen react in sunlight to form ozone. In the

---

[4] Roston, Eric and Brian K. Sullivan, How Science Links Global Warming to Extreme Weather, Bloomberg, Dec. 1, 2021 (last updated July 18, 2022), available at https://www.bloomberg.com/news/articles/2021-12-01/how-science-links-global-warming-to-extreme-weather-quicktake; https://www.epa.gov/climate-indicators/weather-climate.
[5] Li, Wei et al., Identification of Sea Breeze Recirculation and Its Effects on Ozone in Houston, TX, During DISCOVER-AQ 2013, 125 Journal of Geophysical Research Atmospheres (22), DOI: 10.1029/2020JD033165 (Nov. 2020), available at https://www.researchgate.net/publication/346007399_Identification_of_Sea_Breeze_Recirculation_and_Its_Effects_on_Ozone_in_Houston_TX_During_DISCOVER-AQ_2013.

5

afternoon, the breeze transports the cooked ozone inland. This back-and-forth movement constantly re-exposes Houston-area residents to ozone.

11.    I am concerned that I am especially sensitive to air pollution. I have allergies, which I believe are attributed in part to air pollution. I have consistent issues with nasal drainage, which I believe air pollution exacerbates. I also have polyps in my nose, which bleed and make it more difficult to breathe. I sometimes feel the bloody polyps in my nose when I breathe, which is very discomforting. The air pollution takes my breath away causing discomfort and makes me want to get away from the pollution source causing the discomfort and irritation. I worry that the poor air quality in my local area, which will be made worse by increased train traffic and increased refinery throughput attributable to the Uinta Basin Railway, will worsen my health issues or create new ones, and that the health risks will increase with increased exposure.

12.    The health impacts of air pollution make me concerned for my family, including my wife who I live with. I don't want my family exposed to dangerous air pollutants. My concerns for my health and the health of my family due to air pollution lower my quality of life, and I would be much happier if the air quality were improved.

13.    I take walks every day to enjoy the outdoors in my neighborhood. I walk 20 to 40 minutes six days a week in the early morning when I am feeling

okay and intend to continue doing so indefinitely into the future. I also like to go birdwatching at wildlife refuges, such as Anahuac National Wildlife Refuge (which is about 60 miles east-southeast of Houston and halfway between Houston and Port Arthur), San Bernard National Wildlife Refuge (on the Gulf Coast about 70 miles south-southwest of Houston), and Brazoria National Wildlife Refuge (also on the Gulf Coast, about 50 miles south of Houston), a couple times a year each. All three of these National Wildlife Refuges are within the Houston-Galveston-Brazoria nonattainment area for ozone. I plan to continue to visit these areas with the same frequency indefinitely into the future and have concrete plans to take a trip to each of these refuges in the next six months. I also lead Sierra Club outings in Sam Houston National Forest, about 60 miles north of Houston, and lead outings to other national forests once a month, and plan to do so indefinitely into the future. The air pollution in and around Houston takes away from the pleasure I feel when taking my walks or birdwatching, lowering my quality of life. On bad days, I can see the haze of the air pollution, which makes me feel anxious about the high concentrations of air pollution I breathe in while enjoying the outdoors. I know that, even when it can't be seen or smelled, air pollution is always present, and I could be exposed to dangerous contaminants without even realizing. Though I am determined to take my walks, I try to minimize my exposure to air pollution. I try to minimize my time outside on days with severe ozone pollution. I avoid

7

taking walks at 3 p.m., as I understand that pollution levels are usually highest at that time of day. Instead, I take walks in the early mornings because pollution levels are usually lower at that time. I worry about my health because of my age. I want to enjoy life for as long as possible with my family and enjoy the environment. I am concerned that pollution could debilitate me and keep me from enjoying the environment the way I want to. I worry that my health will get worse due to my exposure to pollutants in my 26-year career as an air quality investigator and constant exposure to pollution in the Houston area.

    14.    In Houston, many railroads cross the city and thousands of rail cars travel in and out of the Houston area each day. There are several large railyards throughout the city. Some of the trains traveling through carry oil or chemicals to refineries and power plants. The constant train traffic is an inconvenience, and sometimes increases the time I spend in traffic. Sometimes I can be waiting for a train to pass at a railroad crossing for 10 minutes or longer, especially if a train stops on the track which is not unusual. The diesel train locomotives also emit pollution. I have sometimes seen tank cars left sitting on the tracks over the I-10 highway by Memorial Park or parked in neighborhoods. I am therefore concerned that increased oil traffic will increase the risk of catastrophic accidents in the areas I drive, including accidents with vehicles, and worsen my health and quality of life.

15.    Should a court set aside approval of the Uinta Basin Railway, I will not be subjected to the additional harms from refinery air pollution and train traffic, and so the harm that I would otherwise suffer from worsened air pollution and train traffic will be redressed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed in Houston, Texas.

August 12, 2022
Date

Brandt Mannchen

9

120

## DECLARATION OF MIYOKO SAKASHITA

I, Miyoko Sakashita, declare as follows:

1.      This declaration is based on my personal knowledge. The facts set forth are true to the best of my knowledge and recollection. If called, I could and would testify to these facts in a court of law. I am providing this declaration in support of the Center for Biological Diversity's lawsuit challenging the Surface Transportation Board's authorization of the construction and operation

2.      I am a resident of Oakland, California, and I have been a staff member of the Center for Biological Diversity ("the Center") since October 2006. I also have been a member of the Center since 2005.

3.      The Center has over 89,000 members, including over 740 members in Utah. The mission of the Center is to secure a future for all species, great and small, hovering on the brink of extinction. We do so through science, law and creative media, with a focus on protecting the lands, waters and climate that species need to survive. We want those who come after us to inherit a world where the wild is still alive.

4.      I was born and raised in Salt Lake City, Utah. Now, my parents live in Park City, Utah. I return to Utah a couple of times each year to visit my parents and friends and to vacation with my own family.

1

5.      One of the primary reasons that I return every year to Utah is because I believe it is one of the most beautiful places on earth. I value the wilderness and wildlife in Utah, and I plan trips to many places throughout Utah to explore its natural wonders that are both familiar and new to me. I love to go camping, hiking, rock climbing, skiing, as well as floating and swimming in rivers and lakes in Utah. Growing up in Utah and spending time enjoying the outdoors nurtured my environmental values and interest in conservation.

6.      As a kid, I spent time in the eastern part of Utah, including in the Uinta Basin. I periodically went with my parents and family friends to Spirit Lake in the Uinta Mountains. We went there to enjoy the beautiful forests and clean fresh lake. During my visits there, I would stay in log cabins, hike, and go horseback riding to enjoy the natural beauty. On a couple of occasions, I went to Duchesne and Vernal, Utah to learn about the area's history of pioneers and dinosaurs. I remember researching and writing a school report about the natural history and geography of Duchesne County.

7.      I have spent time in other areas that may be at risk from the Uinta Basin railway. In the early 2000s, I rafted on the Green River, we put our rafts in the river at Sand Wash on Bureau of Land Management land in eastern Utah. We rafted for a week through beautiful red rock canyons enjoying the riparian plants and wildlife. In addition to rafting, I took photos, camped on the banks of the river,

2

and swam in the clean, cool waters. We took our rafts out of the river in Green River, Utah. The Union Pacific line which runs through the town of Green River and across that river will carry an estimated 90% of the oil trains from the Uinta Basin that will use the Uinta Basin Railway.

8.    The Uinta Basin Railway project will harm my interest in these natural areas because it will degrade the landscape. Industrialization of the Uinta Basin and the potential for greater oil and gas development there and in the mountains will spoil the natural values of the area that I go to the area to enjoy. The potential for destruction of natural habitats and pollution will make it less likely that the wildlife that I hope to observe will be as healthy and abundant.

9.    I have traveled through parts of Utah that have been scarred by fossil fuel development. On a few occasions, I have traveled between Salt Lake City and Moab or Rifle, Colorado. My experiences in those areas are diminished by the fossil fuel developments. Once near Price, Utah, I remember stopping and viewing a coal mine and methane gas pads. This area was ugly with equipment, dust, and noise. It was an unpleasant experience after a long drive.

10.     In contrast, the places that I enjoy visiting in that part of Utah are magical landscapes with tree-lined rivers, high mountain deserts, red-rock canyons, and clear lakes.

11.    I plan to return to eastern and southern Utah in the summer of 2025 to enjoy these incredible areas with my family. My husband and I are planning to take the kids to what I refer to as dinosaur land — the Uinta Basin. We plan to hike and camp in the national forests, and visit the creeks, reservoirs, and rivers. As a part of that road trip, I am also planning a river trip on the Green River with my children so that I can experience the red rock canyons and natural beauty of that Colorado River tributary with them. We will also visit more popular southern Utah destinations such as Arches National Park, Dead Horse Point, and Goblin Valley State Park.

12.    In the 1990s, I did a climbing and road trip that took me past Price, Utah and on to Rifle, Colorado. I went there to enjoy hiking and rock climbing at Rifle Mountain. Rifle Mountain Park is a gorgeous area with lovely greenery and spectacular climbing. I spent several days in the canyon, camping, hiking, and climbing and enjoying the natural beauty of the area. I remember enjoying lunches near the bank of the creek to take in the aesthetics of the clear, refreshing water. Even though that was a while ago, I frequently go on climbing trips with my husband. For example, we took climbing trips to Wild Iris, Wyoming and City of Rocks, Idaho in 2021. Rifle and other notable climbing areas in Colorado are a high priority for us to visit on a future climbing trip.

4

13.    The construction and operation of the railroad, as well as the oil trains running on the rail, impair my enjoyment of nature and wilderness in eastern Utah and western Colorado. Construction will clear natural habitats and cause noise, both of which may disturb wildlife. The waterways that are near the railroad and downstream are likely to be adversely impacted by construction and operation of the railroad. The oil trains traveling from the Uinta Basin would also risk accidents that could harm the Green River near the town of that name, and along the Colorado River for hundreds of miles. Such accidents could spill oil and pollute rivers and damage habitat in which I have an interest.

14.    My understanding is that the Uinta Basin Railway's purpose is to carry oil and other fossil fuel products, and thus it is likely that the Uinta Basin Railway will also expand fossil fuel development in eastern Utah. I have read that it could increase production by as much as 400%. Oil and gas development will further degrade the environment in the Uinta Basin and mountains that I have grown up enjoying. Oil and gas development, and concomitant increases in fracking and traffic, may result in harmful air and water pollution that diminish the natural values of the region. The federal public Forest Service and BLM lands, where I grew up hiking and camping, could be vulnerable to new oil and gas developments. My ability to enjoy those areas and seek out nature and wildlife will be impaired by increased fossil fuel development in the region. The ugly industrial

5

sites and my concerns about pollution from oil developments and fracking would make it so that I would not want to bring my family to visit the area and to wade in the rivers that I enjoyed as a child.

15.     I have also spent time on the Gulf Coast, including in New Orleans, Louisiana, and other more rural areas around that metropolitan hub. Specifically, I have enjoyed visiting the bayous and the wetlands in the area. My husband lived in New Orleans in the summer of 2004, and I visited him. We enjoy natural areas, so we delighted in walking along the bayous, and we also took a road trip through Louisiana, Alabama, and Florida to see the coast and beaches. We swam in the Gulf of Mexico and enjoyed the shorelines and coastal birds.

16.     In 2019, I again traveled to New Orleans, Louisiana for a meeting to learn about the environmental threats facing Gulf Coast communities. I have worked to oppose offshore drilling in the Gulf of Mexico since 2007. I have built relationships with people who live in Louisiana and have a shared interest in improving protections for Gulf Coast communities and the environment from oil and gas activities.

17.     During that trip, I visited St. James, Louisiana, an area that lies along the Mississippi River. It is part of a region that is sometimes called "Cancer Alley" because of the heavy concentration of polluting refineries and petrochemical facilities along the river between New Orleans and Baton Rouge. When I went

6

there, one man that I met told me that he started calling it "Death Alley" because so many of his neighbors, family, and friends have died.

18.     I was disgusted by the sight of numerous pipelines, tank farms, refineries, and chemical plants that lined the road. I could smell a bad odor in the air when we were there. There were industrial facilities abutting houses and wetlands, which impaired my enjoyment of the area. One of the places that I visited near the town of Welcome, Louisiana, maintained its intact wetlands and fields. There were beautiful green trees, shrubbery, and wetlands, so we stopped to take photos and look for birds. It was a stark contrast from the other properties that used to be plantations and have been converted to industrial uses. While I was there, I saw a partially collapsed gypsum stack at a chemical plant that threatened to release acidic water from its wastewater pond into the Mississippi River. It was horrendous to see the danger of petrochemical plants on the environment and local community.

19.     Later this year or next year, I plan to go to another work-related meeting in New Orleans, Louisiana. As a part of that visit, I will return to Cancer Alley to meet with friends and colleagues in the community. I intend to sightsee around the Mississippi River and Barataria-Terrebonne Estuary to enjoy the wetlands, nature, and look for birds and other wildlife. I also expect that soon the

Army Corps will have a public meeting about permitting petrochemical facilities in the region, which I plan to attend.

20.     My understanding is that the Uinta Basin Railway will transport oil and other petroleum products destined for the Gulf Coast for processing. I have read that this even includes transporting the oil to facilities near Baton Rouge, which will likely be refined or processed in some of those facilities along "Cancer Alley." The contribution of more petroleum products in that part of Louisiana will mean more air pollution and more degradation of the local environment. My interests in the wetlands, birds, and natural habitats are at risk from the additional oil and gas processing in Louisiana that the Railway will cause.

21.     My interests are also harmed by the federal government's failure to adequately disclose the full scope of environmental impacts of the project. I rely on things like environmental impact statements to help decisionmakers make environmentally sound decisions. I often read environmental impact statements, and it is important for them to fully inform the public of the significant environmental impacts of a project. Here, I wish that the project had more scrutiny and that the federal government had prepared a comprehensive environmental review.

22.     If the Uinta Basin railroad is built, it would adversely affect my interests in seeing, enjoying, and conserving Utah's wildlife and its natural habitat.

8

A favorable outcome in this case could result in a more comprehensive
environmental review, which could result in greater mitigation or a decisionmaker
implementing better protections for the Uinta Basin and surrounding areas.

I declare under penalty of perjury that I have read the foregoing declaration
and know the contents thereof to be true of my own knowledge. Executed in
Oakland, California.

DATED: Aug. 3, 2022

Miyoko Sakashita