# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 3, 2023         Decided August 18, 2023

No. 22-1019

EAGLE COUNTY, COLORADO,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

SEVEN COUNTY INFRASTRUCTURE COALITION AND UINTA
BASIN RAILWAY, LLC,
INTERVENORS

———

Consolidated with 22-1020

———

On Petitions for Review of Orders
of the Surface Transportation Board

———

*Nathaniel H. Hunt* argued the cause and filed the briefs for petitioner Eagle County, Colorado. *Nicholas Clabbers* entered an appearance.

2

*Wendy Park* argued the cause for petitioners Center for Biological Diversity, et al. With her on the briefs was *Edward B. Zukoski*. *William J. Snape* entered an appearance.

*Matthew R. Arnold* and *William S. Eubanks II* were on the brief for *amici curiae* City of Glenwood Springs, et al. in support of petitioners.

*Barbara A. Miller*, Attorney, Surface Transportation Board, argued the cause for respondent. With her on the brief were *Craig M. Keats*, General Counsel, and *Theodore L. Hunt*, Associate General Counsel.

*Justin D. Heminger*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Todd Kim*, Assistant Attorney General, and *Andrew M. Bernie*, Attorney.

*Jay C. Johnson* argued the cause for intervenor-respondents Seven County Infrastructure Coalition, et al. With him on the brief was *Kathryn Kusske Floyd*. *Margaret K. Fawal* entered an appearance.

*Melissa A. Holyoak*, Solicitor General, Office of the Attorney General for the State of Utah, was on the brief for *amicus curiae* State of Utah in support of respondents.

Before: MILLETT, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: These consolidated petitions concern an order of the Surface Transportation Board ("Board" or "STB") authorizing the construction and operation of a new rail line in the Uinta Basin in Utah ("Railway"). The Board

3

exercised its authority to exempt the Railway from the Board's more extensive application requirements in a two-part process. The first addressed the "transportation benefits" of the Railway, and the second concerned the project's environmental impacts. As part of its environmental process, the Board created an environmental impact statement ("EIS") outlining the various environmental impacts associated with the Railway's construction and operation. The EIS was informed by the Board's consultation with the Fish and Wildlife Service ("Service"), which led to the development of a Biological Opinion ("BiOp") concerning the Railway's potential impacts on endangered species and critical habitats.

Petitioners include various environmental organizations and a Colorado county that alleges it will be impacted by the Railway even though it is located "downline" of the proposed rail line's construction area. Petitioners raised numerous challenges at various stages in the proceedings, ranging from whether the Board properly exempted the Railway to whether its environmental analysis was flawed. In these petitions, they lodge various challenges to the validity of the Board order, the EIS, and the BiOp.

For the following reasons, we grant the petitions in part, deny them in part, vacate the underlying order as well as the EIS and the BiOp in part, and remand to the Board for further proceedings.

**I.**

**A.**

Congress gave jurisdiction over rail carriers to the Board after passing the ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803 ("ICCT Act"), which abolished the Board's predecessor, the Interstate Commerce Commission

4

("ICC"). *See Nat'l Ass'n of Reversionary Prop. Owners v. STB*, 158 F.3d 135, 140 (D.C. Cir. 1998). The Board regulates, among other things, "the sale and transfer of rail lines under 49 U.S.C. § 10901, [including] governing construction and operation of railroad lines." *Ass'n of Am. R.R.s v. STB*, 161 F.3d 58, 60 (D.C. Cir. 1998).

There are two approaches a party can take to get approval from the Board for the construction or operation of a railroad line. The party may seek a certificate authorizing the project from the Board by "submit[ting] an application that provides information about itself and its proposed use of the line, including operational, financial, environmental, and energy data." *Snohomish Cnty. v. STB*, 954 F.3d 290, 293 (D.C. Cir. 2020). "Upon receiving the application and providing time for public comment, the Board issues the certificate, potentially with modifications or conditions, 'unless the Board finds that such activities are inconsistent with the public convenience and necessity.'" *Id.* (quoting 49 U.S.C. §§ 10901(c), 10902(c)). Alternatively, the party may seek an exemption from the full application requirements by petitioning the Board to find that "compliance with those provisions 'is not necessary to carry out the transportation policy' codified in 49 U.S.C. § 10101, and that either the 'transaction or service is of limited scope' or the 'application in whole or in part of the provisions is not needed to protect shippers from the abuse of market power.'" *Id.* at 293–94 (quoting 49 U.S.C. § 10502(a)(1)–(2)).

In addition, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires all federal agencies "to examine the environmental effects of proposed federal actions and to inform the public of the environmental concerns that were considered in the agency's decisionmaking." *Citizens Against Rails-to-Trails v. STB*, 267 F.3d 1144, 1150 (D.C. Cir. 2001). This environmental review

5

process requires federal agencies to "include a detailed environmental impact statement . . . 'in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment.'" *Mayo v. Reynolds*, 875 F.3d 11, 15 (D.C. Cir. 2017) (quoting 42 U.S.C. § 4332(2)(C)). Since "NEPA's mandate is addressed to all federal agencies," it applies also to the Board's determinations regarding the construction or operation of rail lines that may affect the environment. *Citizens Against Rails-to-Trails*, 267 F.3d at 1150.

Federal agencies have additional environmental review obligations under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, which Congress enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," *id.* § 1531(b). "The ESA requires every federal agency to 'insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat' that the . . . Service[] ha[s] determined to be critical to those species." *Ctr. for Biological Diversity v. EPA ("Center II")*, 56 F.4th 55, 62 (D.C. Cir. 2022) (quoting 16 U.S.C. § 1536(a)(2)). To fulfill this statutory obligation, "action agencies," "whose planned action may have such effect," must consult with the Service, which is tasked with, among other things, identifying "anticipated adverse effects on species" and critical habitats. *Id.* at 62–63 (citing 16 U.S.C. § 1536(a)–(d)).

Prior to approving "a project, activity, or program," 54 U.S.C. § 300320, federal agencies must also "take into account the effect of the undertaking on any historic property" under the National Historic Preservation Act ("NHPA"), *id.* at § 306108. The statute defines "historic property" broadly and

6

includes "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register." *Id.* § 300308. The NHPA mandates the creation of regulations to ensure that federal agencies consult with local governments "with respect to undertakings . . . that affect the local governments." *Id.* § 304108(b). "In light of the substantial overlap between the NHPA and NEPA inquiries, an EIS 'should include consideration of the . . . likely effects on historic properties.'" *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n ("Oglala")*, 45 F.4th 291, 296 (D.C. Cir. 2022) (quoting 36 C.F.R. § 800.8(a)(1)).

**B.**

Respondent-Intervenor Seven County Infrastructure Coalition ("Coalition") "is an independent political subdivision of the State of Utah" composed of seven different member counties. J.A. 252. On May 29, 2020, the Coalition petitioned the Board to allow for the construction and operation of the Railway, *see id.* at 248, a more than 80-mile rail line in Utah that would connect "two termini in the Uinta Basin . . . to the national rail network at Kyune, Utah," *id.* at 251. The Uinta Basin is an "approximately 12,000 square mile[]" geographic area spanning northeastern Utah and northwestern Colorado. *Id.* at 279. It "contains extensive deposits of valuable minerals, including" phosphate, "crude oil, natural gas, oil shale, oil sands, gilsonite, natural asphalt, aggregate materials, and low-sulfur coal." *Id.* at 280.

In its petition, the Coalition explained that "[c]urrently, trucking is the only mode of freight transportation in and out of the Basin" "primarily due to the geography of the Basin, which is bounded by high mountains or plateaus." *Id.* Railway lines exist around the Basin but there are not even "freeways in and out of the Basin." *Id.* Accordingly, "all goods produced or

7

consumed in the Basin must be transported by trucks on two-lane highways that cross high mountain passes." *Id.* The Railway would "connect the Uinta Basin to the national rail network," "giv[ing] shippers an additional option for freight transportation in and out of the Uinta Basin." *Id.* at 285. The project would involve "construction of the rail line and associated earthwork" as well as "construction of access roads, tunnels, communications towers, road crossings, culverts, and stream crossings." *Id.* at 255. Though the Railway could carry any goods produced or consumed in the Basin, the Coalition's petition recognizes (and no one disputes) that the Railway's predominant and expected primary purpose would be the transport of waxy crude oil produced in the Uinta Basin. *See id.* at 260–61.

In its petition, the Coalition also provided that it "entered into a preliminary Memorandum of Understanding" with two private companies—Drexel Hamilton Infrastructure Partners and Rio Grande Pacific Corporation—which would be responsible for "financing and commercialization of the Project" and "operations and maintenance of the Uinta Basin Railway," respectively. *Id.* at 253. Though the Coalition did not intend to operate the Railway itself, it expected that it would "remain responsible for project planning, completion of the environmental review and permitting processes, and obtaining authority to construct the Railway." *Id.* at 253–54.

The May 2020 petition made two requests of the Board. First, the Coalition sought exemption from the Board's formal application requirements. Second, the Coalition asked the Board to authorize the Railway in a two-part process. The Board would "conditionally approve" the exemption petition based on the transportation merits of the Railway, subject to the condition that the project was found proper after the

8

"completion of the environmental review process under the National Environmental Policy Act." *Id.* at 273.

The Coalition asserted that the "ongoing COVID-19 pandemic and its economic impacts clearly create[d] unique and compelling circumstances that justif[ied] conditional approval." *Id.* It described the impacts as including rising unemployment levels, closed businesses, and substantial decline in state and local tax revenues. *Id.* at 273–74. While noting that "these impacts should not persist in the long-term," the Coalition asserted that completion of the "federal review and approval processes as efficiently as possible" would "have the potential to provide substantial economic stimulation," which it described as "important to state and local economies." *Id.* at 274. Finally, the Coalition asserted that the environmental review process was ongoing and "should not interfere with consideration of the transportation merits on a conditional basis." *Id.*; *see also id.* at 265 (explaining that the Board released a final scope of study for preparation of an environmental impact statement on December 13, 2019).

Several groups filed oppositions to the exemption petition, urging the Board to require the Coalition to complete the full application process. *See id.* at 300, 329 (Center for Biological Diversity Response to Petition for Exemption); *see also, e.g.*, J.A. 341–47 (Argyle Wilderness Preservation Alliance Response to Petition for Exemption); Opening Br. of Pet'r Eagle County 6 [hereinafter "Cnty. Br."]. These oppositions questioned the Railway's financial viability, purported benefits, and "impact to public health, safety, and the environment." Cnty. Br. 5. The oppositions were unsuccessful. The Board published an order conditionally granting the exemption petition based on the "transportation merits" while deferring its "final" ruling on the petition to allow for the completion of the then-ongoing review of the

9

Railway's environmental impact.  *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys.*, S.T.B. Fin. Docket 36284, 2021 WL 41926, at \*10 (STB served Jan. 5, 2021) [hereinafter "Preliminary Exemption Order"].  Petitioners sought reconsideration of the Preliminary Exemption Order, which the Board denied on September 30, 2021.  *See Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys.*, S.T.B. Fin. Docket 36284, 2021 WL 4483773 (STB served Sept. 30, 2021).

As noted above, the environmental review process for the Railway was ongoing at the time the Board requested conditional approval of its exemption petition.  The Board's Office of Environmental Analysis ("OEA") had published a notice of intent to prepare an Environmental Impact Statement in June 2019 and issued a final scope of study for the EIS in the Federal Register in December 2019.  *See Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation—in Utah, Carbon, Duchesne, and Uintah Cntys.*, 84 Fed. Reg. 68,274 (Dec. 13, 2019).  On October 30, 2020, the Board published its Draft EIS for review and comment.  Public comment on the Draft EIS lasted until February 12, 2021, and included six public online meetings and the Board's receipt of over 1,900 comments.  *See* J.A. 802.

In the Draft EIS, "the Board determined that there were three reasonable Action Alternatives (the Indian Canyon Alternative, Wells Draw Alternative, Whitmore Park Alternative), with the Whitmore Park Alternative identified as the Preferred Alternative."  Br. of Resp't Surface Transp. Bd. 11 [hereinafter "Board Br."]; *see also*  J.A. 445, 452.  The Board issued the Final EIS in August 2021, determining that "the Whitmore Park Alternative would result in the fewest

10

significant impacts on the environment." J.A. 874. Supplemental comments were submitted to the Board, including objections by Petitioner Center for Biological Diversity ("Center") and supporting statements from the Ute Indian Tribe and the State of Utah. *See, e.g.*, J.A. 1321–22 (Center for Biological Diversity Supplemental Comments); J.A. 1315–17 (Ute Indian Tribe Supplemental Comments); *see also* Board Br. 14.

The Board issued its final decision accepting the Coalition's exemption petition and "authorizing construction and operation of the Whitmore Park Alternative subject to extensive environmental mitigation conditions" in December 2021. *See* Board Br. 14; *see also Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys.*, S.T.B. Fin. Docket 36284, 2021 WL 5960905 (STB served Dec. 15, 2021) [hereinafter "Final Exemption Order"]. The Final Exemption Order incorporated the final EIS to weigh the project's transportation merits against its environmental impacts.

The Final Exemption Order relied on the BiOp the Service issued on September 20, 2021, which it based on the Board-defined action area for considering the expected environmental impact of the project on protected species and their designated critical habitat. *See Final Exemption Order*, 2021 WL 5960905, at *5, *10. That action area was limited to the project footprint, a 300-foot buffer around it, and "an area of the Upper Colorado River Basin affected by water depletions" from the project. J.A. 1660. The Board's final decision stated that the construction and operation of the Railway could have "major impacts" on water resources, air quality, special status species like the greater sage-grouse, land use and recreation, local economies, cultural resources, and the Ute Indian tribe, as well as "minor impacts" on vehicle safety and delay, rail operations

11

safety, big game, fish and wildlife, vegetation, and geology in the Uinta Basin. *Final Exemption Order*, 2021 WL 5960905, at *7–13. The Board also conducted a geological analysis of the project area to evaluate the risk that construction and operation of the proposed rail line could cause landslides or other geologic movements.

As for climate effects, the Board noted that, "[t]o the extent that the crude oil would be refined into fuels that would be combusted to produce energy, emissions from the combustion of the fuels would produce [greenhouse gas] emissions that would contribute to global warming and climate change," which, under a "high oil production scenario could represent up to approximately 0.8% of nationwide [greenhouse gas] emissions and 0.1% of global [greenhouse gas] emissions." *Id*. at *17.

The Board's order also considered whether to disclose "impacts from rail operations along existing rail lines segments" from "[t]rains originating or terminating on the proposed rail line," *id.* at *11, known as "downline impacts," *see id.* at *18–20; J.A. 1230 (defining "downline impacts"). Its environmental analysis found that the majority of trains originating or terminating on the Railway would travel on the Union Pacific Railroad Company ("Union Pacific") rail line heading east to Denver, Colorado. *See Final Exemption Order*, 2021 WL 5960905, at *20. But the Board determined that it need not consider various downline effects—on vehicle safety and delay, rail safety, noise and vibration, and air quality and greenhouse gases—on the ground that "minimal increases in train traffic on existing rail lines over which trains already operate are unlikely to cause significant impacts." *Id*. at *18.

The Board also did not disclose other environmental effects. It omitted the effects of increased crude oil refining on

12

Gulf Coast communities in Louisiana and Texas already overburdened by pollution from refining. *Id*. at *19. It omitted upline impacts on vegetation or special status species of increased drilling in the Uinta Basin. *See id*. at *15–18. And it omitted downline effects of projected increases in spills and accidents from additional oil trains traveling the existing Union Pacific rail line alongside the Colorado River—including effects on water, special status species or habitats, and recreation and land use. *See id*. at *13. Finally, the Board did not disclose potential effects of the project on historic sites or structures along the Union Pacific line in Eagle County that the County's brief asserted might be eligible for inclusion on the National Register of Historic Places. *See id*. at *21.

Petitioner Eagle County ("County") filed a petition in our Court for review of the Board's Preliminary Exemption Order and Final Exemption Order on February 10, 2022, and the Center filed a separate petition for review of the Final Exemption Order and the Service's BiOp on February 11, 2022. This Court consolidated the two petitions on February 11, 2022.

Petitioners assert violations of several interrelated statutes and various procedural requirements enacted to ensure agencies consider the possible adverse impacts associated with the approval of projects like the Railway. Petitioners both argue that the Board failed to take a hard look at the Railway's environmental impacts in violation of NEPA. The County claims the Board violated the NHPA by failing to consult the County on the Railway and to evaluate the impact of the project on historic properties downline. The Center raises separate challenges under the ESA regarding the Board's reliance on the Service's BiOp, which adopted the proposed action area as defined by the Board's Office of Environmental Analysis, and the validity of the BiOp itself. Finally, Petitioners both assert

13

that the Board erred in exempting the Railway from the ICCT Act's full application process.

## II.

We begin, as we must, with questions of our jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–96 (1998). We find that Petitioners have demonstrated Article III standing for each of the challenges raised and established statutory jurisdiction under the Hobbs Act.

## A.

"[S]tanding has three parts: injury in fact, causation, and redressability." *Util. Workers Union of Am. Loc. 464 v. FERC*, 896 F.3d 573, 577 (D.C. Cir. 2018). "Standing is not dispensed in gross," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)), so Petitioners must prove standing "for each claim [they] seek[] to press," *id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Petitioners both claim that the Final Exemption Order violates the ICCT Act and NEPA. The County separately argues that the order violates the NHPA, and the Center asserts a separate ESA challenge regarding the BiOp.

Given our "duty to assure ourselves of our jurisdiction," we will begin with the ICCT Act and NEPA claims, which are raised by both Petitioners, and then address the NHPA claims as raised by the County before turning to the Center's ESA claim. *Kaplan v. Cent. Bank of Islamic Republic of Iran*, 896 F.3d 501, 509 (D.C. Cir. 2018).

## 1.

The County alleges a procedural injury—namely, that the Board should not have engaged in a two-step approval process,

14

should have considered additional Rail Policies under the ICCT Act and environmental risks under NEPA, and should have consulted with the County on potential impacts to downline historic properties.  Accordingly, the County must demonstrate that the Board's decision to disregard these procedural requirements "impair[ed] a separate concrete interest of [the County]."  *City of Dania Beach v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 (1992)).

"The two things are not one and the same. [The County] must show *both* (1) that [its] procedural right has been violated, *and* (2) that the violation of that right has resulted in an invasion of [its] concrete and particularized interest."  *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (emphasis in original).  "[I]n cases in which a party 'has been accorded a procedural right to protect his concrete interests,' the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (quoting *Lujan*, 504 U.S. at 572 n.7).

For purposes of the standing analysis, the Court "must assume that [the County] will prevail on the merits of [its] claims."  *City of Jersey City v. Consol. Rail Corp.*, 668 F.3d 741, 744 (D.C. Cir. 2012).  The County contends that the Board departed from its prior precedent and therefore violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), in granting the Coalition's request for preliminary exemption contingent upon a later determination of the environmental impacts of the Railway.  *See* Cnty. Br. 18.  It also argues that the Board failed to consider "all pertinent Rail Policies" in granting the exemption, *id.* at 19, and "arbitrarily applied" the

15

Rail Policies it did consider, *id.* at 24.  As to its NEPA challenges, the County asserts that the Board failed seriously to consider numerous adverse effects of the Railway downline, including the increased risk of wildfires and impacts on water resources and other biological resources due to concededly increased rail traffic.  The County also states that the Board did not consult with it or otherwise consider impacts on historic properties downline as required by the NHPA.  Taking these allegations as fact, the County has demonstrated that the Board's Preliminary and Final Exemption Orders constitute "a violation of the procedural requirements" of the ICCT Act, NEPA, and NHPA.  *City of Dania Beach*, 485 F.3d at 1185.

Turning to the second requirement to demonstrate a procedural injury, we have previously recognized that "financial harm alleged by [a] [t]own and the infringement of its property interests" can substantiate standing.  *City of Bos. Delegation v. FERC*, 897 F.3d 241, 250 (D.C. Cir. 2018). Similarly, the Court has found that a town has a concrete interest in avoiding "increased traffic, noise, and disruption of businesses" and has held that "the presence of a continuing safety hazard caused by the nearby installation of a natural gas pipeline can establish an injury in fact." *Id.* (quotation marks omitted).  The County asserts that property in the County could be destroyed should the Railway lead to a "wildfire in Eagle County due to both an increased number of trains and highly flammable cargo."  Shroll Decl. 9 ¶ 22, Cnty. Br. Ex. 1.  It also notes that "the significant increase in rail traffic caused by the Railway" may impact historic sites with adverse "noise, vibrations, and visual effects." *Id.* at 10 ¶ 23.  This is sufficient to establish that the Board's alleged disregard for the relevant procedural requirements caused an injury to the County's "concrete and particularized interest[s]."  *Ctr. for L. & Educ.*, 396 F.3d at 1159.

16

To establish causation, the County must demonstrate "two causal links: 'one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury.'" *Ctr. for Biological Diversity v. EPA ("Center I")*, 861 F.3d 174, 184 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). Regarding the first link, the County does not need to show "that but for the alleged procedural deficiency the agency would have reached a different substantive result," *id.*, but, instead, "[a]ll that is necessary is to show that the procedural step was connected to the substantive result." *Id.* (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)). As to the second link, the County need not "establish the merits of its case, *i.e.*, that [its injury] has in fact resulted from the [Board's] procedural failures," but rather the County must "demonstrate that there is a 'substantial probability'" that the agency's action will cause the injury. *Id.* (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000) (per curiam)).

The County demonstrates both causal links. The Board's alleged failure to follow the procedural requirements of the ICCT Act, NEPA, and NHPA are "plainly 'connected to' its" "substantive government decision" to exempt the Railway. *Id.* If we take the County's allegations as true, the Board granted the exemption without considering various environmental impacts and effects on historic properties downline and, partly as a result of those procedural omissions, the Board failed to properly consider the relevant Rail Policies of the ICCT Act. Accordingly, the first causal link is established. The County's declaration also explains that the Railway will increase the number of trains that travel downline. *See* Shroll Decl. 7–8, ¶ 19. The County therefore demonstrates the second causal

17

link, because there is a substantial probability that this "significant increase in rail traffic," *id.* at 9 ¶ 22, will increase the risk of train derailments, oil spills, wildfires, and the related adverse effects on resources and historic properties downline.

The redressability requirement is relaxed for procedural-rights plaintiffs like the County. *Center I*, 861 F.3d at 185. The County must only show that the Board "*could* reach a different conclusion" if it revisited the order, *id.* (emphasis in original), and it has met this relatively low burden. Even if there were a "serious possibility . . . that the [Final Exemption Order] would remain unchanged following" the Board's revisiting of its determination process, "there remains at least the possibility that it could reach a different conclusion—say, by modifying the [Final Exemption Order]." *Id.* (quotation marks omitted).

Accordingly, the County has demonstrated standing to challenge the Board's orders under the ICCT Act, NEPA, and the NHPA, and so we need not consider the Center's standing to bring those same claims. *See Env't Action v. FERC*, 996 F.2d 401, 406 (D.C. Cir. 1993) ("[O]nce one petitioner has demonstrated standing[,] [the Court] may permit the participation of others[.]").

**2.**

The Center must separately demonstrate that it has standing to challenge the BiOp and the Board's reliance upon it. It asserts that it satisfies the test for associational standing, which requires the Center to establish that "(1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the

18

member to participate in the lawsuit." *Center I*, 861 F.3d at 182 (quotation marks omitted).

The Center's alleged injury arises from the Service's "procedural omissions," namely "its failure to make an effects determination" as to endangered fish in the Colorado River and its tributaries whose existence might be jeopardized, or critical habitat modified, by the Railway since it is expected to increase rail traffic on the river-adjacent Union Pacific Line. *Id.* at 183. As a "procedural-rights plaintiff," the Center must demonstrate "that the failure to make an effects determination . . . affects its members' concrete aesthetic and recreational interests." *Id.*

As the Center provides, one of its members, John Weisheit, is an avid rafter of the affected waterways that are the "critical habitat for the four Colorado River endangered fish" at issue: the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub. *See* Addendum to Center Br. 103. He also notes that he "derive[s] great enjoyment from viewing rare species in their natural environment and [is] constantly on the lookout for . . . federally listed endangered and threatened species." *Id.* at 97. Weisheit states that "[i]t breaks [his] heart and angers and depresses [him] to see the fish" who have died or otherwise been exposed to pollution, noting that he "feel[s] spiritual harm when [he] see[s] dead fish on the water." *Id.* at 108–09. His declaration establishes he has a "plan to use the allegedly degraded environmental area in question" and that he will suffer "aesthetic injuries" from "viewing the despoliation of animals." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 435 (D.C. Cir. 1998) (en banc) (quoting *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988)). This is sufficient to establish an injury-in-fact for standing purposes.

19

The Center also demonstrates the two required causal links to establish causation.

The Center demonstrates the first causal link because "the [Service's] failure to make an effects determination . . . is plainly 'connected to' its" conclusion in the BiOp, *Center I*, 861 F.3d at 184, that the Railway "is not likely to jeopardize the continued existence of Colorado River fishes or result in destruction or adverse modification of designated critical habitat," J.A. 1696. This "omitted procedural step" is also directly connected to the Board's "substantive government decision" to exempt the Railway since its orders relied on the BiOp. *Center I*, 861 F.3d at 184.

As to the second link, the Center points to both record evidence and a supplemental affidavit to show that there is "substantial probability" that the Railway will adversely affect local conditions and harm its members' interests. *Id.* The BiOp notes that "[o]peration of the rail line may release pollutants that negatively affect ESA-listed plant species," J.A. 1687, which the Center explains "will not suddenly cease once oil trains transfer to the national rail network downline of the Railway," Ctr. Reply Br. 20. The Center also references the EIS's explanation that there would be an increased risk of train accidents in the downline area given the increased traffic, with the potential of causing "loaded oil trains derailing" resulting in an oil spill "[r]oughly once every four years." *Id.* at 20 (citing J.A. 899, 1201). As the Center provides, these leaks could occur on rail lines that parallel "roughly 233 miles" of the Colorado River. *Id.* at 21.

In *Center I*, the Court noted that the EPA's belief that an insecticide it authorized would "provide significant benefits to growers" "ma[de] it likely—that is, [gave] rise to a substantial probability—that the EPA's registration of the pesticide

20

[would] in fact create a demonstrable risk to the Center members' interests" since the growers' crops overlapped with the habitat of a protected species. 861 F.3d at 185 (quotation marks and citation omitted). Similarly, here, the Board believes that the Railway's "construction and operation" would lead to "substantial transportation and economic benefits" given opportunities for transporting more oil out of the Basin. *Final Exemption Order*, 2021 WL 5960905, at *23. Under the logic of *Center I*, it follows that there is "substantial probability" that endangered fish in the Colorado River parallel to the downline rail line would be impacted by the Railway given the recognized risk of oil leaks and spills associated with the increased operation of trains carrying oil products. This would harm the aesthetic interests of the Center's members and is sufficient to demonstrate the second causal link necessary to establish causation.

The relaxed redressability requirement is also met, as the Board or Service may modify the Final Exemption Order or BiOp, respectively, after revisiting the effects determination. *Center I*, 861 F.3d at 185. Since the Center has established standing for at least one of its members, and support for the remaining requirements is readily apparent, the Center also has standing to challenge the BiOp in this petition.

**B.**

The Court has jurisdiction to review final orders of the Board "under the Hobbs Act, which allows 'any party aggrieved by a final order' to, 'within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies.'" *Snohomish Cnty.*, 954 F.3d at 298 (citing 28 U.S.C §§ 2321(a), 2342(5), and 2344). The Final Exemption Order was issued on December 15, 2021, making Petitioners' February 10, 2022, and February 11, 2022,

21

petitions for review of that order timely.  As discussed above, both the Center and the County have standing so they "ha[ve] met the statutory requirement of aggrievement," so the remaining question is if they can be considered  "part[ies]." *Water Transp. Ass'n v. ICC*, 819 F.2d 1189, 1193 (D.C. Cir. 1987).

To achieve party status under the Hobbs Act, one must "have participated in the proceeding before the [Board]." *Id.* at 1192.  "The degree of participation necessary to achieve party status varies according to the formality with which the proceeding was conducted."  *Id.*  Accordingly, "[w]hen intervention in agency adjudication or rulemaking is prerequisite to participation therein," only those who sought to intervene will have standing under the Hobbs Act. *Id.*  In more informal administrative proceedings, "party status has been found when the petitioner has made a full presentation of views to the agency." *Id.* at 1193.  For example, in *Water Transport Association*, this Court held that in a proceeding in which the agency "did not call for formal intervention" and "instead . . . solicited general protests of its [action]," the petitioners' submission of a protest was sufficient to be conferred party status.  *Id.*

Here, the administrative proceedings were informal. While the Board did set a deadline for reply comments on the exemption petition and requested public comment as part of the EIS process, it never required interested parties to intervene in the exemption proceedings or take any action of similar formality.  *See* J.A. 293, 802.  The Center, along with others, replied to the exemption petition, actively participated in the EIS proceedings, and submitted a petition for rehearing of the Final Exemption Order.  The County also provided comments in the EIS proceedings and submitted a petition for rehearing of the Board's order.  The participation of both the County and

22

the Center was sufficient for each to be considered a party under the Hobbs Act.

The parties agree that the Court also has jurisdiction to review the BiOp since it was "incorporated" into, or at least relied on in, the Final Exemption Order. Board Br. 1–2 (citing *City of Tacoma v. FERC* ("*Tacoma II*"), 460 F.3d 53, 76 (D.C. Cir. 2006)); *see also* Opening Br. of Pet'rs Ctr. for Biological Diversity, et al. 1–2 [hereinafter "Center Br."] (citing *Tacoma II*, 460 F.3d at 76). While we have not yet specifically addressed whether we may directly review a biological opinion prepared during a Surface Transportation Board proceeding, it follows from our precedent involving other agencies that we have jurisdiction to review a biological opinion where, as here, that opinion was prepared during a proceeding over which this court has exclusive appellate jurisdiction. *See Tacoma II*, 460 F.3d at 76; *In re Pub. Emps. for Env't. Responsibility*, 957 F.3d 267, 272 (D.C. Cir. 2020).

In several cases concerning challenges to licensing orders by the Federal Energy Regulatory Commission ("FERC"), we have found that "when a BiOp is prepared in the course of a FERC licensing proceeding, the only means of challenging the substantive validity of the BiOp is on review of FERC's decision in the court of appeals." *Tacoma II*, 460 F.3d at 76; *see also Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1087 (D.C. Cir. 2021); *Am. Rivers v. FERC*, 895 F.3d 32, 45 (D.C. Cir. 2018). This approach stems from the "well-established" rule that "when two jurisdictional statutes draw different routes of appeal" courts "apply only the more specific legislation." *Center I*, 861 F.3d at 186 (quoting *Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1089 (9th Cir. 2017)). As this Court has recognized, "when jurisdiction to review administrative determinations is vested in the courts of appeals these specific, exclusive jurisdiction provisions

23

preempt district court jurisdiction over related issues under other statutes." *Media Access Project v. FCC*, 883 F.2d 1063, 1067–68 (D.C. Cir. 1989) (quoting *Connors v. Amax Coal Co.*, 858 F.2d 1226, 1231 (7th Cir. 1988)). This decreases "[t]he likelihood of duplication and inconsistency" that may occur if the BiOp was reviewed separately by the District Court while the primary agency order was reviewed under the exclusive jurisdiction of the appeals court. *City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979).

Here, as with our review of FERC's licensing orders, *see* 16 U.S.C. § 825*l*(b), the Hobbs Act limits review of the Board's exemption orders to the court of appeals, *see* 28 U.S.C. § 2321(a) ("Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Surface Transportation Board shall be brought in the court of appeals[.]"). Accordingly, "the specific provisions of the [Hobbs Act] that govern review of disputes concerning the [Board's orders] must preempt the general procedures for ESA and APA claims brought under general federal question jurisdiction." *City of Tacoma v. Nat'l Marine Fisheries Serv. ("Tacoma I")*, 383 F. Supp. 2d 89, 92 (D.D.C. 2005) (citing *Media Access Project*, 883 F.2d at 1067; *Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989); *City of Rochester*, 603 F.2d at 936). Since the Board relied upon the BiOp in making its determination to exempt the Railway, this Court "has jurisdiction to review not only the [Board's] order [exempting the Railway], but also the Service's Biological Opinion that was prepared in the course of the [Board's] [exemption] proceeding." *Shafer*, 992 F.3d at 1087.

24

## III.

We review the orders of the Surface Transportation Board exempting proposed rail projects from the Board's full application process "under the Administrative Procedure Act, examining whether the agency's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Snohomish Cnty.*, 954 F.3d at 301 (quoting 5 U.S.C. § 706(2)(A)). The same standard applies to the review of the EIS, the challenges brought under NHPA, and our review of the BiOp. *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019); *see also Tacoma II*, 460 F.3d at 75–76.

We begin with Petitioners' challenges to the environmental review process and end with the objections to the Board's exemption order itself since the Board relied in large part on the review process in making its final determination.

### A.

Petitioners raise numerous objections under NEPA regarding the Board's environmental review of the Railway. To fulfill their obligations under NEPA, "agencies must take a 'hard look' at the environmental consequences of their actions, and provide for broad dissemination of relevant environmental information." *Pub. Emps. for Env't Resp. v. Hopper ("PEER")*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (cleaned up) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Here, the Board assessed the environmental impacts of the Railway under pre-2020 regulations promulgated by the Council on Environmental Quality ("CEQ"), a division within the Executive Office of the President that was "established by NEPA with authority to

25

issue regulations interpreting it." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).

The CEQ "regulations require an agency to evaluate cumulative impacts along with the direct and indirect impacts of a proposed action." *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (quotation marks omitted). Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (2019). Indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b) (2019). Direct impacts "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a).

While we disagree with many of Petitioners' objections, we ultimately find that the EIS failed to demonstrate that the Board took the requisite "hard look" at all of the environmental impacts of the Railway. With this background, we address each of Petitioners' NEPA challenges in turn.

**1.**

Many of Petitioners' arguments challenge the Board's cumulative impacts analysis. For that analysis, the "OEA identified 27 relevant projects" that it "conclude[d] . . . in combination with the impacts of construction and operation of the [Railway] could result in cumulative adverse impacts on water resources, biological resources, paleontological resources, land use and recreation, visual resources, and socioeconomics." *Final Exemption Order*, 2021 WL 5960905, at *15. Separate from those 27 projects, "OEA's cumulative impacts assessment also include[d] an analysis of potential

26

future oil and gas development in the Basin and the potential future construction and operation of new rail terminal facilities near Myton and Leland Bench, Utah," *id.* at *16, including the effects that oil production in the Basin could have on road traffic and vehicle safety, air quality near oil-producing wells, greenhouse gas emissions from the eventual combustion of crude oil transported on the Railway, and long-term employment and commercial activity, *id.* at *16–18.

The Board concluded that increased oil drilling in the Basin and the construction of new railway terminals could worsen local roadway congestion but would not meaningfully increase the risk of traffic accidents. *Id.* It disclosed the potential for air pollutant emissions from the construction, operation, and maintenance of oil wells in the Basin to affect local air quality. *Id.* Under the heading of cumulative impacts, the Board also discussed the "[d]ownstream end use emissions associated with the combustion of the crude oil that could be transported on the Line" and the potential for Uinta Basin oil production "to generate long-term employment, labor income, and spending on goods and services in the cumulative impacts study area." *Id.* at *17.

### i.

Petitioners' first argument is unpersuasive. While the Center concedes that the Final EIS "acknowledged that increased oil production in the Basin . . . could have profound consequences for the Basin's environment (upstream) and climate change (downstream)," Center Br. 19, it argues that the Board mischaracterized these effects "as 'cumulative effects' that would occur independent of the Railway's construction and/or operational impacts, instead of as 'indirect effects' caused by the construction and operation of the railroad," *id.* at 20 (emphasis omitted).

27

The Center explains, for example, that the Final EIS attributes an additional "131,169 tons per year" in greenhouse gas emissions to the Railway. *Id.* at 21. However, the Center claims that total number would have been closer to "56,078,436 tons annually [or] 427 times the amount the Board attributed to the Railway" if it had included "emissions generated from oil and gas operations and from combustion of the oil transported by the Railway, plus operations along the downline route between the Railway's Kyune terminal and Denver." *Id.* at 21–22 (internal citations and emphasis omitted). The Center describes this "mischaracterization" as "minimizing" the Railway's consequences in contravention of NEPA's hard look requirement as well as "skewing the weighing of environmental costs and projects benefits" the Board must undertake under the ICCT Act. *Id.* at 23.

The Center's argument is unavailing because it fails to demonstrate prejudice from the alleged mischaracterization. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006). Even if the Board erroneously characterized the impacts related to increased oil production as cumulative impacts, Petitioners identify no way in which this decision materially affected the Board's analysis under NEPA. The Center fails to highlight any actual omission in the Board's emissions analysis. In its final order, the Board acknowledged the impact of increased oil extraction in the Basin and explained "[t]he impacts and the analysis of those impacts would be the same no matter which label is used." *Final Exemption Order*, 2021 WL 5960905, at *18 & n.15. The Center fails to show any indication in the final order or the administrative record that the Board did not consider these impacts in its analysis. Further, the Final EIS quantified potential carbon emissions from downstream refining of Uinta Basin oil and concluded that emissions associated with the combustion of fuels produced from crude oil transported on the Railway could constitute

28

nearly one percent of total U.S. emissions under its "high oil production scenario." J.A. 1139.

Such disclosures, even if under the rubric of "cumulative impacts," can hardly be said "to undermine informed public comment and informed decisionmaking." *Sierra Club v. FERC (Sabal Trail)*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

**ii.**

Next, the Center contends that the Final EIS ignored certain upstream and downstream impacts of the Railway. We agree.

The Center notes that the Final EIS "failed to disclose the downstream environmental impacts of increased crude oil refining along the Gulf Coast." Center Br. 24. The Center explains that the Final EIS predicted "half the oil production increase—up to 175,000 barrels/day—would be delivered to Houston and/or Port Arthur, Texas, and another 35 percent to the Louisiana Gulf Coast." *Id.* (citing J.A. 1231). Accordingly, the Center provides, "the EIS was required to analyze the potential for tens of thousands of additional barrels of oil shipments daily and their processing in these locales to further worsen pollution burdens," locales with known, disproportionate exposure to pollution already. *Id.* at 25–26. Further, the Center argues that the Board arbitrarily limited its cumulative impact analysis regarding effects on vegetation and "special-status species" to the area adjacent to the proposed rail line and "within several hundred feet of the rail line." J.A. 1126–27. The Center contends this geographic limitation resulted in the exclusion of impacts on "a vast area in which well and road construction, drilling, and truck traffic could destroy and degrade habitat." Center Br. 27.

29

In response, the Board makes two primary arguments. First, the Board argues that "upstream and downstream impacts from oil development in the Uinta Basin are not reasonably foreseeable impacts." Board Br. 35 (cleaned up). Second, it contends that it was not required to consider the environmental effects of downline oil refining on Gulf Coast communities or on greenhouse gases from oil combustion because the Board "cannot regulate or mitigate impacts caused by [downline train] operations." *Final Exemption Order*, 2021 WL 5960905, at *19.

As to upstream impacts, the Board claims that "any oil development in the Uinta Basin occurring as a result of the [Railway] will be done in the future as part of as yet unknown and unplanned independent projects that would occur on as yet unidentified private, state, tribal, or federal land." Board Br. 35–36. In addition, any development would be undertaken "by as yet unknown entities and licensed or permitted by other federal agencies, state and local governments, or the Ute Tribe, depending on the location of the development." *Id.* at 36. The Board asserts that estimates provided by the Coalition on "upstream wells based on estimates of the amount of oil anticipated to be transported on the [Railway]" are merely estimates and otherwise the actual numbers are "simply unknown and unknowable." *Id.* at 36.

For downstream emissions, the Board explains that the "destinations and combustion of Uinta Basin oil is unknown and unknowable at this stage" since it will depend on many factors such as "oil developers, market forces, refinery capacity, [etc.]" *Id.* at 37. While the Board concedes that it "identified five general geographic regions where the oil could go to be refined," it claims that it is impossible to predict which of the known "31 refineries" in those areas "would receive Uinta Basin oil." *Id.* at 37–38. Accordingly, the Board

30

contends "there is no way to predict or assess impacts to specific nearby communities from refining that oil." *Id.* at 38.

In effect, the Board justifies "declining to consider greenhouse-gas emissions and other environmental impacts" related to oil development both upstream and downstream "based on its lack of information about the" location of future oil production sites in the Uinta Basin and the "destination and end use of the [oil] in question." *Birckhead v. FERC*, 925 F.3d 510, 519 (D.C. Cir. 2019) (per curiam).

We have previously considered when an agency may draw the line and find that it cannot engage in reasonable forecasting to determine certain environmental effects.  We explained in *Birckhead v. FERC*, that impacts from upstream gas production and "downstream gas combustion are" not always as a categorical matter a reasonably foreseeable effect of a project that will facilitate the transport of gas.  *Id.*  The analysis is necessarily contextual.  "In determining what effects are 'reasonably foreseeable,' an agency must engage in 'reasonable forecasting and speculation,' with *reasonable* being the operative word."  *Sierra Club v. Dep't of Energy (Freeport)*, 867 F.3d 189, 198 (D.C. Cir. 2017) (citation omitted).  "The agency 'need not foresee the unforeseeable, but by the same token neither can it avoid drafting an impact statement,'" or including relevant effects in such statement, "'simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting.'"  *Id.* (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

The Center primarily points to *Sabal Trail*, in which FERC argued that "it [was] impossible to know exactly what quantity of greenhouse gases [would] be emitted as a result of [a gas

31

pipeline project] being approved" as part of its effects analysis. 867 F.3d at 1373–74. We rejected that argument because the pipeline developers in that case had identified the specific power plants in Florida that would be the recipients of the gas, *see id.* at 1372, and "FERC ha[d] already estimated how much gas the pipelines [would] transport," *id.* at 1374. Accordingly, the Court found that the related EIS "should have either given a quantitative estimate of the downstream greenhouse emissions that [would] result from burning the natural gas that the pipelines [would] transport or explained more specifically why it could not have done so." *Id.*

The Board, on the other hand, highlights *Delaware Riverkeeper Network*, in which the Court cited *Sabal Trail* as support for its holding that "[g]reenhouse gas emissions are reasonably foreseeable effects of a pipeline project when the project is known to transport natural gas to particular power plants." *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109 (D.C. Cir. 2022). In *Delaware Riverkeeper Network*, however, the Court found that the agency did not have to estimate certain downstream greenhouse gas emission because, as FERC reasoned, "natural gas would be delivered for further transportation on the interstate grid to an unknown destination and for an unknown end use." *Id.* at 110.

Neither *Sabal Trail* nor *Delaware Riverkeeper Network* are perfectly analogous, but the Final EIS's analysis makes this case more akin to *Sabal Trail*. In the Final EIS, the OEA developed different scenarios for the expected increase in rail traffic on the Railway and resulting increase in oil production. *See* J.A. 1106–07. As part of its cumulative impact analysis, the "OEA estimated the number of oil wells that would need to be constructed and operated [in the Basin] to satisfy the expected increased oil production volume scenarios." *Id.* at 1107. The EIS described its "estimates of future oil

32

production" as "a reasonably foreseeable development scenario based on historical data about the Basin and consultation with [the Utah Geological Survey]." *Id.* at 1109. While the Board lacks "direct parameters" about the oil wells that would need to be drilled, this Court has found that "some educated assumptions are inevitable in the NEPA process." *Sabal Trail*, 867 F.3d at 1374.

The Board provides no reason why it could not quantify the environmental impacts of the wells it reasonably expects in this already identified region. Further, the Board's cursory assertion that it could confine the upstream impacts of oil development on vegetation and wildlife to areas where oil development and railroad construction would overlap lacks any reasoned explanation and is unsupported in the record. *See* J.A. 1123. At a minimum, the Board "must either quantify and consider the project's [upstream impacts] or explain in more detail why it cannot do so." *Sabal Trail*, 867 F.3d at 1375.

Similarly, while the Board argues it cannot identify specific refineries that will receive and process the oil that it expects will be developed, the EIS identifies specific regions that will receive the oil based on expected train traffic, *see* J.A. 1191–92, and a limited number of refineries in those regions that would have the available capacity to process and refine the Uinta Basin's waxy crude oil, *id.* at 1189. The Board fails to explain why it cannot take the next step and estimate the emissions or other environmental impacts it expects in its impacts analysis since it has "identif[ied] *where* the [Railway-induced] [oil and] gas production [is expected to] occur." *Freeport*, 867 F.3d at 201 (emphasis in original). This is not a case in which the location of where the oil will be delivered or its end use is unknown, as in *Delaware Riverkeeper Network*. Indeed, the Board has identified the refineries that likely would be the recipients of the oil resulting from the Railway's

33

operation, *see* J.A. 1189, and explained that the oil will be refined for combustion, *see id.* at 1138.

While great "deference [is] owed to [the Board's] technical judgments," it still must provide a reasoned explanation for its rulings. *Del. Riverkeeper Network*, 45 F.4th at 111. The Board fails to adequately explain why it could not employ "some degree of forecasting" to identify the aforementioned upstream and downstream impacts in light of the Board's extensive analysis and estimations related to increased oil production. *Scientists' Inst.*, 481 F.2d at 1092.[1]

---

[1] After the hearing on these petitions, the Coalition brought to our attention a recent case of our Court that it urges us to find supports its position that downstream impacts on the Gulf Coast were not reasonably foreseeable, *Center for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023). However, this recent case adds nothing new to our analysis. There, the petitioners argued that FERC was required "to consider the indirect effects of Alaska-bound gas," *id.* at 1185–86, given its acknowledgement that the corporation requesting authorization to build the proposed liquefied natural gas facility "plan[ned] to install at least three taps along the Project's pipeline and to divert some natural gas for sale and use in Alaska," *id.* at 1185. However, the Court noted numerous uncertainties made any related emissions not reasonably foreseeable, specifically that "the Corporation would have to contract with prospective customers and secure regulatory approval from Alaska, and various subsidiary pipelines (none of which had been proposed) would have to be built." *Id.* In this case, there are no such uncertainties. The Board made clear that it expected a certain amount of oil to be transported to specific regions with a limited set of refineries. *See* J.A. 1189. The Board expects the crude oil would then be refined for combustion. *See id.* at 1189, 1139. This recent case merely reiterates this Court's precedent that "indirect emissions are not reasonably foreseeable if the Commission cannot identify the end users of the gas," but that is not what we have here. *Ctr. for Biological Diversity*, 67 F.4th at

34

The Board, like any agency, is not allowed "to shirk [its] responsibilities under NEPA by labeling" these reasonably foreseeable upstream and downstream "environmental effects as 'crystal ball inquiry.'" *Id.* (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972)).

The Board also cannot avoid its responsibility under NEPA to identify and describe the environmental effects of increased oil drilling and refining on the ground that it lacks authority to prevent, control, or mitigate those developments. *See Final Exemption Order*, 2021 WL 5960905, at *19 (Board order citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768-770 (2004)).

The undisputed purpose of the railway is to expand oil production in the Uinta Basin, by enabling it to be brought to market via the proposed rail line connecting the Basin to existing lines that run to Gulf Coast refineries. The Board concededly has exclusive jurisdiction over the construction and operation of the railway, including authority to deny the exemption petition if the environmental harm caused by the railway outweighs its transportation benefits. *See* 49 U.S.C. §§ 10501(c), 10901(b); *Alaska R.R.—Constr. & Operation Exemption—Rail Line Between Eielson Air Force Base & Fort Greely, Alaska* (*Alaska Railroad*), S.T.B. Fin. Docket 34658, 2007 WL 2875687, at *1 (STB served Oct. 4, 2007). The Board is authorized to license railroad construction and operation based on the "public convenience and necessity," which encompasses reasonably foreseeable environmental harms. *Sabal Trail*, 867 F.3d at 1373. And, given that the Board has authority to deny an exemption to a railway project on the ground that the railway's anticipated environmental and

_____

1185 (citing *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 110 (D.C. Cir. 2022)).

35

other costs outweigh its expected benefits, the Board's argument that it need not consider effects it cannot prevent is simply inapplicable. *See id.*

Just as was the case with the gas pipeline at issue in *Birkhead v. FERC*, the agency is "not excused" from considering the environmental impacts of a railway it approves "even where it lacks jurisdiction over the producer or distributor of the [oil] transported by" that railway. 925 F.3d at 519 (quotation marks omitted).

### iii.

The County contends the Board failed to consider the cumulative impacts associated with the reactivation of the Tennessee Pass Line and the Railway. Cnty. Br. 37. As noted above, agencies "need not foresee the unforeseeable." *Freeport*, 867 F.3d at 198 (quoting *Scientists' Inst.*, 481 F.2d at 1092). Here, the reactivation of the Tennessee Pass Line was much too unlikely for the Board to have included among the potential impacts it considered.

The Tennessee Pass Line is an approximately 163-mile railway running between Sage and Parkdale, Colorado that "has been out of service for many years." J.A. 1241. The County argues that the "reactivation of the Tennessee Pass Line is reasonably foreseeable" since "reactivation of the [Tennessee Pass] Line has been sought in two separate Board proceedings." Cnty. Br. 37 (citing J.A. 550–51). It notes that the Tennessee Pass Line and Union Pacific Line "converge in Eagle County near Dotsero and the Colorado River," which— assuming reactivation of the Tennessee Pass Line and increased rail traffic on the Union Pacific Line—"would present environmental impacts to the same area of Eagle County that would experience the Railway's rail traffic." *Id.* at 38. The County concedes that "the Board rejected requests to

36

consider the impact of the Railway's oil trains using the Tennessee Pass Line as a reasonably foreseeable impact *of the Railway*," but argues that the Board's determination did not excuse it from "tak[ing] a hard look at the cumulative effect of the significant increase in traffic on the Union Pacific Line and a reactivated Tennessee Pass Line." *Id.* (emphasis in original).

The Board explains that "neither reactivation nor use of the Tennessee Pass Line for trains transporting Uinta Basin oil is reasonably foreseeable." Board Br. 55. It notes that since it denied a 2020 request to lease and operate the line, there have been "no pending or reasonably foreseeable requests to reactivate the Tennessee Pass Line." *Id.* Further, it points to its "rail traffic model" and provides that it did not forecast any trains travelling over the Tennessee Pass Line, especially since the line has higher grades—meaning "train[s] would have to use more locomotives and consume more fuel to use that route compared to the [Union Pacific] mainline," J.A. 1241—which the OEA found "make[s] [the Tennessee Pass Line] an impractical and unlikely route for Uinta Basin trains." Board Br. 56. Finally, the Board noted that the Coalition "submitted a verified statement explaining that the planned operators of the [Railway] have no plans to transport Uinta Basin oil on the Tennessee Pass Line and that it would not be practical or economical to do so." *Id.*

Given the information available to the Board, it properly found it was not reasonably foreseeable that the Tennessee Pass Line would be reactivated. Such "baseless speculation is unhelpful," and the Board had no obligation to consider the cumulative impacts of such a remote possibility. *Freeport*, 867 F.3d at 198.

37

**2.**

Petitioners' next set of NEPA challenges concern the Board's assessment of "indirect or down-line impacts" of the Railway. 49 C.F.R. § 1105.7. In this context, "[d]ownline impacts are impacts that could occur along existing rail lines as a result of increased rail traffic due to the addition of new trains originating or terminating on the proposed rail line." J.A. 1230. Using thresholds outlined in the Board's regulations, the Final EIS "identified existing rail lines that could experience an increase in rail traffic of three trains per day or more for areas in nonattainment under the Clean Air Act or eight trains per day or more in attainment areas." *Id.* at 1231 (citing 49 C.F.R. § 1105.7(e)(5)). The Final EIS discussed what impact the Railway could have downline on, among other things, rail accident risk, wildfire risk, water and biological resources, and land use and recreation.

Again, we find Petitioners' various objections successful in part.

**i.**

Petitioners contend that the Board failed to take a "hard look" at the increased risk of rail accidents downline given the increased rail traffic resulting from the Railway. This first argument is persuasive.

The Final EIS determined that the new Railway would lead to increased downline rail traffic, ranging from 0.4 to 9.5 trains per day. J.A. 888. This increase "would have the greatest impact on the segment of the existing [Union Pacific Line] between Kyune and Denver," *id.* at 899, which could experience between 3.3 and 9.5 additional trains per day, *see id.* at 886. Using national data for train accident rates, *see id.* at 1197, the Final EIS modeled two scenarios, one with high

38

rail traffic and one with low traffic for both loaded and unloaded trains, *id.* at 899–90. The OEA found that the Union Pacific line segment "would experience more than two times the risk of an accident than under baseline (existing) conditions" and an increase of "about 40 percent from the baseline risk" in the low rail traffic scenario. *Id.* at 899. Numerically, this comes out to 0.89 additional predicted accidents per year in the high rail traffic scenario and 0.31 additional accidents annually in the low scenario. *Id.*

The Final EIS noted that the Union Pacific Line segment "currently has a low volume of rail traffic relative to the predicted traffic" on the Railway, which contributes to the magnitude of difference in accident risk under the status quo. *Id.* The OEA also explained that an accident would not always involve a loaded crude oil train. *See id.* at 897–98. On the Railway, OEA estimated that "an accident involving a loaded oil train would occur approximately once every 3 to 10 years." *Id.* at 897. On the Union Pacific Line segment, the OEA predicted that "accidents involving a loaded crude oil train would occur slightly less than once per year under the high rail traffic scenario." *Id.* at 900.

The County challenges the Board's use of national data for train accident rates. It contends the Board ignored record evidence undermining its assumption "that the likelihood of derailment for long trains carrying oil through the Mountain West would be the same as any other train in any other locale in America." Cnty. Br. 39. The County also asserts that the Board arbitrarily assumed "that accident rates for loaded trains would be the same as those for empty trains." *Id.* (citing J.A. 898) (emphasis omitted). While the County recognizes that the Board acknowledged there was limited data on accident rates for this geographic area, it argues that NEPA regulations, *see* 40 C.F.R. § 1502.22 (2019), required the Board to explain

39

"why the information was unavailable and what actions the agency took to address that unavailability." Cnty. Br. 41 (quoting *Oglala*, 45 F.4th at 300).

"The regulation appears applicable on its face." *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021). In response to a comment asserting that the Draft EIS "fail[ed] to consider the unique derailment risks posed by heavy, long unit trains that would exclusively transport crude oil," OEA responded that "insufficient data exist on accident rates for unit trains carrying crude oil in general, or trains carrying waxy crude oil in particular, to allow OEA to calculate commodity-specific accident rates." J.A. 1245. Accordingly, under the CEQ regulations, the Board could only "satisfy NEPA by explaining in the EIS why the information was unavailable and what actions the agency took to address that unavailability." *Oglala*, 45 F.4th at 300 (citing 40 C.F.R. § 1502.22(b) (2020)).

Here, the Board does not contend that it followed the regulations with regards to its accident data. Instead, it concededly relied on national freight train accident rates without explanation and assumed that loaded freight trains were as likely to derail as unloaded trains. *See* J.A. 900, 1197–98. Further, the County identifies specific record evidence noting that there is increased risk from loaded, miles-long oil trains traveling through difficult mountainous terrain, *see* Cnty. Br. 39 (citing J.A. 618), evidence the OEA effectively ignored in the Final EIS. "Because the [Board] failed to respond to significant opposing viewpoints concerning the adequacy of its analyses of [rail accidents], [the Court] [must] find its analyses deficient under NEPA and the APA." *Vecinos*, 6 F.4th at 1329.

40

**ii.**

The County also contends the Board violated NEPA by "fail[ing] to take a hard look at the risk and impact of wildfires presented by the Railway" given the expected increased traffic on the Union Pacific Line. Cnty. Br. 33. We agree.

After receiving comments on the Draft EIS, "OEA considered impacts from rail operations along existing rail line segments downline . . . including impacts related to wildfires." J.A. 992. It found that "the downline wildfire impact of the proposed rail line would not be significant" for three reasons. *Id.* First, the OEA noted that the "construction and operation of the [Railway] would not introduce a new ignition source for wildfires along the downline segments" since the rail lines are "active rail lines that have been in operation for many years." *Id.* Second, the OEA explained that "the probability that a train would trigger a wildfire is very low." *Id.* The OEA provides that, among other things, "improvements in locomotive technology and the fact that trains make up a small percentage of fire starts" results in a low "probability of train-induced wildfire." *Id.* at 991. Finally, the OEA references the U.S. Forest Service's Wildfire Hazard Potential map, which was "created . . . to help inform evaluations of wildfire risk or prioritization of fuel-management needs across very large landscapes." *Id.* at 965. "The [Wildfire Hazard Potential] map displays those areas within the continental United States that have very different levels of fire potential, categorized by five [Wildfire Hazard Potential] classes (very low, low, moderate, high, and very high) and two non-[Wildfire Hazard Potential] classes (non-burnable and water)." *Id.* The Final EIS provides that the Wildfire Hazard Potential map demonstrates that "nearly 90 percent of the area along the downline segments consists of very low, low, nonburnable, and water [Wildfire Hazard Potential] classes." *Id.* at 992. Accordingly, the OEA

41

explained, the Railway would not result in significant increased risk of wildfires downline. *See id.*

The County derides the Board's "conclusion that wildfire risks posed by the Railway would be low" because the increased train traffic would not be a "new ignition source" in the downline area, arguing that "[m]ore trains mean more ignition sources." Cnty. Br. 34. The County points to record evidence and "substantial concerns . . . submitted to the Board regarding the elevated risk of wildfire posed by the increase in rail traffic and accidents through the Colorado mountains carrying the highly flammable crude oil." *Id.* (citing J.A. 761–65). The County also faults the Board's reliance on the Wildfire Hazard Potential map. It claims that "the Forest Service cautioned that its [Wildfire Hazard Potential] map is 'not an explicit map of wildfire threat or risk'" and that its primary purpose was "not to determine wildfire impacts." *Id.* at 36 (quoting U.S. Dep't of Agric., Forest Serv., *Wildfire Hazard Potential for the United States*, MISSOULA FIRE SCIS. LAB'Y (2020), https://perma.cc/DV59-XFC8). In the alternative, the County states that the Board's reliance on the map cannot excuse it failing to "evaluate the approximately 4,000 acres of high to very high Wildfire Hazard Potential classes along the Union Pacific Line or the increased risk of wildfire posed by the rail traffic and accidents on the [Union Pacific] Line." *Id.*

The County does not refute that it failed to raise its objections to the Board's reliance on the Wildfire Hazard Potential map during the administrative proceedings. Accordingly, "it has waived the argument by failing to raise it at the administrative level." *Nevada*, 457 F.3d at 88. Its remaining arguments, however, are persuasive.

42

While we recognize that the Board relied on additional factors in analyzing downline wildfire risks—such as technological improvements in the rail industry and historic data on train-induced wildfires—its assertion that an increase in rail traffic of up to 9.5 new trains a day would not result in a significant wildfire risk because it would not be a qualitatively "new ignition source" is utterly unreasoned.  J.A. 992.  A significant increase in the frequency of which existing ignition sources travel this route equally poses an increased risk of fire.  It follows that the historic data relied upon purportedly showing that train-induced wildfire has a low probability is not dispositive, especially given the concededly "low volume of rail traffic" on the Union Pacific Line currently.  *Id.* at 899.  Further, because the Board appears to have underestimated the accident risk for downline trains as noted in the prior section, it necessarily underestimated the wildfire risk from downline derailments.

This is not the "hard look" that NEPA requires.  *PEER*, 827 F.3d at 1082.

**iii.**

Next, the County urges that the EIS failed to evaluate certain adverse impacts on downline resources, including on: (1) "water resources" especially since the "sensitive" Colorado River parallels the Union Pacific Line;  (2) "biological resources . . . including impacts to wildlife, endangered species, habitat degradation, and the impact of more trains on species' survival";  (3) "land use and recreation . . . which includes hundreds of thousands of acres of public lands, national forests, recreational areas, and mountain communities in Eagle County";  and (4) "noise and vibrations on the [Union Pacific] Line."  Cnty. Br. 31–33.

43

The County acknowledges that the Board responded in the Final Exemption Order and EIS to comments challenging the EIS's impact on biological resources on the Union Pacific Line. *Id.* at 31–32 ("[T]he Final EIS . . . 'considered impacts of rail operations along existing rail line segments downline' on 'some biological resources, including impacts on ESA-listed species' and determined that 'the addition of up to 9.5 trains per day, on average, would not substantially change the severity of those impacts.'") (quoting J.A. 995–96). The County also concedes that "the Board purported to evaluate noise and vibrations" on the Union Pacific Line, Cnty. Br. 33, but claims that the Board's analysis was inadequate since it merely "identif[ied] how loud trains would be or the amount of land negatively impacted by the trains' noise and vibrations." *Id.* The County contends that the Board "was required to describe the 'actual environmental effects' of the Railway on the environment, historic properties, and communities along the Union Pacific Line." *Id.* (emphasis omitted) (quoting *Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008)).

Despite its assurance that the EIS's analysis of impacts on water resources considered the impacts on the Colorado River, the Board offers no citations that explicitly reference possible impacts to the relevant downline water resources or explains why, as it says, "the impacts are the same and apply to both." Board Br. 52. Merely "[s]tating that a factor was considered . . . is not a substitute for considering it," *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986), and there is no evidence here that the Board even considered the potential impacts on water resources downline of running up to 9.5 loaded oil trains a day on the Union Pacific Line—about 50% of which abuts the Colorado River, *see* Ctr. Reply Br. 21. The Board concededly fails altogether to mention the Colorado River in the Final EIS's discussion of impacts on water

44

resources. *See* Board Br. 51–52 ("The EIS analyzed the impacts of a spill and other releases on all water resources and, *while it did not explicitly say so*, that analysis applied equally to water resources adjacent to the [Railway] as well as operations in the downline study area. . . .") (emphasis added). This was not a "hard look" under NEPA.

We cannot reach the merits of the County's other arguments concerning downline impacts on biological resources, land use and recreation, and noise-related disturbance, because it failed to raise them before the Board. Longstanding precedent mandates that "persons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Nevada*, 457 F.3d at 88 (cleaned up). While the County claims that "hundreds of comments" put the Board on notice of its positions, *see* County Reply Br. 7, 8, the record citations it provides are vague and "bare" references that "d[o] not touch on what [the County] argues here," *Nevada*, 457 F.3d at 88–89.

The County cites, for example, a letter from a nonprofit river conservation organization, noting that its comments were specifically provided to address "the direct impacts to river recreation in the Uinta Basin and to the reasonably foreseeable impacts associated with potential crude oil transport over the Tennessee Pass Line in Colorado." J.A. 597. Notably, while this letter does request that the Board assess certain recreation concerns in the Uinta Basin, it does not make the same request for downline resources. Further, the letter discusses the reactivation of the Tennessee Pass Line, which we have already found was not reasonably foreseeable. The County also cites one vague comment, which asserted that "the small communities of Colorado are too often the ones to pay the price

for external business ventures such as the [Railway]." *Id.* at 546.

These comments in no way alert the Board to the County's specific challenges relating to downline impacts on biological resources, land use and recreation, or even impacts related to increased noise. The Board did not act arbitrarily in declining to address these "cryptic and obscure reference[s]" in the Final EIS. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554 (1978).

**3.**

Finally, the Center argues that the Board's direct effects analysis failed to take a hard look at the geological risk of landslides attributable to the Railway. Ultimately, this argument is unpersuasive.

As part of its analysis of direct impacts, the Board "determine[d] the potential impacts related to geology, soils, and seismic hazards that could result from construction and operation" of the three Action Alternatives. J.A. 1014. The OEA conducted a baseline analysis of the "geological and seismic characteristics of the study area" and then identified "unstable geologic units for each alternative and the correlating risk of mass movement." Board Br. 63.

The analysis was based on, among other things, "maps of unstable geological units[,] maps of areas with steep slopes which present higher landslide risk," and maps depicting landslide risks. *Id.* at 66. The Board concedes that the landslide maps it employed were "incomplete and likely understated the areas affected by mass movement and that there could be unmapped abandoned mines," as acknowledged in the Final EIS. *Id.* at 65. Regardless, the Board recognized that all three Action Alternatives posed an increased risk of landslides

46

based on the data it had available but found that mitigation measures could be imposed such that "the impacts would not be significant." *Id.* at 63 (citing J.A. 1031).

The Center's primary objection is a simple one: the "landslide hazards throughout the bulk of the study area are unknown." Center Br. 35 (citing J.A. 1019–20). In addition, the Center objects to the Board's reliance on mitigation measures that include "post-approval surveys" to be conducted by the Coalition after the Railway is approved. *Id.* at 35–36 (citing J.A. 1024). The Center complains that the Board cannot assume insignificant impact when "the EIS neither identified nor analyzed site-specific hazards [such that] the nature and extent of the problem are unknown." *Id.* at 37–38. Without a more fulsome understanding of the landslide risk across the three Action Alternatives, the Center asserts, the Board could not say it took a "hard look" at which of the alternatives had the least risk of landslide hazards. Moreover, it could not pawn off its NEPA responsibilities to take a hard look at potential landslide risk to the Coalition, who the Board assumes will conduct the necessary geological surveys once construction begins.

As in its analysis of accident risk, the Board lacked data regarding landslide risk in the relevant area but pressed forward. Here, however, the Board actually met its burden under 40 C.F.R. § 1502.22 (2019).

The Board evaluated the available information, disclosed that information relevant to its environmental impact analysis was incomplete or unavailable, summarized "existing credible scientific evidence" relevant to those impacts, and evaluated the environmental impacts of its actions based on "generally accepted" research methods, theoretical approaches, and credible evidence. *See id.* § 1502.22(b). The Board relied upon

47

information beyond the "incomplete" mapping datasets, including "other data sets that were complete," and "concluded that the available information was sufficient to compare the Action Alternatives and assess the potential impacts of each." Board Br. 65–66 (citing J.A. 1266); *see also* J.A. 1019. Since the Board "explain[ed] in the EIS why the information was unavailable and what actions the agency took to address that unavailability," it was not a violation of NEPA for the Board to reach its determination that landslide risk would not be significant absent suggestions from parties as to better available data. *Oglala*, 45 F.4th at 300 (citing 40 C.F.R. § 1502.22(b) (2020)).

## B.

### 1.

The Center also raises objections related to the Biological Opinion, which was developed by the Service after the Board, as the action agency, sought formal consultation under the ESA.

The Board began the consultation process by conducting "a threshold biological assessment." *Center II*, 56 F.4th at 62. The purpose of a biological assessment is determining both "the species, habitats, and geographic areas that may be present" and "setting forth an empirically based judgment whether the proposed action may affect a listed species or critical habitat." *Id.* The relevant geographic area, or "action area," used in the biological assessment is defined "as all areas to be affected directly or indirectly by the proposed project and not merely the area immediately adjacent to the action." J.A. 1756; *see also* 50 C.F.R. § 402.02.

The Biological Assessment identified that certain protected species of fish in the upper Colorado River Basin

48

may be affected by the Railway.  J.A. 1727.  These included the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub.  *Id.*  Accordingly, the action area for protected fish species was defined, in part, as not only including "streams and other surface waters in the project footprint and a limited distance upstream and downstream of the [Railway]," but also the area "concurrent with the Upper Colorado River Basin" affected by water depletion that may arise from the construction and operation of the Railway.  *Id.* at 1757.

The Board then sought formal consultation of the Service. For a formal consultation, the Service "write[s] a biological opinion using information in the biological assessment and the best scientific and commercial data available to determine whether the agency action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  *Center II*, 56 F.4th at 62–63. (quotation marks and citations omitted).  The Service will also "include[] an evaluation of the basis for [its] findings."  *Id.* at 63.  Here, the Service adopted the Board's proposed action area, defining it as:  "(1) the entire project footprint, (2) a 300-foot buffer around the project footprint, and (3) the area of the Upper Colorado River Basin affected by water depletions."  Br. of Resp't U.S. Fish and Wildlife Serv. 11 [hereinafter "Serv. Br."] (citing J.A. 1660).  In the BiOp, "the Service concluded that the proposed project is not likely to jeopardize the continued existence of the [four federally listed fish species in the affected area of the Upper Colorado River Basin] or result in destruction or adverse modification of designated critical habitat."  *Id.* at 8 (citing J.A. 1696).

49

**2.**

The Center objects to the Board's determination of the relevant action area and the Service's adoption of that action area in the BiOp.  By considering only the possible effects of water depletion—as the Center argues—the Board ignored comments that increased rail traffic may lead to "contamination from spills and leaks" along the Union Pacific Line where it intersects with the Colorado River, which may pose harm to the protected fish and their critical habitat.  Center Br. 43.  For this reason, the Center urges the Court to find that the BiOp and Board's Final Exemption Order, which relied upon the BiOp, are arbitrary and capricious.  *Id.*

Both the Service and the Board contend that the decision was supported by a "rational and sufficient" explanation.  Serv. Br. 11–12; *see also* Board Br. 53–54.  While recognizing that "any active rail line" would expose adjacent water resources to "minor leaks or drips of fuel or lubricants" from train traffic or a larger spill from a derailment, the Board reasoned that the Railway "would not introduce a new potential source of pollution along the existing [Union Pacific] rail line" since trains have traveled the Union Pacific Line for many years. J.A. 1845.  The Board notes that "an effect must be 'reasonably certain to occur' to be an effect of the proposed action," and states that the Board reasonably concluded and explained "that the risk of a large spill is so low as to not be reasonably foreseeable and that adding project-related trains would not substantially change the severity of impacts that already exist." Board Br. 53 (citing J.A. 996).  The Service contends that both agencies are owed deference regarding how they defined the action area, *see* Serv. Br. 9, and asserts that even though the BiOp "does not repeat the analysis the Board already conducted," the "Service reasonably relied on the Board's analysis when issuing the [BiOp]," *id.* at 13.

50

The Board's reasoning for narrowly defining the action area to not include waterways downline near the Union Pacific Line is unreasoned and fails to demonstrate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Though it is obvious that the increased traffic on the Union Pacific Line "would not introduce a *new* potential source of pollution," J.A. 1845 (emphasis added), it is entirely unclear from the record why the Board determined that the additional train traffic—with the attendant increase in "leaks or drips of fuel or lubricants"—"would not substantially change the severity of impacts" on the protected species near the Union Pacific Line, *id.*

This reasoning is especially flawed given the Board's recognition that the Union Pacific Line segment "currently has a low volume of rail traffic relative to the predicted traffic" due to the Railway and the likely flawed analysis of accident risk, as discussed above. *Id.* at 899. Though we accord deference "on matters relating to their areas of technical expertise[,] [w]e do not . . . simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006). Here, the Board failed to adequately explain its reasoning given the record evidence.

The Service's adoption of the Board's proposed action area causes the BiOp itself to be flawed as a result. While the Board was required to provide "[a] map or description" of the action area in its initiation of formal consultation with the Service, 50 C.F.R. § 402.14(c)(1)(ii), the Service had an independent duty to determine the proper scope of ESA review,

51

*id.* § 402.14(g).  The relevant regulations even require a review of the "relevant information provided by the [action] agency" that "may include an on-site inspection of the action area." *Id.* § 402.14(g)(1).  The formal consultation process "ensures that [government action] likely to jeopardize any species protected by the ESA either not be taken without consideration of those risks or yield to safer alternatives." *Center II*, 56 F.4th at 63 (citing 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.15).  Here, the Service never considered possible risks to protected species downline based on the Board's faulty reasoning and therefore did not fulfill its important function under the ESA.  That is not how ESA consultation by an action agency with the expert Services is supposed to work.

The Board arbitrarily narrowed the scope of ESA review, and the Service adopted that flawed determination without interrogation.  Where, as here, an agency determination is not supported by reasoned decisionmaking, "the agency's decision cannot withstand judicial review." *Tripoli,* 437 F.3d at 77.  Both the BiOp and the Board's Final Exemption Order, to the extent it relies upon the BiOp, are arbitrary and capricious.  Not only is this violative of the ESA, but the Board also cannot satisfy its NEPA requirements by pointing to the Biological Opinion.

## C.

The County contends that the Board erred in two ways with regards to the NHPA.

First, it urges us to find that the Board failed to "consult with Eagle County regarding the effects of the Railway's operations on historic properties in Eagle County," Cnty. Br. 41, as required under the NHPA, 54 U.S.C. § 304108, and related regulations, *see* 36 C.F.R. § 800.2(c)(3) ("A representative of a local government with jurisdiction over the

52

area in which the effects of an undertaking may occur is entitled to participate as a consulting party."). This process is known as the "Section 106 consultation," Cnty. Br. 42, and the County argues the Board "arbitrarily restricted consultation with local governments to Utah counties near the rail line proposed to be constructed" despite the known increase in rail traffic and train noise downline, *id.* at 43.

Second, the County identifies "properties included on the National Register and located close to the Union Pacific Line, including historic cabins, prehistoric rock art, and the segment of the [Union Pacific] Line running through the County" that it says will be impacted by the increased rail traffic downline. *Id.* at 44. It notes that the Board's limitation of the NHPA evaluation to the area adjacent to the Railway arbitrarily failed to evaluate historic properties downline that would be impacted by "engine emissions" and "long-term railroad noise and vibration." *Id.* at 44–45.

"[S]ection 106 of the Historic Preservation Act is a 'stop, look, and listen' provision; it requires federal agencies to take into account the effect of their actions on structures eligible for inclusion in the National Register of Historic Places." *Illinois Com. Comm'n v. ICC*, 848 F.2d 1246, 1260–61 (D.C. Cir. 1988) (per curiam). "In fulfilling this obligation, agencies must consult with certain stakeholders in the potentially affected areas, including representatives of local governments." *City of Phoenix v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017), *opinion amended on reh'g*, 881 F.3d 932 (D.C. Cir. 2018) (Mem.). Regulations define "consultation" as "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f).

53

We have little precedent concerning what standards the agencies must use to comply with their NHPA consultation obligations.  *See generally* Kathryn Sears Ore, *Form and Substance: The National Historic Preservation Act, Badger-Two Medicine, and Meaningful Consultation*, 38 PUB. LAND & RES. L. REV. 205, 223 (2017) (describing the "lack of specificity" in consultation requirements).  However, it is undisputed that the Board contacted numerous Colorado entities, including the Colorado State Historic Preservation Office, and invited the public to provide feedback throughout the EIS process.  The Board's "process of seeking, discussing, and considering the views of other[s]," 36 C.F.R. § 800.16(f), through its EIS process was sufficient here, especially since the County participated and could have raised its concerns.

The County's argument that the Board arbitrarily ignored alleged impacts to historic resources along the Union Pacific Line is also unavailing.  It is a bedrock principle of administrative law that objections must be first made to the agency during the administrative proceedings, so it has the opportunity to change course.  *See Maryland v. EPA*, 958 F.3d 1185, 1210 (D.C. Cir. 2020) (per curiam) (collecting cases) ("[G]eneral administrative-law principles require timely preservation of issues before the agency.").  Here, the County had ample opportunity to raise any concerns related to historic resources downline given its active participation in the EIS process.  Yet, the County effectively concedes that it failed to name any historic resources during those proceedings or notify the Board of potential impacts to those resources.  *See* County Reply Br. 15–16.  Under this record, we find no violation of the NHPA.

54

**D.**

Finally, Petitioners contend that the Final Exemption Order is arbitrary and capricious under the ICCT Act. We agree.

**1.**

In granting an exemption from the ICCT Act's full application requirements, the rail transportation policy provided in 49 U.S.C. § 10101 "must guide the [Board] in all its decisions." *Illinois Com. Comm'n v. ICC*, 787 F.2d 616, 627 (D.C. Cir. 1986) (quoting *Coal Exporters Ass'n of U.S., Inc. v. United States*, 745 F.2d 76, 94 n.22 (D.C. Cir. 1984)). While the Board does not necessarily have to "address each and every one of the policy's fifteen components," it "must consider all aspects of the policy bearing on the propriety of the exemption and must supply an acceptable rationale therefor." *Illinois Com. Comm'n*, 787 F.2d at 627. "All that is necessary is that the essential basis of the [Board's] rationale be clear enough so that a court can satisfy itself that the [Board] has performed its function." *Coal Exporters Ass'n*, 745 F.2d at 94 n.22 (quoting *Alamo Exp., Inc. v. ICC*, 673 F.2d 852, 860 (5th Cir. 1982)).

Here, the Board identified several different components of the rail transportation policy as relevant to the Coalition's exemption petition.

The first set were discussed in the Preliminary Exemption Order, which concerned the Railway's transportation benefits. These components can be described as "economic" and "regulatory" policies. They include the policies of "ensur[ing] the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national

55

defense," 49 U.S.C. § 10101(4); "ensur[ing] effective competition and coordination between rail carriers and other modes," *id.* § 10101(5); "minimiz[ing] the need for Federal regulatory control over the rail transportation system," *id.* § 10101(2); and "reduc[ing] regulatory barriers to entry into and exit from the industry," *id.* § 10101(7).

The Preliminary Exemption Order provided that the Railway "would provide shippers in the Basin the opportunity to enter markets they currently cannot access due to cost constraints and the ability to import materials into the Basin at a more economical cost." *Preliminary Exemption Order*, 2021 WL 41926, at *9.  Further, the Board asserted that the Railway "would enhance competition by providing shippers in the area with a freight rail option that does not currently exist and foster sound economic conditions in transportation." *Id.*  It explained that the exemption would meet the remaining policies related to minimizing federal regulatory control and reducing regulatory barriers "by minimizing the time and administrative expense associated with the construction and commencement of operations." *Id.*  In the Final Exemption Order, the Board reiterated these points and added that it "c[ould] grant the Coalition's request for authority even if all issues involving financing [were] not yet resolved because the grant of authority is permissive, not mandatory, and the ultimate decision on whether to proceed will be in the hands of the Coalition and the marketplace, not the Board." *Final Exemption Order*, 2021 WL 5960905, at *23.  With this assessment, the Board ultimately found that "the transportation merits of the project outweigh[ed] the environmental impacts." *Id.* at *24.

The second set of Rail Policies were addressed in the Final Exemption Order and could be described as "environmental" policies.  These include "operat[ing] transportation facilities and equipment without detriment to the public health and

56

safety," 49 U.S.C. § 10101(8), and "encourag[ing] . . . safe and suitable working conditions in the railroad industry," *id.* § 10101(11). The Board "consider[ed] and weigh[ed] the information collected during the NEPA process to inform [the] agency's" consideration of these policies. Board Br. 75. In addition, the Final Exemption Order recognized objections made during the administrative proceedings related to the environmental policies, specifically "potential safety risks related to wildfires and increased truck traffic." *Id.* at 72. The Board provided that the "OEA . . . demonstrated in its Final EIS that there only would be a small risk of forest fire," *Final Exemption Order*, 2021 WL 5960905, at *24, and "included extensive examination of potential increases in safety risks related to wildfires and increased vehicular traffic," Board Br. 74 (citing J.A. 875–93, 963–65, 991–92). The Board contends that it "reasonably found that §§ 10101(8) & (11) did not warrant denying the exemption, as the increased wildfire and truck traffic risks were small and would be lessened by Board-imposed mitigation." *Id.* (citing *Final Exemption Order*, 2021 WL 5960905, *22–24).

In sum, the Board determined that "the construction and operation of [the Railway] will have substantial transportation and economic benefits" that outweigh the environmental impacts. *Final Exemption Order*, 2021 WL 5960905, at *23. It described the environmental impacts as "unavoidable" "as with most other rail construction Projects" but subject to extensive mitigation that would "minimize those impacts to the extent practicable." *Id.* at *23.

Petitioners lodge several objections.

First, the County claims that the Board departed from its prior precedent in granting the Coalition's request for preliminary exemption contingent upon a later determination

57

of the environmental issues.  It notes that the Board's precedent requires a showing of "unique or compelling" circumstances in order to issue a preliminary decision on the transportation merits of a petition prior to completing its environmental review, but here the Board only offered "vague, unsupported references to the 'economic circumstances' or the 'pandemic.'" Cnty. Br. 18.

The County also contends that the Board failed to consider all of the relevant environmental Rail Policies, including the policy of "encourag[ing] and promot[ing] energy conservation," 49 U.S.C § 10101(14), and arbitrarily relied on the ones it did consider.  Among other things, the County asserts that the Board ignored "substantial record evidence demonstrating that the Railway is economically unsound," highlighting "the Coalition's own redacted study that questioned the stability of oil markets, the market for Uinta oil, and investor appetite for the Railway."  Cnty. Br. 25.

Finally, the Center states that the Board's reliance on the flawed EIS and BiOp resulted in a "skewed weighing of harms and benefits," Center Br. 47, noting that Board's significant discussion of the Railway's "speculative economic benefits" effectively glossed over the fact that the "benefits from expanded oil production" necessarily result in significant environmental harms, *id.* at 45.

**2.**

Regardless of the merit of the County's argument that the Board departed from its prior precedent in allowing conditional grant of exemption on the transportation merits, we will not address the Preliminary Exemption Order in its own right. Petitioners' varied objections as to the conditional grant process apply in any event to the ultimate weighing employed in the Final Exemption Order. We will instead review the

58

Board's transportation merits analysis and the challenges to it as incorporated into and reflected in its final determination.

The Board's fundamental task here was to "properly consider[] and appl[y]" the relevant Rail Policies in its determination on the Coalition's exemption petition. *Coal Exporters Ass'n*, 745 F.2d at 94 n.22. It is clear from the Final Exemption Order that the Board failed at every juncture.

First, the Board did not provide "adequate attention" to comments questioning the financial viability of the Railway and therefore did not properly consider the relevant economic and regulatory policies. *Illinois Com. Comm'n*, 787 F.2d at 630. As the County highlights, the Coalition asked a third party, R.L. Banks, "to prepare a detailed 2018 feasibility study addressing the viability of the [Railway]" "prior to seeking authority from the Board." *Preliminary Exemption Order*, 2021 WL 41926, at *6. The Center obtained a redacted copy of the feasibility study that it provided to the Board. *See id.* The redacted copy apparently called into question "the demand for the type of oil extracted from the Uinta Basin" and the financial viability of the Railway overall. *Id.* at *15 (Oberman, Bd. Mbr., dissenting).

The Board did not address the Center's objection that the redacted material from the study was needed to gauge the economic viability of the Railway. Instead, the Board explained that "nothing in the language of § 10502 . . . suggest[s] that an exemption proceeding is inappropriate if the viability of the proposed rail line is questioned." *Preliminary Exemption Order*, 2021 WL 41926, at *6 (citing *Alaska Survival v. STB*, 705 F.3d 1073, 1082 (9th Cir. 2013) ("[N]either § 10502 nor the STB's implementing regulations indicate that an exemption proceeding is improper when the project's financial viability is questioned.")). It also provided

59

"that the ultimate decision to go forward with an approved project is in the hands of the applicant and the financial marketplace, not the agency." *Id.* (citing *Mid States Coal. for Progress v. STB*, 345 F.3d 520, 552 (8th Cir. 2003)).  For these reasons, the Board determined that it "[did] not need the material currently redacted in the R.L. Banks 2018 feasibility study obtained by the Center, despite the Center's claim to the contrary." *Id.* at *7 n.8.

The Board's argument is essentially that the financial viability of a project, specifically whether it can get upfront and ongoing financing, does not implicate the Rail Policies, so the Board does not need to address project viability or respond to comments challenging it.  This interpretation, however, runs counter to the fourth and fifth Rail Policies relied on in the Preliminary and Final Exemption Orders.  As was raised in the Center's reply to the Coalition's petition for exemption, it would not "ensure the development and continuation of a sound rail transportation system . . . to meet the needs of the public," 49 U.S.C.A. § 10101(4), "if the applicant were to start construction but not be able to complete the project and provide the proposed service" due to lack of financing, J.A. 300 (quoting *Great Lakes Basin Transp., Inc.—Rail Const. & Operation—In Rock Cnty., Wisc., Winnebago, Ogle, Lee, Lasalle, Grundy, And Kankakee Cntys., Ill., and Lake, Porter, and Laporte Cntys., Ind.*, S.T.B. Fin. Docket 35952, 2017 WL 3835978, at *4 (STB served Aug. 31, 2017)).  The STB decision referenced by the Center did not deal with an exemption petition but rather a full application under 49 U.S.C. § 10901, but this reasoning still has force when considering the language of the fourth and fifth Rail Policies.

Despite its protestations to the contrary, the Board cannot ignore and, in the past, has not ignored serious concerns about financial viability in determining the transportation merits of a

60

project.  *See, e.g.*, *Texas Cent. R.R. & Infrastructure, Inc. & Texas Cent. R.R., LLC-Petition for Exemption-Passenger Rail Line Between Dallas & Houston, Tex.*, S.T.B. Fin. Docket 36025, 2020 WL 4036897, at \*12 (STB served July 16, 2020). In *Texas Central Railroad*, the Board required the full application process after "significant questions had been raised" about the financial viability of a project where the estimated costs increased "from over \$10 billion to over \$20 billion (with one estimate over \$30 billion)."  *Preliminary Exemption Order*, 2021 WL 41926, at \*7.  The Board explained that the discrepancy was not adequately addressed and there were "conflicting statements" on the "extent of nonmarket funding sources."  *Id.*

The Board attempts to distinguish the Railway from *Texas Central* and other matters in which it found the full application process was necessary.  It reiterates its categorical rule that "the ultimate test of financial fitness is in the hands of the applicant and marketplace" so uncertainty about financial viability is not relevant to its determination.  *Id.* at 7 n.10; *see also* Board Br. 77–78.  In the Preliminary Exemption Order, the Board also articulates a separate test of sorts to establish when an exemption petition should be denied in light of a project's financial viability.  It provides that when two factors—an "increase in project costs or uncertainty about funding"—"are both substantial and inadequately or inconsistently addressed, combined with other relevant factors, including the extent to which the marketplace will assess financial fitness, additional scrutiny may be warranted."  *Preliminary Exemption Order*, 2021 WL 41926, at 7 n.10.  But the Board insists that the there was only "some uncertainty" as to the financing of the Railway, so a full application process was unnecessary.  *Id.* at \*7–8.

The Board's reasoning is unavailing.  These tests are nothing more than the adoption of a new rule without real

61

explanation for its "changing position." *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020). At bottom, a project that is in doubt of ever materializing or continuing to operate cannot accomplish any of the transportation merits identified by the Board. And, the Board has applied that reasoning in prior cases in which "[c]ommenters . . . have raised significant questions surrounding the financial feasibility of [a] proposed rail project." *Texas Cent.*, 2020 WL 4036897, at *12. Given the record evidence identified by Petitioners—including the 2018 feasibility study—there is similar reason to doubt the financial viability of the Railway. Of course, our Court "may permit agency action to stand without elaborate explanation where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears." *Bush-Quayle '92 Primary Comm., Inc. v. FEC*, 104 F.3d 448, 454 (D.C. Cir. 1997). Here, however, the Board fails to explain how the financial uncertainty unearthed by Petitioners is meaningfully distinct from the Board's prior precedent. In both, significant questions regarding the financial viability of the proposed project were raised. Yet, in this latter case, the Board has elected to ignore these concerns despite their application to the relevant Rail Policies. Accordingly, the Board's adoption of this new rule of washing its hands of any concern for financial viability is "an inexcusable departure from the essential requirement of reasoned decision making." *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (quoting *Columbia Broad. Sys., Inc. v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971)).

Second, with respect to its consideration of the environmental policies, the Board relies solely on its EIS. *See Final Exemption Order*, 2021 WL 5960905, at *22. As we have held, the EIS is arbitrary and capricious, so those errors infect the final determination as well. Even so, the Board's discussion of the environmental policies in the Final

62

Exemption Order separately demonstrate that the Board did not adequately consider the incredibly significant environmental effects identified in the EIS in weighing those impacts against the uncertain transportation benefits of the Railway. The "cumulative" effects within the Uinta Basin of a major expansion of oil drilling there, on Gulf Coast communities of refining the oil, and the climate effects of the combustion of the fuel intended to be extracted are foreseeable environmental effects of the project. These are effects the Board ultimately has the authority to prevent. The Board was required not only to identify those effects under NEPA, as discussed above, but also to weigh them in its ICCT Act analysis. Its failure to do so contributes to our conclusion that the Board's order is arbitrary and capricious.

As an initial matter, the Center has failed here, just as it failed under NEPA, to show that consideration of downstream emissions as cumulative versus indirect effects itself skewed the Board's analysis in any material way under the ICCT Act. In its final order, the Board acknowledged these impacts and explained "that its analysis of these impacts would be the same whether they were labeled cumulative or indirect." *Final Exemption Order*, 2021 WL 5960905, at *18 n.15. Taking the Board at its word that its treatment of downstream emissions in its Final Determination is no different due to their categorization as "cumulative effects" instead of "indirect effects," the Board was required to weigh them as cumulative effects just as it would weigh any indirect effect of the project.

The Board largely concedes in its briefing that it did not evaluate the energy conservation policy, providing that it "addressed numerous energy-related issues throughout" but not this particular policy. Board Br. 77.[2] The Court, however,

_____

[2] The Board claims that the County did not timely raise its objection related to the Board's failure to consider the energy conservation

63

can only uphold the agency's action "on the basis articulated by the agency itself," *State Farm*, 463 U.S. at 50, and "may not substitute [its] judgment for that of the [Board]," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019). This, however, is exactly what the Board asks of the Court. Based on its nebulous references in the record to "potential issues related to energy," Board Br. 77, we should apparently create from whole cloth a reasoned consideration of the energy conservation policy. This we cannot do.

The limited weighing of the other environmental policies the Board did undertake fails to demonstrate any serious grappling with the significant potential for environmental harm stemming from the project. The Final Exemption Order completely glossed over the objection that "the project's many significant environmental impacts" necessitated additional scrutiny and "more extensive proceedings." *Final Exemption Order*, 2021 WL 5960905, at *23. Instead, its "weighing" of environmental impacts and transportation merits only directly references the EIS to claim that "there only would be a small

_____

policy. *See* Board Br. 75–77. Generally, "reviewing courts . . . will not consider an argument that was not raised before the agency 'at the time appropriate under its practice.'" *Riffin v. STB*, 733 F.3d 340, 343 (D.C. Cir. 2013) (citing *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). While the County did not raise this issue in a formal objection to the Coalition's exemption petition, it did provide this specific objection in response to the Draft EIS, specifically asserting that the Railway's "consequences will likely also detract rather than encourage and promote energy conservation." J.A. 760. Raising this objection when the Board said it would consider environmental impacts is a "time appropriate under [the Board's] practice." *Riffin*, 733 F.3d at 343. Since the Board had the "opportunity for correction," the County did not forfeit this objection and this issue can be considered "reviewable by the [C]ourt[]." *Id.* (citing *L. A. Tucker*, 344 U.S. at 37).

64

risk of forest fire" and "truck traffic would not significantly increase on major roads as a result of construction and operation of the [Railway]." *Id.* at *24. Otherwise, the Board hurriedly disposed of Petitioners' environmental objections with assertions that the mitigation discussed in the Final EIS was sufficient and that the Board modified certain mitigation measures to ensure clarity. *Id.* at *24–25. With this paltry discussion, the Board determined that "the transportation merits of the project outweigh[ed] the environmental impacts." *Id.* at *24.

The Board is required to compare both sides of the ledger, not just acknowledge that both sides exist. And it may not completely ignore a "policy bearing on the propriety of the exemption" as it did here with the energy conservation policy. *Illinois Com. Comm'n*, 787 F.2d at 627. As the Board identified, on one side of the scale the Railway could result in nearly one percent of total U.S. greenhouse gas emissions and the increased rail traffic downline could cause amplified risk of wildfires, the potential of derailed trains on an annual basis, and crude oil spills in critical habitats and sensitive water resources that are home to endangered species. On the other side, the Railway may open up new markets for crude oil transportation, assuming the project is financially viable—an assumption that is not clear from this record. The Board's consideration of these impacts and benefits was cursory at best, leaving little question that the ICCT Act necessitated a more fulsome explanation for the Board's conclusion that the Railway's transportation benefits outweighed the project's environmental impacts.

It is not our job to decide whether the Board ultimately arrived at the right outcome in light of its findings. *See State Farm*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to

65

substitute its judgment for that of the agency."). However, it is clear that the Board failed to adequately consider the Rail Policies and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotation marks omitted). The Board's protestations at argument that it is just a "transportation agency" and therefore cannot allow the reasonably foreseeable environmental impacts of a proposed rail line to influence its ultimate determination, *see* Oral Arg. Tr. 84:19–20; 85:20, ignore Congress's command that it make expert and reasoned judgments that "properly consider[] and appl[y]" the relevant Rail Policies prior to granting an exemption from its full application requirements, *Coal Exporters Ass'n*, 745 F.2d at 94 n.22. Here, those Rail Policies include the environmental impacts of the Railway, and the Board failed to fulfill its obligation under the ICCT Act to consider them alongside any potential economic benefits.

The Board failed to "supply an acceptable rationale" as to its consideration of the relevant Rail Policies and therefore the Final Exemption Order was issued in violation of the ICCT Act. *Illinois Com. Comm'n*, 787 F.2d at 627.

## IV.

We are left to consider the remedy. "The decision to vacate depends on two factors: the likelihood that 'deficiencies' in an order can be redressed on remand, even if the agency reaches the same result, and the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

The deficiencies here are significant. We have found numerous NEPA violations arising from the EIS, including the

66

failures to: (1) quantify reasonably foreseeable upstream and downstream impacts on vegetation and special-status species of increased drilling in the Uinta Basin and increased oil-train traffic along the Union Pacific Line, as well as the effects of oil refining on environmental justice communities the Gulf Coast; (2) take a hard look at wildfire risk as well as impacts on water resources downline; and (3) explain the lack of available information on local accident risk in accordance with 40 C.F.R. § 1502.22(b) (2020). The EIS is further called into question since the BiOp failed to assess impacts on the Colorado River fishes downline.

The poor environmental review alone renders arbitrary the Board's consideration of the relevant Rail Policies and the final order's exemption of the Railway. Yet, the Board also failed to conduct a reasoned application of the appropriate Rail Policies as required under the ICCT Act. The Board failed to weigh the Project's uncertain financial viability and the full potential for environmental harm against the transportation benefits it identified.

"'[V]acatur is the normal remedy' when a rule is found unlawful," and we see no reason to depart from our normal practice here given the lack of argument from the Board, Service, or the Coalition, that vacatur would be disruptive. *Am. Pub. Gas Ass'n v. Dep't of Energy*, 22 F.4th 1018, 1030 (D.C. Cir. 2022) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).

Accordingly, we grant the petitions in part and vacate the Final Exemption Order as arbitrary and capricious. Further, we vacate the EIS and BiOp in part for the reasons described above. This matter is remanded to the Board for further proceedings in accordance with this opinion.

*So ordered.*